UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :  No. 3:15CR1(JAM)
                                :
          vs.                   :
                                :
IAN PARKER BICK,                :
                                :  New Haven, Connecticut
                  Defendant     :  November 10, 2015
                                :
- - - - - - - - - - - - - - - - x
```

EXCERPT OF JURY TRIAL

TESTIMONY OF JOHN WROBEL

    BEFORE:

        THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

                    and a Jury of Twelve


APPEARANCES:

        FOR THE GOVERNMENT:

            OFFICE OF THE UNITED STATES ATTORNEY
            157 Church Street, 23rd Floor
            New Haven, Connecticut 06510
            BY:  MICHAEL S. McGARRY, AUSA
                 CHRISTOPHER W. SCHMEISSER, AUSA

        FOR THE DEFENDANT:

            LAW OFFICE OF JONATHAN J. EINHORN
                129 Whitney Avenue
                New Haven, Connecticut 06510
            BY:  JONATHAN J. EINHORN, ESQ.


                            Diana Huntington, RDR, CRR
                            Official Court Reporter

1                       TABLE OF CONTENTS

2

3

GOVERNMENT                                                    VOIR
4  WITNESS              DIRECT   CROSS   REDIRECT   RECROSS   DIRE

5  JOHN WROBEL
     By Mr. McGarry        4
6    By Mr. Einhorn                                            16
     By Mr. McGarry       20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    *     *     *     *     *

 2                     (Excerpt as follows:)

 3              MR. McGARRY:  The government calls Mr. John

 4    Wrobel to the stand.

 5              THE CLERK:  Please raise your right hand.

 6

 7                    JOHN WROBEL,

 8         called as a witness, having been first duly

 9         sworn, was examined and testified as follows:

10

11              THE CLERK:  Please be seated.

12              Please state your name.

13              THE WITNESS:  John Wrobel.

14              THE CLERK:  Please spell your last name?

15              THE WITNESS:  W-R-O-B-E-L.

16              THE CLERK:  Please state your city and state

17    only?

18              THE WITNESS:  Philadelphia, PA.

19              MR. McGARRY:  Your Honor, for housekeeping

20    matters, before I inquire, the government plans to

21    introduce and will offer now exhibits in full the

22    following exhibits:  Government Exhibits 14, 21, 32, 41,

23    49, 50, 51, 73, 383, 575, 576, 583, 601, 625, 633, 635,

24    641, 642, 643, 675, 680, 732, 734, 735, 736, 759, 875,

25    925, 951, 955, 956, 957, 958, 976, 1103 and 1150.
```

```
 1              THE COURT:  All right.  Any objection?

 2              MR. EINHORN:  As long as none of those are

 3   photographs yet, I'm okay.

 4              MR. McGARRY:  I did my best to eliminate from

 5   the list the photos that I recognized the numbers.

 6              THE COURT:  That we'll want to check through,

 7   yes.  That sounds fine.  Those are full exhibits.

 8              Please proceed.

 9                  (Government Exhibits 14, 21, 32, 41, 49, 50,

10                   51, 73, 383, 575, 576, 583, 601, 625, 633,

11                   635, 641, 642, 643, 675, 680, 732, 734, 735,

12                   736, 759, 875, 925, 951, 955, 956, 957, 958,

13                   976, 1103 and 1150 marked in evidence.)

14

15                      DIRECT EXAMINATION

16   BY MR. McGARRY:

17   Q.   Good afternoon, Mr. Wrobel.

18   A.   Good afternoon.

19   Q.   You mentioned your current city that you're from is

20   Philadelphia, Pennsylvania.  What are you doing in Philly?

21   A.   I'm going to school.

22   Q.   Where do you go to school?

23   A.   Temple University.

24   Q.   What grade are you in?  I shouldn't say that, sorry.

25   What year of college are you in?
```

1   A.   I'm a junior, third year.

2   Q.   And where are you from originally?  Where does your

3   family live?  Where did you previously call home or maybe

4   you still call it home?

5   A.   Danbury, Connecticut.

6   Q.   Where did you go to high school?

7   A.   Danbury High School.

8   Q.   Do you know the defendant, Ian Bick?

9   A.   Yes, I do.

10  Q.   Did you go to school with him?

11  A.   I did.

12  Q.   Okay.  When you were in school with him, were you

13  familiar with parties that he organized at the Matrix,

14  whether they were dance parties, raves, whatever they were

15  called, were you familiar with those?

16  A.   Yes.

17  Q.   Did you invest monies into those events?

18  A.   I did.

19  Q.   Tell the jury a little bit just briefly, if you

20  would, about those events, investing in those events and

21  how one sought to make money?

22  A.   So Ian had this entertainment company, Planet

23  Entertainment, and he would take, you know, investors'

24  money.  And with our money he would host these teen

25  events, raves, parties, what have you.  And then from the

1    profits, you would then get your money back.

2    Q.   And did the investors or the people who were loaning

3    money into this venture, did they also have a certain

4    sweat equity into the events, meaning were they tasked

5    with helping promote them?

6    A.   Some were, but it was not in the contract.   They

7    didn't have to, no.

8    Q.   Did you give him money for these events?

9    A.   I did.

10   Q.   Were you -- did you make money?

11   A.   I did.

12   Q.   Did anyone else in your family invest or loan him

13   money for these events?

14   A.   Yes, they did.

15   Q.   Who was that?

16   A.   My sister, Kathleen Wrobel.

17   Q.   And she made some money on these events?

18   A.   Yes, she did.

19   Q.   Separate and apart from these events, did you also

20   yourself have some kind of business when you were in high

21   school?

22   A.   I did.

23   Q.   Was it your own business run from your house?

24   A.   Yes.

25   Q.   Tell the jury about that.

1   A.   So when I was in high school, I was selling iPhones

2   on eBay.  What I would do is I would find kids with broken

3   iPhones usually in school or outside school, cracked

4   screens.  And I would take them, flip them and sell them

5   on eBay.

6   Q.   I'm sorry, you said you would flip -- fix them?

7   A.   Fix them or flip them.

8   Q.   What do you mean by "flip"?

9   A.   I would buy it broken and sell it broken.

10  Q.   And you would somehow make money on this?

11  A.   Yes.

12  Q.   And approximately how long did you do this?  What

13  year did you start, what year did you finish?

14  A.   I started in my late sophomore year in high school.

15  I was doing it until early freshman year in college.

16  Q.   And approximately how much do you think you would

17  make on an annual basis doing this?

18  A.   Annual basis, couple thousand dollars.

19  Q.   And you were friends with Ian Bick at this time?

20  A.   Yes.

21  Q.   Did he know about your iPhone repair and resell

22  business?

23  A.   He did.

24  Q.   Did that business have a name?  Did you call yourself

25  anything?  Did you have anything on eBay or anything

 1  related to that?

 2  A.    No.

 3  Q.    How did you sell these fixed or phones that you were

 4  reselling?

 5  A.    I would just either sell them at auction or Buy It

 6  Now on eBay.

 7  Q.    I'm going to stop you for a second.  You said sell it

 8  at auction or sell it Buy It Now.  It's probably a small

 9  point, but just so we're all on the same page, you would

10  post it onto eBay?

11  A.    Yes.

12  Q.    And there are different ways people can bid on eBay?

13  A.    Correct.

14  Q.    And one of the ways is what, an auction?

15  A.    Auction.

16  Q.    And what's the other way?

17  A.    Just to Buy It Now.

18  Q.    And they could just click it and buy it?

19  A.    Correct.

20  Q.    Did you talk to Ian about the success you were having

21  with this business?

22  A.    Yes.

23  Q.    What did he say to you about that?  What

24  conversations did you have?

25  A.    There wasn't much conversation.  He knew I was

1    selling these and he knew I was making money.  That was

2    about it.

3    Q.   Did he talk about you about possibly taking this

4    business model and expanding it greatly?

5    A.   Yes.

6    Q.   Tell the jury about that.

7    A.   This was in the summer 2013 or before the summer of

8    2013, my senior year at high school.  We were at the

9    Matrix and I had the business of selling iPhones but was

10   also selling other electronics.  Ian knew about this.  So

11   we were talking about it and he wanted to know if I could

12   take it on a larger scale, buy more products and higher

13   quantities and resell them for profits.

14   Q.   You said you were selling electronics.  What other

15   electronics were you selling at that time?

16   A.   I was selling Beats headphones, DVDs, Game Boy video

17   games, and cell phone cases.

18   Q.   Like the OtterBoxes?

19   A.   Yes.

20   Q.   To protect the cell phone?

21   A.   Correct.

22   Q.   At this point is this before you formed W & B?

23   A.   Yes.

24   Q.   Where were you getting the products that you were

25   reselling at this point early on in 2013?

1  A.   The electronics that I mentioned before I was getting

2  from a young man named Alex Bergen in New Britain,

3  Connecticut.

4  Q.   You were getting them from him and selling them?

5  A.   Correct.

6  Q.   So at some point did you decide -- did you and

7  Mr. Bick decide to go into business?

8  A.   Yes.

9  Q.   Did you form a company?

10  A.   We did.

11  Q.   What was the name of that company?

12  A.   W & B Wholesale.

13  Q.   And what does the W stand for?

14  A.   Wrobel.

15  Q.   What does the B stand for?

16  A.   Bick.

17  Q.   What does the Wholesale stand for?

18  A.   Wholesale electronics and reselling them.

19  Q.   What was the plan?  Let's start small.  What was the

20  plan at that point?

21  A.   The original plan was to buy, you know, to deal with

22  iPhones, just to buy the electronics that I was purchasing

23  from Alex Bergen and to, you know, buy on a larger scale

24  in the thousands of dollars and take those and sell them

25  on eBay and Amazon.

1    Q.   And did you form a company?

2    A.   We did.

3    Q.   Did you open up a bank account?

4    A.   We did.

5    Q.   Multiple bank accounts or just one bank account?

6    A.   One bank account, checking and savings account.

7    Q.   Let me show you what has been marked Government

8    Exhibit 1150.  Do you recognize this business account

9    application?

10   A.   Yes, I do.

11   Q.   Let me scroll down.  It says here under Customer

12   Name, can you read that?

13   A.   Yes.

14   Q.   What was the name?

15   A.   W & B Wholesale LLC.

16   Q.   And it has your name?

17   A.   Correct.

18   Q.   And it has Mr. Bick's name?

19   A.   It does.

20   Q.   And were you both signers on the account?

21   A.   We were.

22   Q.   How is that determined?  What conversations or

23   discussions did you have about opening an account and you

24   both being signers on the account?

25   A.   Since we both were going into business together and

1  this was our business together and both our names were

2  going to be on the business, we needed bank accounts.  And

3  so had both our names since we were both going to be in

4  business, we were both going to be on the account.

5  Q.   It says LLC.  Who owned W & B Wholesale?  Were there

6  other people who owned parts of it or was it just the two

7  of you?

8  A.   Just the two of us.

9  Q.   At that point in time were you equal?

10  A.   Yes.

11  Q.   What was the plan about sharing any upside?

12  A.   We really didn't have anything special on that.

13  Q.   Fair enough.

14       At some point did you take in some money as

15  investment or loan, call it what you will, but did you

16  take in money from people for this venture?

17            THE COURT:  Hold on just a second.

18            MR. EINHORN:  Objection, Your Honor.  I don't

19  want to keep popping up.  That's a leading question.  I

20  like to ask that further questions --

21            THE COURT:  The question was did he take money

22  in.

23            MR. EINHORN:  Did he take money in from other

24  investors.

25            THE COURT:  Well, just reframe the question, but

 1   I'll allow the question.

 2            MR. McGARRY:  Sure.

 3            MR. EINHORN:  Can I ask one other thing?  I

 4   don't mean to -- I can't see the witness the way we moved

 5   things around.  I can move my chair, but then I don't have

 6   a screen.

 7            THE COURT:  Can we try to move it just a bit?

 8            MR. EINHORN:  Can we put it back the way it was?

 9            THE COURT:  Let's move the lectern back the way

10   it was so Mr. Einhorn can see.

11            MR. McGARRY:  Your Honor, I'm happy to push

12   whatever way you tell me.

13            THE COURT:  Let's make sure we don't disconnect

14   something.

15            MR. EINHORN:  Terrific.

16            THE COURT:  Is that going to work for you,

17   Mr. Einhorn?

18            MR. EINHORN:  Yes, thank you, Your Honor.

19            THE COURT:  Hold that microphone closer so we

20   can hear you better.

21   BY MR. McGARRY:

22   Q.   Okay.  So the question was, I'm going to say it this

23   way:  Did you guys take in money?

24   A.   Yes.

25   Q.   Tell the jury about that.  Who were the initial

1   investors?

2   A.    In order to, you know, fund our operations, we needed

3   money, capital.  So we sought out investors.  Some of the

4   original investors were Henry Scozzafava, Elliot Paume,

5   and Anthony Galente.

6   Q.    Where was Ian working at the time?

7   A.    He was working at the Matrix.

8   Q.    And what is the Matrix?

9   A.    Matrix is a large corporate center.  They have other

10  offices in there.  They do events, they have a ballroom.

11  Q.    And have you been to the Matrix?

12  A.    I have.

13  Q.    How many times do you think you've been to the

14  Matrix?

15  A.    Over a hundred.

16  Q.    Let me show you on your screen what's been marked

17  Government Exhibit 958 for identification at this time.

18        Do you recognize the photo of this building?

19  A.    I do.

20  Q.    Is that part of the Matrix?

21  A.    It is.

22  Q.    Is that a place that you've been by a number of

23  times?

24  A.    It is.

25  Q.    It has a list of companies, do you see that?

1   A.   Yes.

2   Q.   Was there a point in time W & B was listed there?

3   A.   It was.

4   Q.   And is this a fair and accurate representation of

5   that portion of the Matrix that you walked by when working

6   at W & B?

7   A.   Yes.

8   Q.   Let me move down to the next page.  Do you recognize

9   the photo of these doors?

10  A.   I do.

11  Q.   Okay.  What is it?

12  A.   It's the entrance for guests that were coming to

13  visit the offices in that suite.

14  Q.   Is this one of the entrances that you would use?

15  A.   Yes.

16  Q.   Is this a fair and accurate representation of what it

17  looked like at the time when you went there over a hundred

18  times?

19  A.   Yes, it is.

20  Q.   Okay.  Let me show you page 3.  What is this

21  document?

22  A.   This is an aerial view of the Matrix.

23  Q.   You said you've been to the Matrix over a hundred

24  times.  Regardless of the fact that it's an aerial view,

25  do you recognize that building?

1    A.    Yes.

2    Q.    What is that building?

3    A.    It is the Matrix where we had an office.

4    Q.    And it looks like there's a drive up or bridge in the

5    front.  What is that?

6    A.    That is one of the entrances that you can drive up

7    on.  It's leads up to the different floors for the Matrix.

8    Q.    Is the office that W & B or Ian Bick had located in

9    this building?

10   A.    It is.

11   Q.    And did some of the investors come to this building?

12   A.    Yes, they did.

13          MR. McGARRY:  Your Honor, I would offer the

14   three photos of 958 at this time.

15          THE COURT:  Any objection?

16          MR. EINHORN:  Yes, Your Honor.  I'd like to voir

17   dire the witness.

18          THE COURT:  Solely with respect to the photos?

19          MR. EINHORN:  Yes, Your Honor.

20

21                    VOIR DIRE EXAMINATION

22   BY MR. EINHORN:

23   Q.    Mr. Wrobel, with regard to the first photo, it

24   doesn't show W & B on there, does it?

25   A.    No, it does not.

1   Q.   When's the last time you were at that location at the

2   Matrix?

3   A.   Over seven months ago.

4   Q.   The last time you were there, was the name W & B on

5   the sign?

6   A.   It was not.

7   Q.   I beg your pardon?

8   A.   It was not.

9   Q.   It was not.

10       When the name W & B was on the sign, was it a similar

11  sign to that?

12  A.   Yes.

13  Q.   Where was that sign located?

14  A.   It's located near the guest entrance to the suite.

15  Q.   How many different businesses are located at that

16  location?

17  A.   In that particular suite?

18  Q.   Yes, sir.

19  A.   As many as are on this board.

20  Q.   Go ahead.

21  A.   Eleven.

22  Q.   And are there other suites in that building with

23  other offices and suites, other locations?

24  A.   There are.

25  Q.   Do you have any idea how many in total there are?

1  A.    I do not.

2  Q.    And on the second photo it shows what purports to be

3  you said the entrance doors.  That's not the entrance

4  doors to your old offices, is it?  That's a lobby door,

5  right?

6  A.    Correct.

7  Q.    Do any of these three pictures show the actual

8  offices?

9  A.    They do not.

10 Q.    This lobby door, this is an entry to how many

11 different offices?

12 A.    This is to our suite.

13 Q.    Just to your suite.  You don't share that lobby with

14 any other businesses?

15 A.    It's shared with those 11 other businesses that were

16 on that board.

17 Q.    Thank you.  It shares with eleven others in that

18 area, right?  So, in other words, if I was going through

19 those glass doors, I could also visit any of the other ten

20 businesses?

21 A.    Correct.

22 Q.    Okay.  And finally, the third photograph you were

23 shown as to the Matrix, obviously it says what it is, the

24 Matrix.  Do you have any idea the total number of

25 businesses that are located within that, looks like, very

1    large complex?

2    A.   I do not.

3    Q.   How do you know this is the Matrix besides the fact

4    that it says what it is on the photo?

5    A.   The shape of the building.  I've been around the

6    Matrix a lot of times, not just in our suite.

7    Q.   One last question.  Can you point for the Court

8    exactly where your former office was within this sketch of

9    the facility?

10   A.   Point to generally?

11   Q.   Sure.

12          MR. EINHORN:  May I approach the witness so I

13   can see, Your Honor?

14          THE COURT:  Just identify, maybe describe where

15   it is.

16   A.   It's not on this side, it's on the other side.

17   There's two sides, two entrances.  Not the closest one,

18   but the farthest one behind us.  It's on the first, either

19   left or right side of one of those first --

20          MR. McGARRY:  Pods?

21   A.   -- pods.

22   BY MR. EINHORN:

23   Q.   The question is:  Can you see it from this photo or

24   is it hidden?

25   A.   Hidden.

1    Q.   It's hidden?

2    A.   To a point.

3              THE COURT:  Is there still an objection?

4              MR. EINHORN:  Yes.

5              THE COURT:  The objection's overruled.  I find

6    the evidence is sufficiently authenticated for purposes of

7    its admissibility.

8              Ladies and gentlemen, we haven't had many of

9    these evidentiary disputes in the case, but essentially

10   the effect of my ruling that the evidence is admissible is

11   simply a preliminary ruling.  It's for you to determine

12   the ultimate weight to be given to any evidence that's

13   admitted in this case in any form, a document or a

14   photograph.

15             So you may proceed.

16             MR. McGARRY:  Okay, thank you, Your Honor.

17

18                  DIRECT EXAMINATION (Resumed)

19   BY MR. McGARRY:

20   Q.   So since we've heard so much about it, this was the

21   first page, correct?

22   A.   Correct.

23   Q.   Is that a second page?

24   A.   It is.

25   Q.   And showing now the third page.

1          Heading back to the first page -- let's just go to

2     the second page.

3          So you were talking about W & B Wholesale.  And you

4     mentioned some of the earlier investors.  I believe before

5     we did the voir dire with the pictures, you mentioned a

6     Mr. Elliot Paume?

7     A.   Correct.

8     Q.   How do you know Elliot?

9     A.   He used to go with us to Danbury High.

10    Q.   You mentioned an Anthony Galente?

11    A.   Yes.

12    Q.   Did Mr. Galente work at the Matrix?

13    A.   Yes, he worked in the kitchen.

14    Q.   Did Ian Bick work at the Matrix?

15    A.   He did.

16    Q.   Were there other people who worked there who were

17    investors with W & B or Planet Youth?

18    A.   Yes, there were.

19    Q.   Do you know an individual named Ivan Resto?

20    A.   I do.

21    Q.   Who is Ivan Resto?

22    A.   Ian's boss at the Matrix.

23    Q.   Do you know if he invested with Ian Bick?

24    A.   He did.

25    Q.   Do you know what, in particular, he was investing in?

```
 1  A.   I do not.

 2  Q.   Geovanny Melendez, do you know that name?

 3  A.   I do.

 4  Q.   Goes by Geo?

 5  A.   Yes.

 6  Q.   Who is Geovanny Melendez?

 7  A.   A chef at the Matrix.

 8  Q.   Are there any other names just at this point off the

 9  top of your head that you remember of people who invested

10  in W & B Wholesale in the electronics business?

11  A.   In the early stages or in general?

12  Q.   We'll start with the early stages.

13  A.   The names I mentioned before are the only ones.

14  Q.   And then how about in general?

15  A.   In general, there were others.  Such as Elliot's

16  parents.

17  Q.   Elliot's parents.  Do you remember their names?

18  A.   David Paume and Denise, I believe.

19  Q.   Okay.  Did you call them David and Denise or did

20  you -- did you talk with them at any point?

21  A.   At one point I did speak with them briefly.

22  Q.   And what did you call them?

23  A.   Mr. and Mrs. Paume.

24  Q.   Okay.  Fair enough.  Who else?

25  A.   There was also Christopher Cunningham.
```

1    Q.    Okay.

2    A.    Christian Hordos.

3    Q.    Did you ever meet a fellow named David Osei?

4    A.    Yes, I did.

5    Q.    Who is that?

6    A.    David Osei was one of the owners of Planet

7    Entertainment.  They met when they were doing concerts.

8    He went to the University of Rhode Island.

9    Q.    Did he invest in W & B Wholesale?

10   A.    Yes, he did.

11   Q.    Do you know if his parents provided the money or what

12   was your understanding?

13   A.    His father also provided money.

14   Q.    Had you ever met him?

15   A.    No, I don't remember.

16   Q.    Did you ever go to his house?

17   A.    I went to his house with Ian and sat in the car.

18   Q.    How about anyone else who was friends from University

19   of Rhode Island?

20   A.    There was Evan Browndorf.  Robert Burke, I believe.

21   Q.    Let me just, I'll stop you there.

22         Were you with Ian when he was trying to get people to

23   invest in W & B Wholesale?

24              MR. EINHORN:  Objection.

25              THE COURT:  Foundation.

```
 1  BY MR. McGARRY:

 2  Q.   Let me take a step back.  You mentioned that there

 3  were investors?

 4  A.   Correct.

 5  Q.   Did some of these people give money to W & B?

 6  A.   Yes.

 7  Q.   Were there meetings with people prior to their giving

 8  money to W & B?

 9  A.   Yes, there were.

10  Q.   Were they told certain things about W & B prior to

11  them investing or loaning money?

12           MR. EINHORN:  These are all leading questions,

13  Your Honor.  There's a way to ask this in a more general

14  fashion, I believe.

15           THE COURT:  I'll allow it, but we're getting a

16  little bit close to leading.

17           MR. McGARRY:  Sure.

18  BY MR. McGARRY:

19  Q.   What do you recall Ian saying to people about W & B

20  Investments?

21  A.   We would have a meeting with them.  Formal meeting,

22  lunch or dinner.  If it was informal --

23  Q.   Let me stop you there.  Were some of these meetings

24  at the Matrix?

25  A.   Yes.
```

1    Q.   And some of them were where?

2    A.   Either out to dinner or lunch.

3    Q.   Okay.  Go ahead.

4    A.   And so we sit them down and talk to them.  And Ian

5    would talk about his past business experiences with, you

6    know, success in concerts.  And then Ian talked about our

7    plan for the electronics company buying wholesale and

8    selling online.

9    Q.   Let me stop you a second.  What did Ian say about his

10   success in the past with concerts?

11   A.   That he was rather successful in teen events and

12   local concerts at venues and that he's made money for

13   people.

14   Q.   And what did he say -- was he specifically talking

15   about the teen nights or talking about the other bigger

16   concerts?

17   A.   Both.

18   Q.   What did he say about the other bigger concerts?

19   A.   That they were profitable.

20   Q.   Do you know that to be true?

21   A.   It was not true.

22   Q.   How do you know that?

23   A.   Ian himself told me.

24   Q.   What did he tell you?

25   A.   He told me that some of the concerts, you know, he

1    hosted were not profitable.

2    Q.   Is it your testimony that regardless of that, he told

3    people they were profitable?

4    A.   Yes.

5    Q.   Focusing now more on the electronics part of the

6    discussion, what did he tell people about the W & B

7    Wholesale business?

8    A.   That we were going to -- any money that they

9    invested, we were going to take their money, buy products

10   with it and then would sell it online, and a percent of

11   the profits from the sales were going to go back to them.

12   Q.   And what percent did Ian offer people?

13   A.   Percent varied.  Usually they were always high.

14   Thirty-five, 45 percent.

15   Q.   I was asking about Ian.  Let me ask about you.  Were

16   you talking to people at this time at these meetings?

17   A.   Yes.

18   Q.   What were you telling people?

19   A.   I was more of the operations side.  I had the past

20   experience with selling iPhones and electronics online

21   myself.  So I would tell them the logistics of everything

22   and where we could buy this from, how much these things

23   are going to cost, what we were going to mark them up for.

24   Q.   Based on your experience doing this on a small scale,

25   were the returns that were being represented realistic?

1    A.    Yes.

2    Q.    Did you think initially that you might be able to do

3    that?

4    A.    Yes.

5    Q.    Okay.  And did people give you money?

6    A.    Yes, they did.

7    Q.    So what did -- are you familiar with some of the

8    contracts that people entered into?

9    A.    I am.

10   Q.    And you've seen a lot of them?

11   A.    I've seen a good deal.

12   Q.    Let me show you what's been marked Government

13   Exhibit 21.  At the top it says W & B Wholesale LLC Loan

14   Agreement, do you see that?

15   A.    Yes.

16   Q.    Do you know Luca Rietti?

17   A.    I do.

18   Q.    Who is that?

19   A.    He was another member of Planet Entertainment, went

20   to the University of Rhode Island with David Osei.

21   Q.    Did he give money to W & B Wholesale?

22   A.    He did.

23   Q.    And tell me about this contract.  Who drafted it, if

24   you know?

25   A.    To my best knowledge, Ian drafted it.

1   Q.   To the best of your knowledge -- I'm sorry?

2   A.   Ian drafted it.

3   Q.   Take a look at, if you will, just by way of example,

4   951, second page.  Do you recognize this contract?

5        Do you recognize the name Patrick Brown?

6   A.   Yes, I do.

7   Q.   Who is that?

8   A.   He's another member of Planet Entertainment.  He's a

9   friend of Luca and friend of Dave from University of

10  Rhode Island.

11  Q.   Did he give money to W & B?

12  A.   He did.

13  Q.   And was it pursuant to W & B Wholesale loan

14  agreement?

15  A.   Yes.

16  Q.   Okay.  And there were other people -- were there

17  other people?

18  A.   There were.

19  Q.   Tell the jury, initially, what did you do when you

20  got some money?

21  A.   So when we first got money for the wholesale company,

22  we opened a bank account.  Initially we deposited the

23  money, we initially did not buy electronics.

24  Q.   What did you do initially?

25  A.   I'm not sure.  The money was put in and from there I

1    just saw it go in and out.

2    Q.   At some point did you buy electronics?

3    A.   Yes.

4    Q.   From where?

5    A.   From Alex Bergen.

6    Q.   Did you -- was that the only place you bought any

7    large amount of electronics -- let me rephrase that.

8         You said Alex Bergen.  Anyone else?

9    A.   Not other than -- no other individuals.

10   Q.   No other what?

11   A.   Individuals.

12   Q.   Any entities?

13   A.   Once or twice BJ's Wholesale.

14   Q.   So you were buying from BJ's Wholesale to W & B

15   Wholesale and then you were going to mark it up?

16   A.   Correct.

17   Q.   Did that part of the business make money?

18   A.   No.

19   Q.   Did you have any contacts overseas or anything like

20   that?

21   A.   No.

22   Q.   Did you ever represent to people whether you had

23   contacts overseas?

24   A.   We did not.

25   Q.   In total, approximately how much or what amount of

```
 1   dollars' worth of electronics did you buy?

 2   A.   Approximately $27,000.

 3   Q.   Is that all in, meaning -- we've been talking about

 4   initially.  For the whole period that you worked with

 5   W & B, how many dollars' worth, if that's the right

 6   expression -- what volume in terms of dollars did you buy

 7   wholesale products?

 8   A.   Maximum, $30,000.

 9   Q.   Okay.  And did you try to sell some?

10   A.   Yes, we did.

11   Q.   What happened?

12   A.   Initially we sold some.  We were selling them through

13   an eBay seller who was taking profit from us.  He had some

14   complaints that some of the products were counterfeits so

15   he no longer wanted to tell them for us.  I myself started

16   selling them on accounts.  And eventually we got shut down

17   because the products turned out to be counterfeit.

18   Q.   You got shut down by who?

19   A.   EBay and Amazon.

20   Q.   And did you say that the buyers complained?

21   A.   That's correct.

22   Q.   Okay.  So what happened with the electronics that you

23   had gotten from Alex Bergen?

24   A.   We tried, you know, selling them in person, friends.

25   We returned some to Alex Bergen.  And then we were just
```

1    sitting on it, sitting in our offices.  Sometimes we would

2    give it away free to friends and gave it away to investors

3    either to keep them quiet for a while or as a partial

4    payment.

5    Q.    You mentioned to keep them quiet.  Was that later on?

6    A.    Yes.

7    Q.    Did you give them away sometimes when individuals

8    came into the Matrix?

9    A.    Yes.

10   Q.    Did you give them away when people were deciding

11   whether or not to invest?

12          THE COURT:  Hold on just a second.  Is there an

13   objection?

14          MR. EINHORN:  Yes.  The past two questions have

15   been leading.  I didn't catch the first one.

16          THE COURT:  I'll ask you to be more open-ended.

17   And also if you could specify more about time frame, that

18   would be helpful.

19          MR. McGARRY:  Sure.

20   BY MR. McGARRY:

21   Q.    Talking about electronics, after eBay and Amazon got

22   shut down, what did you guys do with the electronics?

23   A.    Initially sat on them.  We didn't have anywhere to

24   sell them.  And after that, sold them to other friends or

25   to people, you know, online.  And then after that we, you

1    know, when people would come and see them, you know,

2    potential investors, we would show them our product and

3    sometimes give to them.

4    Q.   Did you do anything else with respect to Mr. Bergen?

5    A.   We returned some of the product.

6    Q.   Did he return you some money?

7    A.   Yes.

8    Q.   Okay.  What is your best estimate as to the total

9    amount of electronics that were bought and sold, maybe if

10   you net out what you returned?

11   A.   Five or $6,000.

12   Q.   Okay.  How much did W & B actually make in profit on

13   the purchase and sale of electronics?

14   A.   No money.

15   Q.   I'm sorry?

16   A.   Zero dollars.

17   Q.   Did you lose money?

18   A.   Yes.

19   Q.   At any point did you ever buy large pallets of

20   electronics?

21   A.   No.

22   Q.   At any point did you ever buy large volumes of

23   iPhones?

24   A.   No.

25   Q.   At any point did you and/or Ian Bick represent to

 1   people that you were buying pallets of iPhones?

 2            MR. EINHORN:  Same objection, Your Honor.

 3            THE COURT:  It's overruled.

 4   A.   Yes.

 5   BY MR. McGARRY:

 6   Q.   Do you remember -- do you remember -- okay.  Let me

 7   catch myself.

 8        After the accounts were shut down, did you and Ian

 9   continue to raise money for W & B Wholesale?

10   A.   Yes, we did.

11   Q.   Did Ian Bick continue -- did he give a pitch to

12   people?

13   A.   Yes.

14   Q.   Did the pitch change at all?

15            MR. EINHORN:  Same objection.

16            THE COURT:  I'm going to ask you, Mr. McGarry,

17   just if you can to try to frame the questions in terms of

18   what was said rather than in the content of your question

19   suggesting what the answer might be.

20            MR. McGARRY:  I'm trying to, that there could be

21   an either "yes" or "no," but I will do that, Your Honor.

22            THE COURT:  Thank you.

23   BY MR. McGARRY:

24   Q.   What did Ian tell people about W & B Wholesale after

25   the point in time when the accounts were shut down?

```
 1   A.   To some people he told -- he never mentioned that any
 2   of the products were counterfeit and that we were going to
 3   continue to buy product with their money.
 4   Q.   I'm sorry, I just couldn't hear you.  Some people he
 5   told --
 6   A.   Some people he told -- he did not tell and some
 7   people he did tell.  And so the ones he did tell that the
 8   items were counterfeit, he said we were going to start
 9   buying iPhones, pallets of iPhones.
10   Q.   And do you know an individual named Henry Scozzafava?
11   A.   Yes, I do.
12   Q.   Who is Henry?
13   A.   Henry is a friend of Ian, friend of mine.  He went to
14   Danbury High School with us and he was an investor.
15   Q.   Did he invest in W & B Wholesale?
16   A.   Yes, he did.
17   Q.   Approximately how much, if you recall?
18   A.   $100,000.
19   Q.   What did you guys -- what did you and Ian Bick do
20   with that money?
21   A.   Put it into our account.  And after that, I don't
22   know where it went.
23   Q.   We saw the account opening documents.  Did you have
24   access to the bank accounts?
25   A.   Yes, I did.
```

1  Q.   Take a look, if you would, at Government Exhibit 41.

2  Let me show you first page 1, and page 2.  Do you

3  recognize page 2?

4  A.   Yes, I do.

5  Q.   What is this document?

6  A.   That is the check from Henry with my signature on the

7  back.

8  Q.   Did you deposit this check into the account?

9  A.   Yes, we did.

10  Q.   Take a look at Government Exhibit 14, if you will.

11  Let me direct your attention to page 2.

12     What is Government Exhibit 14, by the way?  Let me go

13  back to page 1.  What is this document?

14  A.   This is our bank account at Wells Fargo for W & B

15  Wholesale.

16  Q.   Take a look at this portion of page 2.  Do you see

17  the deposit of $100,000?

18  A.   Yes.

19  Q.   Okay.  And what was the balance before the $100,000?

20     I'm sorry, can you see the various columns now?

21  A.   $221.69.

22  Q.   And what is the date of Mr. Scozzafava's $100,000

23  check being deposited into your account?

24  A.   July 7 -- I'm sorry, 12.

25  Q.   Let me direct your attention to July 18.  Do you see

1    that entry there?

2    A.   Yes, I do.

3    Q.   What is that entry?

4    A.   That is a debit card swipe for purchase of a hotel

5    room in Florida.

6    Q.   Do you know anyone who took a trip to Key West?

7    A.   I do.

8    Q.   Who do you know?

9    A.   Ian Bick, Justin Kenny, Wyatt Bosworth, and Brian

10   Bill.

11   Q.   Did you go on that trip?

12   A.   I did not.

13   Q.   Were you with Henry when he -- take a look at

14   Government Exhibit 720.  The date of July 22, do you see

15   that?

16   A.   Yes.

17   Q.   What is the second to the last entry there?

18   A.   It's Stone Crab.

19   Q.   And let me turn to the next page.  See the

20   highlighted entry on the following page for July 24 and

21   those for July 25?

22   A.   Yes.

23   Q.   Were you with Henry when the investment of $100,000

24   was discussed?

25   A.   No.

1  Q.   Okay.  Did you talk to Henry at any point in time

2  about his investing $100,000 to W & B?

3  A.   Yes.

4  Q.   What did you say to him about his investment?

5  A.   Not much.  Ian previously discussed terms and what

6  the money was going to be used for.

7  Q.   Do you know, from talking with Ian Bick, what he told

8  Henry the money would be used for?

9  A.   I do not.

10  Q.   Let me direct your attention further down in your

11  bank account.  Do you see July 25?

12  A.   Yes.

13  Q.   Do you see a deposit of $30,000?

14  A.   I do.

15  Q.   I'm sorry, let me -- there's a deposit of 50,000.

16  Let me widen the screen a little bit.

17      See where it says withdrawals and debits?

18  A.   Yes.

19  Q.   Do you see a $30,000 what appears to be a wire

20  transfer to a Robert Emmett Burke III?

21  A.   Yes, I do.

22  Q.   What is the date of that?

23  A.   July 25.

24  Q.   And what's the entry after that?

25  A.   July 26, deposit of $50,000 from Robert Burke.

1   Q.   Okay.  And scrolling down do you see this entry here

2   which I'm highlighting where it says wire transfer to

3   David Paume?

4   A.   Yes, I do.

5   Q.   Do you know Mr. Paume?

6   A.   Yes, I do.

7   Q.   Did you -- what did the Paumes invest in?

8   A.   W & B Wholesale.

9   Q.   And is this the account that their money went into?

10  A.   Yes.

11  Q.   Okay.  Let me direct your attention to the last entry

12  on this page.  There's a deposit for $5,000.  Do you see

13  this last entry -- again, scrolling down for a second, do

14  you see where it says deposits and credits?

15  A.   Yes.

16  Q.   And you see it says withdrawals and debits?

17  A.   Yes.

18  Q.   Can you tell the jury, July 29, what the bank records

19  of the bank account that you and Ian Bick controlled at

20  Wells Fargo, what the wire transfer of David Paume was?

21  A.   $50,000 for investment into W & B Wholesale.

22  Q.   At this point in July, tell the jury what was going

23  on with the electronics business.

24  A.   At this point we -- our product was, you know, we

25  found out some of it was counterfeit and nothing was

1    really happening with the purchase of electronics.

2    Q.   And take a look, see the last line, $22,500

3    withdrawal?

4    A.   Yes.

5    Q.   Are there any deposits after the Paumes' money before

6    this entry for 22,500?

7    A.   Yes.

8    Q.   How much?

9    A.   $5,000.

10   Q.   Okay.  Take a look at Government Exhibit 73.  Do you

11   recognize -- I direct your attention to the second page of

12   Government Exhibit 73, do you recognize the signatures?

13   A.   Yes, I do.

14   Q.   Whose signatures are those?

15   A.   Ian Bick and my own.

16   Q.   Directing your attention back to the first page, what

17   is the first page of Government Exhibit 73?

18   A.   A cashier's check made out to David Osei, $22,500.

19   Q.   Who was David Osei?

20   A.   He was an investor.

21   Q.   What was this check for?  What did it represent?

22   A.   It represented his money, his return on his

23   investment.

24   Q.   And if we go back to Government's Exhibit 14, what is

25   the source of funds that were used to pay Mr. Osei?

1          MR. EINHORN:  I don't know that he knows that.

2   That's what we're going to get to in closing argument.

3          MR. McGARRY:  I would submit that Mr. Wrobel is

4   the W of W & B, he's got control of the bank account.  He

5   and Mr. Bick controlled --

6          THE COURT:  The question is simply what is the

7   source of funds.  In other words, what was previously

8   deposited into the account?

9          MR. McGARRY:  Sure.

10          THE COURT:  Why don't you ask him in that term.

11  BY MR. McGARRY:

12  Q.   What was previously deposited into the account prior

13  to the money going to Mr. Osei?

14  A.   Other investors' money.

15  Q.   And would that include the Paumes' money?

16          MR. EINHORN:  Objection.

17          THE COURT:  That's leading.  Sustained.

18  BY MR. McGARRY:

19  Q.   When you say other investors, who would that include?

20  A.   People such as the Paumes or Robert Burke.

21          MR. EINHORN:  I don't know that we need to have

22  his answers highlighted so he can see what we're talking

23  about.  I don't think that's --

24          MR. McGARRY:  We don't want him to see?

25          THE COURT:  It's overruled.  Continue, please.

1          MR. EINHORN:  I meant -- I didn't mean that it

2     was highlighted.  I meant before he can answer the

3     question, the information --

4          THE COURT:  I see.  If you could wait for the

5     answer before you highlight.

6          MR. McGARRY:  I understand that.  That's fair,

7     Your Honor.

8          THE COURT:  Thank you.

9     BY MR. McGARRY:

10    Q.   At this point in July, tell the jury what's going on

11    with the bank account and the business.

12    A.   At this time we aren't buying any more electronics,

13    we're still continuing to take in investments.

14    Q.   And what were you telling people when you were

15    continuing to take in investments?

16    A.   That we were going to use their money to buy

17    electronics.

18    Q.   And was that a true statement?

19    A.   It was not.

20    Q.   And what were you telling people when you gave them

21    purported interest checks?

22    A.   That this money that's coming back to them is from

23    profits of the electronics.

24    Q.   And was that a true statement?

25    A.   It was not.

```
 1   Q.   Was Ian Bick making those statements?

 2   A.   Yes, he was.

 3   Q.   Do you recall an individual named Scott Tepper?

 4   A.   Yes.

 5   Q.   Did you meet Mr. Tepper?

 6   A.   Yes, I did.

 7   Q.   What do you recall about your conversations with

 8   Mr. Tepper?

 9   A.   He was very interested in our ideas and, you know,

10   what we wanted to do with the wholesale electronics.  And

11   we told him that the money he would give us would go

12   towards buying pallets of iPhones.

13   Q.   And did you ever buy pallets of iPhones?

14   A.   No, we did not.

15   Q.   When did you first meet Mr. Tepper?

16   A.   I can't recall the exact date.  The first time I met

17   him was at, you know, Sky Bar and Lounge in Danbury,

18   Connecticut.

19   Q.   Was it in the summer?

20   A.   May have been.

21   Q.   Okay.  And what did you talk to him about?  Who was

22   there?

23   A.   Ian and myself and Scott.

24   Q.   And Scott being?  Is Scott the older -- he's got some

25   sons your age?
```

1    A.    Scott has two sons, Zach Tepper and Josh Tepper.   One

2    is my age and one is two years older.

3    Q.    How old is Scott Tepper?

4    A.    Late 40s to mid-50s.

5    Q.    And what did you and Ian Bick tell Scott Tepper about

6    his investment when you were at the Sky Bar?

7    A.    That we planned on purchasing -- I talked to him

8    about my past with purchasing broken iPhones and fixing

9    them.   Told him with this money we were going to buy

10   pallets of iPhones in various conditions, some broken,

11   some non-broken; we were going to take them, fix them as

12   needed and flip them on eBay.

13   Q.    Let me show you what's been marked Government

14   Exhibit 901 in evidence.   What is Government Exhibit 901?

15   What is this document?

16   A.    It's a loan agreement between W & B Wholesale and

17   Scott Tepper.

18   Q.    What is Government Exhibit 904?

19   A.    Another W & B Wholesale loan agreement between Scott

20   Tepper and the company.

21   Q.    And 905?

22   A.    An e-mail with Scott.

23   Q.    Can you read the e-mail from Ian Bick to Scott?

24   A.    Hey Scott.   Sorry I haven't reached out to you.

25   Everything is going really well.   I'm out of town right

1    now for concerts but I'll be back on Sunday.  I'll send

2    you the report of what we've sold so far and what we've

3    made on the pallets on Monday.  And then I'll be able to

4    give you a payment of what we have so far early next week.

5    Have a great weekend.

6    Q.   Were there any pallets?

7    A.   No.

8    Q.   Were things going well?

9    A.   They were not.

10   Q.   Tell the jury what you and Ian Bick were telling

11   Mr. Tepper.

12   A.   We were telling him that with his money that he gave

13   to us, that we had purchased pallets of iPhones and that

14   we had sold some and things were going very well.

15   Q.   And did Ian -- were you present when Ian made

16   statements like that to Mr. Tepper?

17   A.   Yes, I was.

18   Q.   Were those statements true?

19   A.   They were not true.

20   Q.   And yourself as well, did you make statements like

21   that to Mr. Tepper?

22   A.   Yes, I did.

23   Q.   Were they true?

24   A.   No, they were not.

25   Q.   Moving to the top, what did -- how did Mr. Tepper

1  reply?

2  A.  Hi Ian.  No problem.  Good enough to go with another

3  early?  Regards, Scott.

4  Q.  Let me show you Government Exhibit 906.  What is

5  Scott e-mailing to Ian here?

6  A.  Hi Ian.  Just checking in.  Are you back?  Can we

7  review some numbers?  Regards, Scott.

8  Q.  And what did Ian respond?

9  A.  Hi Scott.  I apologize for not getting back to you.

10  The club opens on Thursday and have been busy running

11  around like a madman getting everything in place.  I'll

12  send you the numbers tomorrow and give you a call to

13  follow up and go over everything.

14  Q.  What numbers is Ian talking about with Mr. Tepper?

15  A.  The numbers of sales.

16  Q.  Were there any sales?

17  A.  There were not.

18  Q.  Were there any iPhones?

19  A.  No.

20  Q.  Take a look at the next document.  Let's start at the

21  bottom.  Forwarded message.  It says:  Here you go.  Have

22  the rest over to you soon.

23      See where it says attachment?

24  A.  Yes.

25  Q.  What is the attachment?

1    A.    Attachment is a spreadsheet.  The spreadsheet said

2    that this was the first pallet that we purchased and on it

3    what we got on that pallet.

4    Q.    Okay.  Who prepared these spreadsheets?

5    A.    I did.

6    Q.    Tell the jury about that.

7    A.    So Ian, you know, Ian said send to Scott -- he told

8    me to come up with a spreadsheet, numbers that would

9    represent what Scott's investment went towards.

10   Q.    So Ian asked you to come up with some numbers?

11   A.    Yes.

12   Q.    What did you say to him?

13   A.    I said sure.

14   Q.    And how did you -- so how did you make up these

15   spreadsheets?

16   A.    I based the numbers off of my past experiences

17   selling iPhones.

18   Q.    When Ian asked you to make up -- is it fair to say --

19   are these real or are these fake?

20   A.    These are fake.

21   Q.    When Ian asked you to make up these fake spreadsheets

22   for Scott Tepper, what was your reaction?

23   A.    I was a little shocked.  But I went ahead and did

24   them anyway.

25   Q.    Did you know it was wrong?

1    A.    Yes.

2    Q.    Did you know that these were going to Mr. Tepper?

3    A.    Yes.

4    Q.    Did you know that Mr. Tepper was basing -- what did

5    you know he was -- why did he want them?

6    A.    He was very involved in his investment and wanted to

7    know where his money was going, how it was being invested,

8    and information to show him exactly where his money went.

9    Q.    So it says here sold for, it has bin dollar amounts,

10   shipping fees, gross profit after eBay fees.  What was

11   that meant to represent?

12   A.    This was after our initial purchase.  You know, the

13   first spreadsheet was the numbers we got from the

14   purchase, this was showing the iPhones themselves, the

15   iPhones and the profits we were making.

16   Q.    And if we go down to line 14 it says "returned"?

17   A.    Correct.

18   Q.    What was that meant to represent?

19   A.    Meant to represent a return on that phone.

20   Q.    Why were you going through so much trouble?

21   A.    To make it look legitimate.

22   Q.    Was it legitimate?

23   A.    No, it was not.

24   Q.    At this time had you and Ian, how would you describe

25   what you guys were doing?

1   A.   In terms of?

2   Q.   I mean, did you have an agreement to do this with

3   Ian?

4   A.   Yes.

5   Q.   Did you have an understanding?

6   A.   Yes.

7   Q.   Did the understanding include sending fake

8   spreadsheets?

9   A.   Yes.

10  Q.   Were you sending these to hope to get more money?

11  A.   Yes.

12  Q.   How would you describe it?

13  A.   It was fraudulent.

14  Q.   And did you know it was fraudulent?

15  A.   Yes.

16  Q.   And is that part of the reason you've agreed to

17  cooperate?

18  A.   Yes.

19  Q.   Did you have conversations with Ian throughout this

20  time?

21  A.   Yes.

22  Q.   What were the conversations like?

23  A.   Well, Ian was asking if these were believable numbers

24  and if these would lead them to send more money, make them

25  satisfied with the payoff.

1   Q.   Actually, going back in time a little bit, do you

2   remember when I showed you the $22,500 check to David

3   Osei?

4   A.   Yes.

5   Q.   And whose signatures did we see on the withdrawal?

6   A.   Ian and mine.

7   Q.   Were there any profits from electronics at that time?

8   A.   No, there are not.

9   Q.   So where was the money coming from?

10  A.   From the rest of the bank records, it was coming from

11  investors.

12  Q.   Did you know that was wrong?

13  A.   Yes.

14  Q.   Did you agree to do that with Ian at that time, to

15  sign that check?

16  A.   Yes.  Mutually agreed.

17          THE COURT:  To sign the withdrawn?

18          MR. McGARRY:  The withdrawal.

19  BY MR. McGARRY:

20  Q.   And you said?

21  A.   I said nothing about it.

22  Q.   To answer my question, you said what?

23  A.   Yes.  We agreed upon.

24  Q.   And that was given to David Osei, correct?

25  A.   Correct.

1    Q.   And you knew that was wrong?

2    A.   Yes.

3    Q.   And going to page down, again, this is another page

4    of this spreadsheet?

5    A.   Correct.

6    Q.   How did you gather -- where did these descriptions

7    come from?

8    A.   They were made up.

9    Q.   Again, were you talking to Ian during this time,

10   texting, e-mailing, telephoning?

11   A.   Yes.

12   Q.   What were you talking about?

13   A.   That he had more -- he needed another pallet of --

14   sales of another pallet to be purchased.

15   Q.   You needed to do another spreadsheet, is that what

16   you said?

17   A.   Yes.

18   Q.   Take a look at Government Exhibit 908.  Do you

19   recognize this e-mail?  Do you recognize this e-mail?

20   A.   Yes.

21   Q.   And I'll read it.

22        Hey Scott.  Here are the answers to your questions.

23   John went back to Jersey today do he'll have the second

24   spreadsheet finished by tomorrow and I can send you over

25   another contract with what I'm thinking for you to look

1    over.  Also I'll send an e-mail following this one to

2    introduce you to the guy starting CALOUPON.  Talk to you

3    tomorrow.

4         And then there are a series of answers, I take it.

5    See where, again, Scott writes a few questions?

6    A.   Yes.

7    Q.   Did you talk to Ian Bick about providing answers to

8    Mr. Tepper's questions?

9    A.   Yes, we did.

10   Q.   What did you guys talk about?

11   A.   I remember him saying here's questions that Scott

12   has, you know, can you answer them?

13   Q.   And did Ian know what answers to give without

14   consulting you?

15   A.   No, he did not.

16   Q.   At any point did you talk to Ian and say, you know,

17   about -- discuss openly what's going on and what you're

18   doing?

19   A.   No.

20   Q.   And what happened after this?  Did you also provide a

21   second pallet, description of a second pallet?

22   A.   Yes.

23   Q.   Was it similar to the first pallet?

24   A.   Yes, it was.

25   Q.   Let me just see if I can pull that one up really

1    quick.

2         Pulling up Government Exhibit 909 where it says

3    Monday, October 7.  Scott, attached is the new agreement.

4    My signature is there.  Let me know if we are good to go.

5    John wasn't feeling well today but said we will have the

6    second set of numbers by the end of the day tomorrow.  Our

7    profit exceeded the $15,000 margin we set so I included

8    your additional $1,250 in the new agreement.

9         Was that a true statement?

10   A.    No.

11   Q.    Why not?

12   A.    Because there are no iPhones that we bought which

13   means there are no profits.

14   Q.    And then it says I want to purchase another two

15   iPhone pallets like the last time.

16        Is that a true statement?

17   A.    It was not.

18   Q.    Were there any pallets purchased the last time?

19   A.    There were not.

20   Q.    So why was Ian sending this e-mail to Scott Tepper?

21   A.    To satisfy his wants for knowing where his money went

22   and seeing that he made money.

23   Q.    And added another two pallets.  Do you remember if

24   Mr. Tepper sent more money in?

25   A.    Yes, he did.

1   Q.   And what did you guys do with that money?

2   A.   I don't know where it exactly went, but it did not go

3   to purchasing any more pallets.

4   Q.   Where did it go, if you recall?

5   A.   I do not recall.

6   Q.   You don't recall specifically?

7   A.   Correct.

8   Q.   How about generally?  What were some of the expenses

9   that W & B Wholesale had?  Or maybe I'll rephrase the

10  question.

11       What was Ian Bick doing with the money?

12  A.   Mostly paying other investors back or some of the

13  expenses were material items, clothes, trips, dinners.

14  Q.   Were you at some of the dinners?

15  A.   Yes, I was.

16  Q.   Did you know -- well, was there any other source of

17  income for the W & B account other than investors?

18  A.   There was not.

19  Q.   Would any of the concerts -- as far as you know, were

20  any of the concerts making money?

21  A.   Some of them were.  Most of them were not.

22  Q.   How about is there any sale of electronics or had

23  that gone by the by?

24  A.   That had gone by after we found out they were

25  counterfeit.

1   Q.   At this point in time was Ian -- we talked about

2   Henry a little bit.  We talked about Mr. Tepper.  Were

3   there other people who were still being solicited for

4   investments?

5   A.   Yes, there were.

6   Q.   Were those people told the truth about what was going

7   on?

8   A.   They were not.

9   Q.   What were they told?

10  A.   That sales were going well.  Basically sales were

11  going well and that we were making money.

12  Q.   And when I say were they told, who was telling them

13  that?

14  A.   Both Ian and myself.

15  Q.   Talking about Ian, Ian Bick?

16  A.   Correct.

17          THE COURT:  We're at the 4:00 hour at this point

18  in time so we'll have to suspend for the day.

19          So ladies and gentlemen, we'll be off tomorrow,

20  of course, because of Veterans Day.  We'll look forward to

21  seeing you first thing on Thursday at 8:45 a.m.  We very

22  much appreciate the careful attention that you're giving

23  to the evidence so far.

24          And I just remind you once again please don't

25  talk about the case with anybody at home or do any kind of

1    research concerning the case.  And we wish you a happy but

2    short holiday.  See you on Thursday.

3                    (Whereupon the jury left the courtroom.)

4              THE COURT:  You can step down.

5              Please be seated.

6              MR. McGARRY:  Your Honor, what time do you plan

7    on starting on Thursday with Mr. Wrobel?  Regular time?

8              THE COURT:  Mr. Wrobel, you need to be here well

9    before 9:00 a.m.

10             MR. McGARRY:  8:30?

11             THE COURT:  I think 8:30 would be a great idea.

12   And we'll see you at that point in time.

13             MR. McGARRY:  Thank you, Your Honor.

14             THE COURT:  All right.  In terms of the lineup,

15   what are we looking at?  I know obviously we're going to

16   spend a lot more time with Mr. Wrobel.

17             MR. SCHMEISSER:  Yes.  I believe the present

18   order after this -- again, we'll confer based on

19   schedules, but I think the current plan is to continue

20   with Mr. Wrobel on Thursday for a while.  And then move to

21   Henry Scozzafava, Steven Litchman, Gabe Desiqueira, Manny

22   Desiqueira, Geovanny Melendez.  I think the desire is to

23   get Steven Litchman on, but it's also Henry Scozzafava's

24   day off.  Those we're trying to get on.  I'm not sure if

25   that will be possible to get all those witnesses on.

1        THE COURT:  I'm sorry, after the Desiqueiras?

2        MR. SCHMEISSER:  Geovanny Melendez.  And that

3   would be the last person for that day.  I have in addition

4   to Wrobel, one, two, three, four, five other witnesses.

5        THE COURT:  That's for Thursday.  What about

6   Friday?  Is it going into Friday?

7        MR. SCHMEISSER:  Friday would be Rosemary Burke;

8   Robert Burke, her son; a representative from Danbury Power

9   Sports to talk briefly about the purchase of jet skis.

10   And possibly Jonathan Pinto, who was another investor or

11   classmate.  And then possibly Nataly Cardona-Vargas, who

12   is another investor.  Again, those are in part dependent

13   upon how long some of these other witnesses go.

14        THE COURT:  Okay.  Are there any hick-ups

15   concerning discovery concerning those witnesses?

16        MR. McGARRY:  I do not anticipate there will be,

17   Your Honor.  I'm sure we'll be talking to Mr. Einhorn.

18        MR. EINHORN:  We've been working pretty well

19   with the exhibits.

20        THE COURT:  It seems it.  Okay, that sounds

21   good.  All right.

22        And is there anything else in terms of the

23   physical exhibits?

24        Are there more objections that you're looking

25   at, Mr. Einhorn, other than the ones you've raised about

1   the photographs or things you might want to raise with the

2   Court?

3         MR. EINHORN:  I can't think of anything.  I hate

4   to keep jumping and down on leading questions.  Aside from

5   that, I can't think of any.  The alternative is not to

6   object anymore.  But I wish -- you know, I have to protect

7   my client's interest.  I think if the government is going

8   to continue to ask leading questions, I have no choice.

9         THE COURT:  I've sustained many of these

10  objections, so I think that if you hear a leading

11  question, you should certainly stand up and object if you

12  believe there's a leading question.  Sometimes I sustain

13  them and sometimes I think that they're not leading.  We

14  may have a different notion of what is leading.

15        I would just encourage the government once again

16  to -- it's a very different way of questioning between the

17  two prosecutors here.  And one of them is very much more

18  closer to the line than the other questioning.  I don't

19  know how else to say it.  If the questions were more

20  open-ended.  But I don't know how to keep doing these

21  question by question.

22        MR. McGARRY:  I think it's finding an

23  appropriate line, Your Honor.  Yesterday you told me I was

24  too open-ended with Dr. Forrester.  So perhaps I

25  overcompensated based on that.  And I'll recalibrate

1    again.

2            THE COURT:  I think when there's a cooperating

3    witness in this kind of case and this kind of testimony,

4    it would behoove the government to be open-ended about it

5    rather than the question forms at least I've seen.

6            MR. McGARRY:  Sure.

7            On the photographs, Your Honor, if I may, that

8    was kind of the next area I was going towards and I was

9    trying not to get there, only because I had plenty of

10   other questions.  But I think we'll try and work with

11   Mr. Einhorn because that, in my outline, for what it's

12   worth, is the next area where probably the other eight or

13   ten photos would be used.  So we can probably use sometime

14   tonight or tomorrow, maybe 8:30 or so on Thursday we'll

15   have a resolution, if you will.

16           THE COURT:  Okay.

17           MR. EINHORN:  I understand Your Honor's ruling.

18           THE COURT:  Mr. Einhorn, I'm not guaranteeing

19   that you'll have an opportunity to voir dire every single

20   one of these photographs, and the voir dire really has to

21   be restricted to the photographs themselves, the

22   authentication requirements.

23           MR. EINHORN:  I see where Your Honor's going.

24   I'm sure we'll work out the rest.

25           THE COURT:  Is there anything else?

1            MR. EINHORN:  No, Your Honor.  Thank you.

2            THE COURT:  Thank you.  We will stand in recess

3    and I look forward to seeing you on Thursday.

4                (Proceedings adjourned at 4:07 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5      RE:   UNITED STATES OF AMERICA v. IAN PARKER BICK

6                    No. 3:15CR1(JAM)

7

8

9           I, Diana Huntington, RDR, CRR, Official Court

10   Reporter for the United States District Court for the

11   District of Connecticut, do hereby certify that the

12   foregoing pages 1 through 59 are a true and accurate

13   transcription of my shorthand notes taken in the

14   aforementioned matter to the best of my skill and ability.

15

16

17

18

19                    _____/s/_____

20                    DIANA HUNTINGTON, RDR, CRR
                           Official Court Reporter
21                   United States District Court
                      141 Church Street, Room 147
22                   New Haven, Connecticut 06510
                           (860) 463-3180
23

24

25