UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 3:15CR1 (JAM) |
| | : | |
| IAN BICK | : | August 31, 2016 |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

This Memorandum is submitted in aid of the sentencing of Defendant Ian Bick ("Defendant" or "Bick"). The sentencing is currently scheduled before this Court for Friday, September 30, 2016. The Pre-Sentence Report ("PSR") prepared by the United States Probation Officer calculates the defendant's Guidelines' range to be 63-78 months. PSR at ¶ 70. However, the Government argues herein (and as submitted to the Probation Officer) that the calculation should also include an enhancement for sophisticated means, which would increase the adjusted Guidelines range to a level 28. With the defendant's criminal history of I, the advisory Guidelines range would be 78-97 months.

The Government submits this higher advisory Guidelines range is not simply the correct Guidelines range, and not simply the starting point, but in addition should be given substantial weight in determining the ultimate sentence. This is based on not only the nature and seriousness of the offense, which is very serious given the amount of loss and the extent and nature of the scheme, but also based on the history and characteristics of the defendant.

As discussed below and addressed in a separate pleading to be filed with the Court regarding post-conviction violations of the conditions of his supervised release, Defendant Bick

has shown no remorse for his conduct and has continued to engage in the same type of conduct that underlies his conviction.

Bick has violated the conditions of supervision by repeatedly traveling out of the State of Connecticut without approval of his supervising United States Probation Officer and lied to his supervising United States Probation Officer when he told her he had not left the State of Connecticut when in fact he traveled to the Empire City Casino in New York on multiple occasions to gamble.  *See* Attachments O and Q.

Bick ignored the Court's Order and the subsequent Probation Office's request that he produce financial statements that accurately reflected his financial condition and, contrary to the Court's December 14, 2016 Minute Entry, never arranged for an accountant to meet with the Probation Officer as Ordered by the Court during the December 14, 2016.  (*See*  Doc. No. 111.)

Perhaps most significantly, Bick has demonstrated a high likelihood that he will continue his illegal conduct in the future.  Bick has continued to raise money for his so called ventures and has done so based on materially false and fraudulent pretenses and had taken money from additional people promising them a return on their investments for "shows."  These new investors did not receive the promised returns.  For example and significantly, Bick represented to Martin and Jake Mallow that he would use their investment funds in connection with a Zomboy show that Bick represented was scheduled for late July 2016.  *See* Attachment M. However, no such show was ever scheduled to occur and never did occur, and the Mallow family lost approximately $9,800. To compound this fraud, when asked about the money by the Supervising Probation Officer, Bick falsely told his Supervising Probation Officer that he had refunded the money "weeks ago," when he had not.  *See* Attachment P.  These latest victims

have yet to be repaid.

This Memorandum provides a summary of evidence presented at trial as well as a summary of additional evidence developed through the investigation regarding the losses suffered by the victims. The factual record, which includes the Pre-Sentence Report ("PSR"), the trial record, and as supplemented by the Attachments to this sentencing memorandum, is sufficient for the Court to make findings on Guidelines loss, the number of victims, the additional specific offense characteristics, as well as Defendant Bick's role in the offense without the need for additional testimony or hearings.

Based on the trial testimony and the factual record, the Government submits that the defendant should be ordered to pay restitution in the amount of $495,886,[1] which represents the amount of loss suffered by the 27 victim-investors who invested with Bick and were defrauded. *See* Attachment "A."[2] This loss amount is not only supported by the trial testimony of the many victims that testified and by the Memoranda of Interviews attached hereto as Attachments C through N, but is also supported by Bick's own statement to the United States Postal Inspectors when he said he estimated he owed his "investors" between $500,000 and $600,000 (See Attachment S at 3) and is supported by documents that Bick himself produced to the Connecticut Department of Banking and to Mr. Steven Lichtman. *See* Attachment T (the document provided by Bick to the Connecticut Department of Banking (CTDOB-IPB 000371) and to Lichtman (SLICH-000035) list almost all of the victims included in Attachment A, including Henry

---

[1]    The loss figures include $5,000 owed to Eric Browndorf. (*See* attachment N at 3-6; 11-14). Mr. Browndorf reached a civil settlement with Bick after Browndorf discovered the fraud. It remains unclear whether Bick has, in fact, paid Browndorf monies under that settlement and so the figure remains on the restitution chart.

[2]    The Government has set forth in Attachment A, a detailed list of victim-investors and the loss amounts they invested with Defendant Bick which he used fraudulently for personal use and for Ponzi scheme payments to other investors. As discussed later in this Memorandum, included in the attachment is a detailed spreadsheet identifying when payments were made to investors and certain monies repaid.

Scozzafava, but actually calculate the loss as greater than the Government's calculation).

Contrary to his trial testimony, to the effect that he was going to work to pay everybody back, the Government is not aware of any efforts taken by the defendant to make any restitution payments since the date of is conviction. Instead, Defendant Bick has continued to lose money, now he seems to have additional creditors and additional victims, and has, on multiple occasions, violated the current conditions of release by traveling to Empire City Casino in New York and gambling away monies that could have otherwise been used to begin to meet his substantial restitution obligations. *See* Attachments O and Q.

During these excursions, he has made efforts to hide his excursions and the corresponding obvious violation of the terms of his present release and has falsely represented to the United States Probation Officer that he has not left the State of Connecticut without approval. Further, it is the Government's understanding that the defendant continues to obtain "investor" monies on false and fraudulent pretenses and has kept and/or embezzled the funds once obtained.

I. **Procedural Background and Summary of Offense Conduct**

A. **Procedural Background**

On January 8, 2015, a grand jury sitting in New Haven, Connecticut, returned a 15-count indictment charging the defendant with eleven counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 1-11), three counts of money laundering in violation of 18 U.S.C. § 1957 (Counts 12-14), and one count of making a false statement in violation of 18 U.S.C. § 1001 (Count 15). Prior to trial, the Government dismissed Count 12.

The Court held jury selection on November 4, 2015, and the trial commenced with the start of evidence two days later on November 6, 2015. In its case-in-chief, the Government

called 24 witnesses and introduced approximately 335 exhibits. Among the witnesses called at trial were a number of victims, who testified that Bick made specific promises and representations to them prior to their providing Bick with money, including specific representations as to how the money would be used, which Bick knew were false when made.

As discussed in detail below, the majority of the victim-witnesses testified that Bick represented to them that he would use their money to buy electronics, such as iPhones and other electronic devices, *via* the internet and sell them at a profit and from this profit provide them a specific return on their money. Defendant Bick promised the victims that, through W&B Wholesale and later W&B Investments, he would generate a profit for them and return both a profit and their initial investment. The victim-witnesses who testified at the trial included, among others, Denise Paume, David Paume, Wyatt Bosworth, Scott Tepper, David Osei, Dominic Atuahene, Kevin Bill, Brian Bill, Manny DeSiquiera, Steven Lichtman, Rosemary Burke and Nataly Cardona-Vargas. Another victim, Henry Scozzafava, who knew Bick somewhat from school, but who Bick befriended after Scozzafava received a rather large personal injury insurance settlement, testified that he invested certain monies with Bick on the representations that the monies would be used for specific agreed-upon concerts and, as to a separate investment, for use for the purchase of electronics (W&B Wholesale). Bick lists Scozzafava as being owed approximately $220,000 (*see* Attachment T), which corresponds almost precisely with the Government's calculated loss for Mr. Scozzafava. *See* Attachments A and B.

As the trial evidence established, Bick's entire marketing persona of purported investment success was a fraud. Bick repeatedly lied to his victims that their money was to be used for the particularized purpose he had represented. He lied to them when he represented that

returns were generated from the successful business (rather than Ponzi payments).  The victims

testified that their money was not intended to be used nor did Bick inform them that their money

would be used, however Bick wanted or chose to spend it -- including to pay for vacations and

hotels; expensive dinners in New York City; clothes from Gucci; jet skis or trailers; trips to

Empire City Casino; or other expenditures on Bick's own lifestyle.  As established at trial,

collectively the victims lost approximately $500,000 to Bick as a result of Bick's scheme.

Also at trial, the Government called various state and federal law enforcement agents,

including a U.S. Postal Inspector who had met with and interviewed Bick; an IRS agent; an FBI

forensic accountant (Ms. Karen Palmer) who analyzed Bick's bank accounts and traced the

money he had taken from his victims; and a Connecticut Department of Banking official, who

had interviewed Bick and subpoenaed Bick and to whom Bick produced documents pursuant to a

Connecticut Department of Banking subpoena. The United States Postal Inspector testified that

in response to a grand jury subpoena for business records, Bick, as a custodian of records for the

various entities that he controlled, had produced the same documents that he had produced to the

Connecticut Department of Banking.  Significantly however, the evidence at trial together with

the testimony of a United States Postal Inspector established that the documents produced to the

United States Postal Inspectors in response to a Grand Jury Subpoena had been materially altered

when compared with the same documents that had been produced by Bick to the Connecticut

Department of Banking.  Gov. Exh. 604 and 604A (altered checks on which Bick had written

"Artist Deposit").

The Government also called a cooperating witness, John Wrobel, a co-conspirator and

Bick's partner in W&B Wholesale and W&B Investments.  Wrobel testified at length at trial

about the scheme, including that at Bick's direction he, Wrobel, fabricated spreadsheets to

falsely represent the purchase of pallets of iPhones – when, in truth, such pallets did not exist.

Wrobel testified that the fake spreadsheets were provided to a victim-investor, Scott Tepper, who

"wanted to know where his money was going." Trial Tr. Vol. III (Wrobel) at 808-09. Wrobel

testified that the fraudulent spreadsheets had been manufactured at Bick's instruction. *Id.* at 808;

Gov. Exh. 905, 906, 908.  Wrobel further testified that there were no iPhones; there were no

sales; and the sales listed on the spreadsheets were fake. Trial Tr. Vol. III (Wrobel) at 808-09.

Wrobel himself had pleaded guilty in Connecticut State Court for lying to the Department of

Banking about various expenditures and at trial implicated Bick in the same illegal conduct of

lying to the Connecticut Department of Banking.[3]

On November 25, 2015, the Jury returned verdicts of guilty on six (6) counts of wire

fraud in violation of 18 U.S.C. § 1343 (Counts 5, 6, 7, 9, 10, and 11) and one (1) count of money

laundering in violation of 18 U.S.C. § 1957 (Count 14). The Jury was deadlocked on three counts

of wire fraud (Counts 1, 3, 4) and deadlocked on one count of money laundering (Count 13). The

Jury also returned a verdict of not guilty on two counts of wire fraud (Counts 2 and 8) and

returned also returned a verdict of not guilty on one count of making a false statement in

violation of 18 U.S.C. § 1001 (Count 15). The defendant Bick, through counsel, moved the Court

for a mistrial on the counts on which the Jury deadlocked, Counts 1, 3, 4, and 13; that motion

was granted by the Court. Accordingly, defendant Bick stands convicted of multiple felonies,

including more specifically, wire fraud on Counts 5, 6, 7, 9, 10, 11 and money laundering on

---

3        Both the alterations of documents Gov. Exhs. 604 and 604A and the false testimony to the Connecticut
Department of Banking provide the court grounds to include an enhancement for obstruction of justice pursuant to
U.S.S.G. Section 3C1.1 Application Note 4.

Count 14.

      **B.**      <u>**Offense Conduct**</u>

The offense conduct is accurately summarized in the PSR at ¶¶ 5-16 and is of course

supplemented by the detailed trail record and the additional documents attached hereto at

Attachments A-T.

      **1.**      <u>**Evidence of the Scheme Presented**</u>

The evidence at trial established that from approximately October 2012 and continuing

until the date of the indictment in January 2015, the Defendant Bick engaged in a scheme to

defraud investors and in furtherance of the scheme caused the use of interstate wirings. Bick also

engaged in an illegal monetary transaction greater than $10,000 by using the proceeds of the

fraud to purchase jet skis.   The evidence at trial established that Bick misrepresented to his

victims that he could earn significant returns for them in a relatively short period of time.  These

representations were false.

The trial established that Bick had previously promoted parties and certain DJ-type

concerts for teenagers in Danbury that drew large numbers of young people from the local high

schools, but were of limited financial success. Trial Tr. Vol. IX (Bick) at 2249-2262.  Bick

promoted these small-time concert ventures under several corporate names, but most frequently

did so under the name of the entity named Planet Youth Entertainment. *Id.* at 2249, 2286-87.

Bick then tried to expand to larger venues during the time of the scheme, but, as the

evidence showed, did not make any profit on any of those attempts, and, in fact, lost money on

all the shows. *Id.* at 2471. Trial Tr. Vol. III (David Osei) at 564-65 (Q. And when you were in

college, did you make money generally or lose money on these ventures? A. Lost money on the

ventures); *Id.* at 570 (Q. Do you remember approximately how much Mr. Bick's partners put into
Big Sean? A. I'd say maybe ten to 15,000. Q. How did it do? A. It lost money.); *Id.* at 573 ("the
Rusko show at the Ryan Center -- … how did that show do financially? A. Lost money."); *Id.* at
574-75 (Q. How did, overall, the Crizzly show do? A. I'd say it was a loss. . .. Q. And did Ian
Bick's company, Planet Youth Entertainment, lose money? A. Yes.); *Id.* at 575 (testifying that
Electric Flurry at UMass lost money); *Id.* at 617-18 (testifying that Kid Ink in Waterbury lost
money and Kid Ink in Providence lost money); *Id.* at 619 (testifying that the show at Lupo's lost
money); *Id.* at 622 (testifying that the Tyga concert at the University of Rhode Island lost
$40,000 - $50,000).

During the same time period Bick claimed that he had started and was successfully
operating an electronics wholesale business, which he claimed, bought and sold electronics and
electronic devices, such as pallets of iPhones, tablets, DVDs, head phones, on the internet and
made a significant profit. Trial Tr. Vol. IX (Bick) at 2213, 2319-24. The evidence showed that
this electronics business -- while the ruse for obtaining funds from investors -- failed quickly and
did not return any meaningful profit.  *Id.* at 2415.  In fact, John Wrobel testified that the
electronics business only bought and sold about $5,000 or $6,000 worth of electronics and did
not make any profit. Trial Tr. Vol III (Wrobel) at 793-795. Wrobel testified that the business lost
money. *Id.* At no point did Bick buy large volumes (or pallets) of iPhones. *Id.* However, as
Wrobel testified, Bick repeatedly lied to people (including the victims here) that they were
buying pallets of iPhones. *Id.* The evidence also established that after their initial failures,
including being banned from certain internet sites for attempting to sell what were determined to
be counterfeit goods, Bick and Wrobel weren't buying any more electronics, but they were

however, still continuing to take client money as purported investments in the electronics

business. Trial Tr. Vol III (Wrobel) at 803.  This was fraud.

More specifically, Wrobel testified about the material misrepresentations made in

connection with the scheme as follows:

> Q. At this point in July, tell the jury what's going on with the bank account and the
> business.
> A. At this time we aren't buying any more electronics, we're still continuing to take in
> investments.
> Q. And what were you telling people when you were continuing to take in investments?
> A. That we were going to use their money to buy electronics.
> Q. And was that a true statement?
> A. It was not.
> Q. And what were you telling people when you gave them purported interest checks?
> A. That this money that's coming back to them is from profits of the electronics. Q. And
> was that a true statement?
> A. It was not.
> Q. Was Ian Bick making those statements?
> A. Yes, he was.

Trial Tr. Vol III (Wrobel) at 803.

The evidence at trial also established that later on in the fraud scheme Bick tried to start

other ventures, including a nightclub called Skyy Bar. Trial Tr. Vol. IX (Bick) at 2388. The

evidence established that Bick used money from the victims, who were told that their money was

going to the electronics business, to pay for work done on the Skyy Bar, including paying the

credit card bill of the person who renovated the Skyy Bar space. *See* Trial Tr. Vol. VI,

(Caccamo) at 1625-28; Gov. Exh. 325 (Credit Card Statement), 117, 728 (showing cashier's

check of $12k to Caccamo, funds drawn from Lichtman $55k investment); Trial Tr. Vol. VII

(Palmer) at 1758-59 (tracing funds for Caccamo to $55,000 provided by Lichtman).

The evidence established that time and time again Bick, together with Wrobel, defrauded

friends, former classmates and their parents, as well as acquaintances by promising to use their

money for one thing, and then spending it as if it were Bick's own money, using it for whatever he pleased. The fraud included both "actual, direct false statements as well as half-truths" and included "the knowing concealment of facts that are material or important to the matter in question and that were made or used with the intent to defraud." 2A Fed. Jury Prac. & Instr. § 47:13 (6th ed.). Additionally, Bick throughout the scheme deprived others of "information necessary to make discretionary economic decisions," *See United States v. Carlo*, 507 F.3d 799 (2d Cir. 2007),[4] and painted an entirely misleading picture of how investors' funds were being used, through direct lies and half-truths. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).[5]

In pitching his scheme, the investments were at times called "loans" or in other instances "joint ventures" or "joint participation" agreements. *See id.* at 2421 (Steve Lichtman's agreement was titled "Joint Venture Agreement") *compare with id.* at 2343 (agreement with Henry Scozzafava says the money is a "loan" and Henry is a "Music Venture Participant"). However, regardless of the terms used to describe the arrangement, Bick continued to lie both orally and in writing, including in text messages and e-mails, to convince investors to part with their money.

---

[4] *Id.* (per curiam) (concluding that the defendant "caus[ed] . . . developers to make economic decisions about the viability of their real estate projects based on misleading information" and thereby "harmed the developers' property interests"); *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998); *Dinome*, 86 F.3d at 283-84 (false information on mortgage loan application deprived bank of "information relevant to its decision whether it would extend [the defendant] a loan"); *United States v. Tomicic*, No. 3:09 cr 210, 2012 WL 2116143, at*2 n.1 (D. Conn. June 8, 2012).

[5] *Id.* ("it is just as unlawful to speak half-truths or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading") (internal quotation marks omitted). *Accord United States v. Townley*, 665 F.2d 579, 585 (5th Cir. 1982) (holding that "under the mail fraud statute, it is just as unlawful to speak 'half-truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading").

11

Bick repeatedly promised remarkably high returns over relatively short periods of time from the businesses, in some instances he promised returns as high as a 50% return in a matter of weeks. Bick knew when he made the representations that he did not have profitable businesses generating returns and, in fact, he wasn't even buying or selling electronics as promised. Bick made lulling payments that created the appearance that he had generated returns and did so by making Ponzi payments using other investors money. His businesses did not generate a profit. Bick's promises came with the false conviction of certainty, when the truth was that the promised profits were impossible to generate. The promise that he would generate such high returns from electronics' sales was fraud *ab initio* as he was not buying electronics to resell. Some examples of the high returns promised representations are as follows:

• Mr. Dominic Atuahene testified: "Q. And what is Government's Exhibit 701? What is this document? What do you recognize this to be? A: Okay. This was I give him 5,000 for return of 7,500." Trial Tr. Vol. I (Atuahene) at 701. *Accord* Gov. Exh. 701.

• David Osei testified: "I believe Ian said there would be a 50 percent return on top of the initial loan or investment…" Trial Tr. Vol. I (Osei) at 583.

• David Paume testified: "Q. What happened next with this first $5,000? A. I believe in two weeks the money came back with 50 percent interest. It was $7,500 came back to us, to my son." Trial Tr. Vol. I (David Paume) at 182. *Accord* Denise Paume, Trial Tr. Vol. I at 65.

• Ms. Rosemary Paccione-Burke testified: "A. He [Robbie] told me that he had met with Ian and also had spoke with his other schoolmates and that there was an opportunity to loan Ian money and get a nice return on that loan. Q. And what was the nice return? A. The nice return was 50 percent of the loan amount." Trial Tr. Vol. VI (Paccione-Burke) at 1385.

• Mr. Scott Tepper also testified that he was promised a 50% return. Trial Tr. Vol. I (Scott Tepper) at 238-239; *Accord* Gov. Exh. 901. *Id.* at 250-51 ("He started with this is what it is, you get 50 percent out, that's it.")

• Mr. Lichtman was also promised a return of 50%. Trial Tr. Vol. V (Steve Lichtman) at 1279; Gov. Exh. 625, 636 (contracts) and 649 (Joint Venture Agreement).

Wrobel testified that the representations made to victim investors, including that Bick and W&B would be using the funds to purchase electronics and electronic devices, such as pallets of iPhones, tablets, and head phones and resell the electronics *via* the internet, were simply not true. Trial Tr. Vol. III (Wrobel) at 787-88, 794-95. As Wrobel testified that the electronics business itself did not make any profit (*Id.* at 793-795), and that the money used to make the phony interest payments or "return of the profits," came from the funds of other investors. *Id.* at 800-03.

The testimony of the FBI Forensic Accountant and the bank records established the same fact. Instead of running an electronics business as he had represented to the victim-witnesses, the defendant Bick was running an ordinary Ponzi scheme and the "returns" were simply the payment of monies invested by other investors.  Trial Tr. Vol. VII (Palmer) at 1717-29, 1742-48, 1756-61, 1800-05; Gov. Exh. 57, 64, 96, 101, 108, 117, 725, 727, 728, 729, 730, 732.

Similarly, Bick represented to other victim-investors, most notably Henry Scozzafava, that he had made significant profits organizing and promoting concerts in the past, when in truth he had not made such profits, if any profit at all, on the concerts. Trial Tr. Vol. V (Scozzafava) at 1171-79, 1186, 1197; Gov. Exh. 2, 19, 42, 53, 64, 728, 730, 742; Trial Tr. Vol. III (Osei) pg. 569-76, 602-609.  In fact, contrary to Bick's claim of concert success, as David Osei's testimony established, Bick suffered large financial losses in connection with his failed attempts at concert promoting. Osei testified that the concerts did not make any money. Trial Tr. Vol. VII (David Osei) at 676 (testifying that the Big Sean concert lost money as not enough tickets were sold); *Id.* at 677 (testifying that the Rusko concert lost money because not enough tickets were sold); *Id.* at 678 (testifying that Crizzly lost money); *Id.* at 680 (Kid Ink lost money due to lack of ticket sales). Additionally, Bick represented to Scozzafava that Bick would be using the funds from

13

Scozzafava – and as confirmed in the investment agreement – for the promotion of specific scheduled events and that profits from those events would be shared. Trial Tr. Vol. V (Scozzafava) at 1171-79, 1186, 1197.  Bick did not represent to Scozzafava orally or in writing that certain later concerts that actually also lost money would be "attributable" to Henry.  In reality, as the bank records reflected, Bick did not use the Scozzafava money as represented, but instead Bick used the funds immediately for a wide range of other purposes – treating the investment monies as Bick's personal piggy bank. Trial Tr. Vol. VII (Palmer) at 1714-29, 1745-48; *see* Gov. Exh. 2, 19, 42, 53, 64, 728, 730, 742. Bick used investor funds to live lavishly in the moment, including trips to Key West Florida, Malibu, California, New York City, and shopping at among other places Gucci and Tiffany's. Bick conducted himself and importantly his finances with little or no regard for the specific promises that he had made.

The FBI Forensic accountant, Ms. Palmer, reviewed the bank records and her review and testimony corroborated the fact that a substantial portion of investor funds were not being used as represented, instead funds from the later investors were used to make Ponzi-like payment to generate the false returns and the appearance of success and moreover, other investor funds were being used to pay for trips with friends and for shopping. Trial Tr. Vol. VII (Palmer) at 1714-29, 1745-48; *see* Gov. Exhs. 2, 19, 42, 53, 64, 728, 730, 742.

The evidence presented at trial also established that, as part of the scheme, Bick lulled victim-investors into believing that their funds were being invested as promised and sought to delay discovery of the scheme by periodically making Ponzi payments to victim-investors, calling them "interest payments" or "return of principal," when he was simply using monies obtained from other victim-investors. Trial Tr. Vol. VII (Palmer) at 1717-29, 1742-48, 1756-61,

1800-05; *see also* Gov. Exhs. 2, 19, 42, 53, 64, 728, 730, 742.

These Ponzi payments to victim-investors furthered the scheme because Bick was able to convince investors to "reinvest" monies paid out to them, again by misleading the victim-investors into believing that Bick was earning viable returns that would warrant investing again. The trial testimony of the victims shows how they were in fact fooled for a period of time.  Trial Tr. Vol. VI (Paccione-Burke) at 1393-1404, 1416 ("Q. In any event, it turns out you got your money back plus 50 percent interest early, right? A. Correct. Q. So you got your 50 percent interest, and I think your exact words this morning were you thought it was a good thing, right? A. Yeah. You know, it's what he promised and he delivered. Great."); *see also* Vol. I (Denise Paume) at 72-82, (David Paume) at 182-87; Trial Tr. Vol. V (Lichtman) at 1302-03 ("Q. So you were, in essence, rolling the money back in, but instead of just leaving it with him, you wanted the fourteen to come back first and then roll it back in? A. Yes. That shows good faith and shows that he could actually produce the $14,000.")

Throughout the scheme, Bick perpetuated his false picture of financial success.  He did not correct the misleading image by telling investors that he was losing money nor did he tell victims that their funds were simply used for Ponzi payment and to support his carefree lifestyle. Trial Tr. Vol. VI (Burke) at 1461-75; Vol. II (Tepper) at 295-325; Vol. I (David Paume) at 182-198; Gov. Exh. 780, 858A, 916.  In fact, Bick perpetuated the scheme, even after arranging for an attorney to enter payment plans with victims, by again making additional material misrepresentations to new investors to get funds to pay earlier investors. Trial Tr. Vol. I (David Paume) at 193-198; *see also* Gov. Exh. 603, 631, 725, 727, 728, 729, 730, 742, 780, 784, 785, 790A, 790E.

As the scheme crumbled, Bick continued to make false statements to keep the scheme going and, as late as May of 2014, when he was already hundreds of thousands of dollars in debt (Gov. Exh. 732), Bick lied to an elderly woman to get additional funds and then returned to her modest home to ask for an additional $10,000, a request for funds she declined as she literally did not have that the money to invest. Trial Tr. Vol. IV (Wrobel) at 936-38.  Ms. Anastasia Osdranus and her son Charlie have never seen any return on the $6,000 and though Bick falsely represented that Charlie would be a part owner in Bick's night club venture, Bick has never shared any profits (if any even exist) with him.  *See* Attachment K

### 2. The Testimony of the Victim Witnesses Established the Scheme to Defraud

The Government called approximately 15 victim-witnesses who were defrauded by Bick and who lost money in the scheme.  Examples of testimony relating to particular victims and the counts of conviction are included below:

- ### The Burkes Testified at Trial as to How They Were Defrauded.

Defendant Bick was convicted of wire fraud on Counts 5, 6, and 10, which involved Bick's scheme to defraud and certain identified wires that furthered the scheme and that were made in execution of the scheme. These wires related to Bick's interaction with the Burke family. Bick was also convicted of Count 14 relating to an illegal monetary transaction relating to Bick's use of a substantial portion of $50,000 that had been invested by the Burkes to purchase jet skis and a trailer.  Gov. Exhs. 64, 69, 756.

Both Mr. Rosemary Burke and her son Robert Burke testified at trial. Mrs. Burke testified, among other things, that Ian Bick had told her that he was buying and selling

electronics *via* the internet and that business had already made profits for other people. Trial Tr.

Vol. VI (Paccione-Burke) at 1387. Ms. Burke testified that Ian Bick:

> ". . . explained that he was an entrepreneur and was not in college and had this business model where he would buy electronics such as the popular item at that time was the Beats headphones and the pads. They weren't iPads but another computer-type tablet. And that they were able to buy them and turn them over and sell them very quickly on the internet and make a sizeable profit. He didn't have enough capital on his own to buy as much and sell as much as he could, so he was looking for a loan to buy more and sell more, and we would get a piece of that profit."

*Id.* at 1386. Bick told her that he had already made profit for other people with his

business plan with the electronics. *Id.* at 1387.

After Bick took the initial investments from the Burkes he sought additional monies from

them. To accomplish this, Bick told additional lies to the Burkes, including convincing the

Burkes that their initial investment had resulted in a return. According to Ms. Burke's testimony,

"[w]hat happened next is the money went away for a while and a few weeks later it came back

with the 30,000 a little bit early." *Id.* at 1391. After getting the investment and the purported

profit back, according to Ms. Burke, "A. What happened next was we invested. We loaned

further money." *Id.* at 1391-92. The Burkes eventually increased their primary investment to

$50,000 and, as the testimony established, the purpose of that investment was "[a]gain, it was

going to purchase electronics from overseas and to be sold at profit on the internet." *Id.* at 1393.

When she was asked about the returns on her earlier investments, Ms. Burke testified: "I had

every indication that the transactions that we agreed to were being executed as we had agreed

and discussed, and they continued to do well and everything was going according to our

discussion and our agreements." *Id.* at 1394-95. From her perspective, she believed Ian Bick was

successful at this time. *See Id.*

17

However, as established at trial, Bick was running a Ponzi scheme. As Bick himself testified to on cross-examination, the money that was in his bank account when he sent the Burkes $30,000 (the purported profit) came from other investors. (Trial Tr. Vol. X (Bick) at 2610-13 ("Q. But the money that was in the bank account came from other people, didn't it? A. Yes"). *Accord id.* at 2583-85 ("Q. And a check went to the Burkes for $30,000, didn't it? A. Correct. Q. So from this account, one of the sources of the money would necessarily be a portion of Mr. Tepper's money, wouldn't it? A. Yes.")

Ms. Palmer, the FBI forensic accountant also demonstrated the Ponzi nature of the payments and showed how the monies that comprised the $30,000 transfer in large part were simply other victim-investors' money.  Trial Tr. Vol. VII (Palmer) at 1801-02; Gov. Exh. 57. The $30,000 wire transfer from the account of W&B Wholesale to the Burkes' account at JP Morgan Chase Bank was made in furtherance of the overall scheme by misleading the Burkes that the prior investment had been legitimate and earned a substantial return. The lulling payment – as Bick fully intended – convinced the Burkes that the prior investment was legitimate and profitable.  The jury, however, was not deceived.  In considering the evidence, the jury found the wiring furthered the scheme and convicted Bick on Count 5.

Immediately after providing them the $30,000 lulling payment, Bick sought and obtained the $50,000 investment from the Burkes. Ms. Burke testified that Bick had told both her and her son that the $50,000 "was going to purchase electronics from overseas and to be sold at profit on the internet." Trial Tr. Vol. VI (Paccione-Burke) at 1393; Gov. Exh. 63 (wire transfer of $50,000). Ms. Burke testified that based on her conversations with Bick, the business purpose of the $50,000 was "to be for electronics, at that time would be headphones and the computer

tablets." Trial Tr. Vol. VI (Paccione-Burke) at 1394. Relying on Bick's fraudulent representations regarding the promised return, the use of the money, and the belief of the apparent profit payments, the Burkes wired $50,000 from their account at JP Morgan Chase to W&B Wholesale account at Wells Fargo. This wiring in execution of the scheme was charged as Count 6 and Bick was convicted on this count as well.

At the time Bick was defrauding the Burkes out of the $50,000, Bick knew he was not making a profit on electronics; he knew he could not guarantee a 50% return; he knew he was using other investors' money to make the lulling payments; and he plainly knew he was using investors' money for other things. In fact, as established by the testimony and exhibits introduced by the FBI forensic accountant, within a day of receiving the $50,000 Bick used a substantial portion of the $50,000 to purchase two jet skis and a trailer, among other items. Trial Tr. Vol. VII (Palmer) at 1727-29. This immediate use of the Burke's $50,000 investment to purchase the jet skis constituted the illegal monetary transaction that was charged and proven in Count 14, of which Bick was also convicted. Gov. Exh. 64; Trial Tr. Vol. VII (Palmer) at 1803-04 (Q. So is it fair to say that a good portion of the Burke's money ends up going to Danbury Power sports? A. Yes).

Ms. Burke also testified about a subsequent $10,000 investment that she made with Bick. Burke testified that the $10,000 was also to be used for "items, the electronics and the headphones and the tablets." Trial Tr. Vol. VI (Paccione-Burke) at 1396. As a result of the apparent financial success that Bick portrayed and in reliance on the materially false representations made by Bick, Ms. Burke wired the additional $10,000 to Bick. This wiring was charged as Count 10, of which Bick was convicted. The testimony of the FBI forensic accountant

and the summary bank charts established that the $10,000 money provided to Bick was not used to purchase electronics but was used instead for purchases related to Skyy Bar, merchants such as Buffalo Wild Wings, to pay John Wrobel, and to cover an American Express Bill. *See* Gov. Exh. 108; Trial Tr. Vol. VII (Palmer) at 1747-48.

- **The Paumes Testified at Trial as to How They Were Defrauded.**

Denise Paume testified that she met with Bick and discussed investing. Based on the conversations with Bick, her "understanding was that his business made money from selling electronics online." Trial Tr. Vol. I (Denise Paume) at 59. She further testified that Bick told her that "they bought them [electronics] on pallets. They would get a large quantity of electronics to sell online and they were able to make a higher profit by purchasing them that way." *Id.* at 60. Ms. Paume testified that Bick told her that the return on their investment was due to the fact that he would sell these, the electronics, at such a good price. *Id.* at 64. She testified that the return on their investment was due to the profit on the electronics sales. *Id.* at 66. Ms. Paume testified that it was an important part of her understanding that the investment funds went to the electronics business. *Id.* at 69.

Ms. Paume testified that received some money back and they subsequently reinvested with Bick. *Id.* at 70-71. She also testified that she did not want her funds to go to concerts or any other businesses ventures, but that the agreement was for the electronics business. *Id.* at 72-73. Ms. Paume testified that the apparent success in the smaller investments absolutely played a role in their decision to put in larger amounts of money. *Id.* at 81. Ms. Paume testified that "[w]e were investing our money with the understanding from our discussions with Ian that the monies were being used to purchase electronics." *Id.* at 164.

20

Mr. David Paume (Ms. Paume's spouse) also testified and corroborated the testimony of his wife. *See generally* Trial Tr. Vol. I (David Paume) 176-229. For example, Mr. Paume testified, "I was told that he bought electronics equipment. I was never quite sure where it came from, but he was able to sell it on the internet for a good profit." *Id.* at 182. Mr. Paume also testified, "[w]e felt it was a good investment. We'd invested with him twice before. We had gotten our principal plus interest back. And we thought that this is legitimate. He had an office, it all made sense, and we thought we should invest more money." *Id.* at 185-86. Ms. Denise Paume and Mr. David Paume lost a significant amount of money in Defendant Bick's scheme.

The testimony of the FBI forensic accountant Ms. Palmer, as well as Gov. Exh. 64, established that the $50,000 wired to Bick did not, in fact, go to the purchase of pallets of electronics as Bick had represented, but instead was used, almost immediately (which is indicative of Bick's fraudulent intent), for a trip, for shopping at Gucci and other stores, and to make payments to other victim-investors such as Scott Tepper.

The wire fraud alleged in Count 7 – of which Bick was convicted – was established by the testimony of the victims, the co-conspirator Wrobel, the bank records, the testimony of the forensic accountant, and relevant text messages, Gov. Exh. 780 (*see* Trial Tr. Vol. I at 188). The trial record made clear that Bick knew when telling the Paumes how their funds were to be used, that he did not intend to use the funds as promised. In fact, as further evidenced by the Bank record Bick made Ponzi payments to fraudulently entice the Paumes to invest the larger $50,000 investment.

- **<u>Steven Lichtman Testified at Trial as to How He Was Defrauded</u>**

The jury heard substantial testimony from Steve Lichtman about the face-to-face

meetings and about numerous false representations made by Bick to Lichtman.  Mr. Lichtman testified that he had spoken with Bick and Wrobel and it was his understanding based on those conversations that the electronics side of their business was profitable. Trial Tr. Vol. V (Lichtman) at 1273-74. Bick indicated to Lichtman that the profit "would come from product sales, since they were buying and selling them, and there was a pretty quick turnaround to those products." *Id.* at 1276-77. Lichtman testified that his understanding of W & B Wholesale was "buy something wholesale and sell it for retail or any other way, that means you're making a profit on products." *Id.* at 1278. Mr. Lichtman was promised a return of 50%. *Id.* at 1279; Gov. Exh. 625, 636 (contracts), 649 (Joint Venture Agreement).

Relying on the various false representations, the Lichtmans transferred $10,000 *via* wire transfer from the account of Barbara Lichtman at Bank of America to the W & B Wholesale account at Wells Fargo. This payment constituted a wiring caused by Bick in execution of the scheme as charged in Count 9 of which Bick was convicted. Lichtman testified that the $10,000 wire transfer was to be used for the purchase of electronics. He testified "[m]y understanding, in my view it was for the electronics." Trial Tr. Vol. V (Lichtman) at 1279. The testimony of FBI forensic accountant Karen Palmer, however, showed that this initial investment was not used for electronics, but instead was used for gambling at the Empire City Casino in Yonkers, and together with other investors' funds, was used to pay Robert Burke a payment in the amount of $20,000. Trial Tr. Vol. VII (Palmer) at 1745-47. This payment to Burke was obviously a lulling payment in further of the Ponzi scheme.

Defendant Bick also made lulling payments to Lichtman which suggested to Lichtman that his initial investment was legitimate and generating a profit. Lichtman, together with his son

and his son's college roommate (Browndorf), had invested $10,000 anticipating a return of

approximately 40% for a total of $14,000. To perpetrate the fraud, Defendant Bick made a

$14,000 return payment, even though there were no profits from the electronics. *See* Trial Tr.

Vol. III (Wrobel) at 793-95. Nevertheless, Bick paid the $14,000, as Lichtman testified first there

was a check that bounced, but subsequently "there were two cash deposits made into my account

-- I believe one was for 5,000, one was for 9,000 -- the same day. Cash clears right away, so that

made it whole." Trial Tr. Vol. V (Lichtman) at 1302.

    As a result, and based on additional conversations and e-mail correspondence where Bick

maintained the story of how the money was being used on electronics and how he was

successful, Bick convinced Lichtman to invest further. *Id.* at 1285-88; Gov. Exhs. 632, 633, 634;

*Id.* at 1293-94. Lichtman testified that he was investing in the W&B Wholesale business. *Id.* at

1294. Lichtman also testified that Bick told Lichtman about Bick's product sales business,

including the internet sites through which they sold their products, including eBay. *Id.* at 1299.

Specifically, Lichtman testified that Bick told him "[t]hat they were buying and selling and

turning the inventory where they could do investment paybacks within 45 days." *Id.* at 1300.

Based on the bank records and the testimony of Wrobel, this was an entirely false statement.

    On or about November 1, 2013, Bick caused Lichtman to send via interbank wires a

transfer of funds of $55,000 from the account of Lichtman Marketing Group (owned by Steve

Lichtman) at Sovereign Bank to the W & B Investments account at People's United Bank. *See*

Gov. Exh. 635. This interbank wiring of $55,000 of funds, which was charged as Count 10 and

Bick was convicted on this Count. As with the other investments, this $55,000 investment was

not used for the purchase of electronics. As noted by the forensic accountant at trial, there was no

money in Bick's account on the day the $55,000 was wired to Bick. Rather than purchase electronics, it was almost immediately used within the next few days to make Ponzi scheme payments to Ryan Groenewegen (who also testified) and Dominic Atuahene (who also testified), to pay off a Citicard credit card bill, and $27,000 in cash was withdrawn from the account. Trial Tr. Vol. VII (Palmer) at 1756-61; Gov. Exh. 117. Based on the speed with which the defendant Bick spent the $55,000, it is clear Bick never had any intention of purchasing $55,000 worth of electronics to sell over eBay or any other site.

Nonetheless, even after the $55,000 was spent Bick met with Mr. Lichtman in Danbury and continued to make additional material misrepresentations about his success in business. Bick even told Lichtman that Bick had an accountant/bookkeeper who was helping to do the accounting for the business. *Id.* at 1308-09.[6]  Bick told Lichtman, among other false statements, "Currently, the majority of [their] profits come from inventory sold online." *Id.* at 1311; Gov. Exh. 641. Bick also said that he "had a good handle on everything and said there were no money issues." *Id*. at 1314; Gov. Exh. 643.

- **Scott Tepper Testified at Trial as to How He Was Defrauded**

Consistent with most of the other victim-witnesses, Scott Tepper also testified about his investments with the defendant. Mr. Tepper testified that Bick made clear that the money was going to wholesale electronics and no other events: "I wanted to be specific that it had to do with this, because he said he had a track record with this with a partner. And he offered a personal guarantee." Trial Tr. Vol. I (Tepper) at 239. He clarified that "this" meant "Wholesaling. Not

---

6      Similarly, Bick told his Supervising Probation Officer on or about June 1, 2016 that he was meeting with three accountants and was going to make a decision as to who he was going with to give probation a picture of his financial condition, but the Probation Officer has not as of yet ever been able to have a meeting with an account for Bick or his business.

putting on rock star events, not running his club, not doing these other entities." *Id.* The testimony from the FBI forensic accountant Karen Palmer, however, established that Mr. Tepper's money was pooled with money from Jonathan Pinto substantially to make a $30,000 payment to Robert Burke. Trial Tr. Vol. VII (Palmer) at 1801-04, Gov. Exh. 57, 64.

- **Henry Scozzafava Testified at Trial as to How He Was Defrauded**

As reflected in trial testimony, and which the Court no doubt remembers, Henry Scozzafava was completely deceived by Bick and ended up giving him hundreds of thousands of dollars from a personal injury settlement. Bick went to the same high school as Scozzafava but Bick did not befriend Scozzafava until <u>after</u> Scozzafava had received a substantial settlement for an injury he suffered at a fitness gym. Trial Tr. Vol. V at 1147-50, 55-60.

Bick approached Scozzafava and Bick convinced Henry to give Bick $225,000 to fund specific, previously identified concerts. Trial Tr. Vol. V at 1186. As reflected in the trial exhibits, the moment Bick obtained those moneys from Scozzafava, Bick spent them on making Ponzi payments to others and spending the monies on vacations and other trips for Bick. *See, e.g.*, Gov. Trial Exhs. 2, 19, 42; 742 (pie chart demonstrating how money was spent) Attachment U. This money was not used for concerts as had been represented, and infact the money was spent long before the concerts were even scheduled to take place. *See* Gov. Exh. 19, 42. The contract Gov. Exh. 851, lists the specific dates for the concerts that Henry was investing in as: September 23, 2013, November 15, 2013, November 18, 2013 and December 20, 2013. Trial Tr. Vol. V at 1185-86. However, the money was long spent before the concerts even were scheduled to take place.

Once the monies were spent, Bick owed Scozzafava repayment of the stolen monies. At

no point did Bick tell Scozzafava he had already spent his money.  At no point  did he tell

Scozzafava that he was raising additional money to use to fund the concerts from other victims,

as he had spent Henry's money, and at no point did he repay Scozzafava, with the exception of

certain limited Ponzi payments. *Id.*  Instead, Bick defrauded other later investors to give him

more money.  It is unclear how much of the later investors funds were used to fund the money

losing concerts, but those funds were lost as well.  Since, as David Osei testified all the shows

lost money.

Bick then came up at trial with his novel theory that we should consider the later monies

he stole from later investors and lost as monies "attributed to Henry."  However, long before the

time Bick was promoting later concerts, Henry had already been defrauded by Bick and, as

reflected on the charts introduced at trial, Bick had already spent Henry's money.  *See*

Attachment B, U (Gov. Exhs. 19, 42, 742).

Additionally, Bick convince Scozzafava to invest an additional $11,000 with him when

they were in California on a trip that was funded, unknowingly, in large part by Scozzafava's

money.  Scozzafava gave Bick a check for $11,000 that was intended to be used as an investment

for "Electronics to be resold onto the internet."  Trial Tr. Vol V at 1197; Gov. Exh. 854.

*See*1196-1198.  Scozzafava entered into an agreement (Gov. Exh. 855) that just like the other

agreements was with W & B investments LLC and related to the buying and selling of

electronics.  Moreover, Scozzafava was subsequently induced into rolling money over into what

he was led to believe was a larger investment.  Gov. Exh. 856; Trial Tr. Vol V at 1199-1202;

Gov. Exhs. 854.   This investment, which was separate and distinct from the concert investment,

was also based on false and fraudulent statements as there was no buying and selling of

electronics.   These representations were not true and Scozzafava lost this money as well as the money he had been told would be used for concerts.

- **Other Victims Testified at Trial as to How they Were Defrauded**

The Defendant Bick followed the same fraud playbook with virtually every victim, painting of a picture of entrepreneurial success, and lying about the anticipated use of the invested monies.   As discussed in Attachment B (the annotated analysis of victims' investments) and reflected in Trial Exhibits 725, 727, 728 (the summary charts from trial of bank debits and credits for bank accounts for Planet Youth Entertainment LLC, W&B Wholesale, and W&B Investments, respectively), the monies were simply not used as represented, and much of the payments were used as Ponzi payments to others to keep the fraudulent scheme afloat.  It is worth highlighting some of the specific misrepresentations made to the victims who testified:

- **Dominic Atuanhene**.   Bick told Dominic that the invested money would be used to purchasing electronics and would split the profit with the victim.  *See* Trial Tr. Vol. III at 700-701, 703.   Funds provided were used to repay prior debts and other expenses unrelated to electronics.  Attachments B and C.

- **Kevin Bill.**    Bick told Bill that Bick was buying large quantities of iPads, iPods and that the return would be 35%.  Trial Tr. Vol. VII at 1910-1911. Monies were cashed, Attachment B, so use is unclear, but consistent with the testimony of Wrobel were not used on electronics. Gov. Exhs. 175, 177, 178, 179, 180.

- **Wyatt Bosworth.**  Bick sold him on investing in electronics and Bick showed him sample electronic merchandise in Bick's office.  Trial Tr. Volume II at 475.  Monies were cashed, Attachment B, so use is unclear, but consistent with the testimony of Wrobel were not used on electronics.

- **Robert Burke.**   Burke understood the investment was in electronics and that it was doing well.  Bick promised a 50% return.  Trial Tr. Volume VI at 1456, 1458   *See also* discussion above at 12, 13-17, identifying the nature of the fraud. *See* Attachment B reflecting that monies not used as represented.

- **Rosemary Paccione-Burke**.  Investment was to be in electronics.  Trial Tr.

27

Volume VI at 1394, 1404.  *See also* discussion above at 12, 13-17, identifying the nature of the fraud.  *See* Attachment B reflecting that monies not used as represented.

- **Nataly Cardona-Vargas**.  Bick told her he was reselling electronics and that generated the 30% interest return.   Trial Tr. Vol. VI at 1605, 1608.  Monies wired in; no repayment reflected. Attachment B. Gov. Exhs. 400, 401.

- **Gabriel DeSiqueira**.  Bick told him he would be investing in concerts and resale of crates of electronics. Trial Tr.Vol. VII at 1861, 1863.  The investment monies were used to pay non-electronic expenses, including repaying other investors.  *See* Attachment B.

- **Ryan Groenewegen**.   Bick said investment monies used to resell Beats Headphones and iPads.  Trial Tr.Vol. VII at 1836.  Only limited repayment made with Ponzi payments coming from monies invested by Lichtman. Attachment B.

- **Steven Lichtman**.  The understanding was that Bick and Wrobel were buying excess inventory and remarketing it.  Trial Tr. Vol. V at 1273, 1277.  *See* discussion above at 10, 12, 19-22, identifying the fraud.   Lichtman monies used to make Ponzi payments to various investors.  Attachment B.

- **Geovanny Melendez.**  Bick represented that the victim would be investing in wholesale business to buy and resell electronics, video games, iPhones, iPads, and Beats headphones.  Trial Tr.Vol. VII at 1816.  Limited repayment with Ponzi payments with monies from Scozzafava.  Attachment B.  Gov. Exhs. 96.

- **Denise Paume/David Paume**.  Denise told she was investing in Bick's electronic business. Bick claimed to buy pallets of electronics and resell them. Trial Tr.Vol. I at 56, 59 – 60.  David understood Bick would provide a 50% return. *Id*. at 179.   *See* discussion above at 17-19, identifying the fraud.

- **Scott Tepper**.  Invested money solely for the purchase of iPhone pallets. Trial Tr.Vol. I at 246.  *See* also discussion above at 10, 12, and 22, identifying the nature of the fraud.

#### • <u>Other Victims Who Were Not Called at Trial Are Still Nonetheless Victims</u>

Defendant Bick also defrauded a number of other individuals who were not called as

witnesses at trial, but they are nonetheless victims of the fraud.

The summary list from Attachment A also includes additional victims identified by the

investigation and the fraud losses associated with them.  As relevant to these other investors, the

Government has included relevant Memoranda of Interview reflecting interviews of the victims,

as well as a selection of relevant contracts, e-mails, or texts, and other documents.  Attached as

Attachments D through N, are the various memoranda of interviews and a selection of

supporting documents reflecting that these witnesses should be included in both calculation of

Guidelines loss and restitution.   Also, as stated above, Bick himself included these victims

among his list of investors provided to the Connecticut Department of Banking and to Steve

Lichtman.  (Attachment T).

- **Daniel Clancy.**  During Clancy's Junior year in high school he loaned WBW $2,800 in cash to purchase the electronics for resale.  Clancy was promised he would receive approximately $3,300 back in cash.  Clancy received the $3,300 as promised in approximately the Fall of that year.  Clancy did not loan WBW money again until 12/2013.  Around that time, Clancy had a car accident in which he hit a rock and received an insurance settlement.  Clancy took $6,000 in cash from the settlement and loaned it to WBW with the promise Clancy would receive $7,300 back in 40 days.  Approximately two weeks after Clancy loaned the money to WBW, he received a telephone call from Bosworth advising Clancy that Bick could not pay back the money owed.  *See* Attachment D, MOI, dated December 16, 2014.  The transactions were in cash, and thus we are unable to show the specific use of cash, but a fair inference given the testimony of Wrobel and others at trial was that it didn't go to electronics.  In any event, a fair inference is that Clancy would not have invested with Bick had he known the truth of Bick's operations.  (*See* Attachment D).

- **Charles Cunningham**.  When Cunningham received the funds from the car accident, he planned on investing with Bick and trusted that he would receive a significant return on this substantial investment ($15,000).  Around November 2013, Cunningham was texting Bick about the investment when Corey Brosz contacted him.  Brosz acting on Bick's behalf, asked Cunningham if he wanted his money back, or did he want to invest more funds.  Cunningham decided to reinvest an additional $3,000 to Bick's investment business.  In turn, Brosz gave Cunningham an investment agreement dated December 3, 2013 which Cunningham signed.  On the document, Cunningham was to receive $30,000 in return on the total of his investment on or before 45 days after the loan amount is actually received by W&B.  At the time, Bick told him he had some shows scheduled at Toad's Place in New Haven, Connecticut including performer "Chief Keef."   (*See* Attachment E, MOI dated September 11, 2014.)  The transactions were in cash, and thus

the Government is unable to show the specific use of cash, but a fair inference was that it didn't go as represented. In any event, a fair inference is that Cunningham would not have invested with Bick had he known the truth of Bick's operations. (*See* Attachment E).

- **Timothy Quinn Curtin.** Mr. Curtin explained Ian Bick was constantly trying to get Curtin to invest money in Bick's companies. Curtin added he finally did, investing $10,000 cash and signing a contract with Ian Bick on January 30, 2013. The investment was in "This Is Where It's At Entertainment, LLC". The term of the agreement was two months. Mr. Curtin added he was not sure what the return was because two different percentages of return were given on the contract. Curtin stated before repayment was due on the contract, Ian Bick convinced him that although he had the money, he should reinvest the principal plus interest due. Curtin recalled investing an additional $2,000 cash in "Planet Youth Entertainment, LLC" on March 13, 2013, which would earn an 11% return. Curtin stated on October 27, 2013, he signed a contract with Ian to loan $25,000 to "W&B Investments, LLC". He would receive $5,000 on or before November 15th and $5000 more on or before December 15th. Curtin continued, stating he would receive a final payment of $30,000 on January 15, 2014. Curtin stated this agreement was a restructuring of the September contract, but admitted, at this point, he was confused by the contracts. He added Ian was very convincing in making him believe he would make money through his businesses. (*See* Attachment F, MOI dated October 14, 2015.) Many of the transactions were in cash, and thus the Government is unable to show the specific use of cash on the bank records, but a fair inference was that it didn't go as represented. In any event, a fair inference is that Curtin would not have invested with Bick had he known the truth of Bick's operations. (*See* Attachment F).

- **Shane Dalton**. Mr. Dalton stated he invested $10,000 cash with Bick in September 2012. Dalton explained the investment was in W&B Wholesale. Dalton remarked Bick called it a loan and guaranteed the rate of return on the money. Dalton stated he did not remember the rate of return, but seemed to think it was 30% for 30 days. Dalton stated he signed a contract. Dalton explained at the end of the thirty day contract, Bick told him he had the $13,000, and asked if he would like to reinvest the money. Dalton reinvested the money and signed a new contract. Dalton stated he never physically saw the $13,000. Mr. Dalton stated he renewed the contract three times after the initial contract, never seeing any cash or check for the agreed upon amounts. Dalton added the rate of return for each contract was 30%." Dalton stated the last time he spoke to Bick was at the end of the summer 2014. Dalton explained Bick promised he would start paying Mr. Dalton $1000 a month beginning September 1st. Mr. Dalton stated he never received the $1000 as promised. (Attachment G, MOI dated October 7, 2014.) The various transactions were in cash, and thus the Government is unable to show the specific use of cash from the bank records. It is a fair inference that Dalton would not have invested with Bick had he known the truth of his operations and that Bick's returns were primarily monies from other investors. (*See* Attachment G).

- **Anthony Galente**.  Bick told Galente that he bought "stuff" wholesale and resold it on e-bay.  Galente said that was supposed to be guaranteed money.  Bick provided Galente the opportunity to invest in the business.  Galente and Gronewegan invested a total of $30,000, each put up $15,000, in Bick's business with the promise that they would receive $10,000 per month for four months (a total of $40,000 on the $30,000 investment. Bick wired Galente back $10,000 a few times but Galente and Gronewegan never received the full $40,000.  The money he did receive from Bick, he divided evenly between himself and Gronewegan.  On many occasions, Bick told Galente that he had his money, however, when Galente drove out to Danbury to meet Bick, Bick did not have the money.  One time Bick told Galente that he would pay him back quickly and give him two I-pads (Attachment H, MOI dated December 16, 2014.) A number of the transactions were in cash, and thus the Government is unable to show the specific use of cash.  The record does reflect that certain repayments made to Galente were Ponzi payments using funds of other investors, which encouraged Galente to reinvest.  Attachment B.  In any event, a fair inference is that Galente would not have invested with Bick had he known the truth of Bick's returns.  (*See* Attachment H).

- **Christian Hordos**.  On or about October 18, 2013, Wrobel called Hordos and had conversation regarding the investment opportunity that Wrobel was proposing. This time, Hordos agreed to participate. Hordos wanted to invest approximately $6,000 with a promised return of $7,008 in forty days. Wrobel sent him a contract via email and Hordos signed the document.  Hordos felt more confident in the investment when he was provided with the contract, but he was not sure if he received the contract before or after he provided the funds to Wrobel. Hordos believed that he was providing his money as an investment and did not see the funds as a loan. In the end, Hordos was not sure what method Wrobel or Bick used to extract the $6,000 from his account. All of these conversations were done through email and text messages.  On January 20th, 2014, Hordos sent Bick a demand letter via certified mail requesting the $6,000 principal plus the promised interest. In the letter, Hordos stated that he and Bick had a verbal agreement for a total payout of $10,000; none of these funds were ever paid to Hordos. See Attachment I, MOI dated November 21, 2016.  A fair inference is that Hordos would not have invested with Bick had he known the truth the Ponzi payments were generating the purported returns.  (*See* Attachment I).

- **Zach LaMotta**.  LaMotta invested $5,000 in another Bick company, W&B Wholesale. LaMotta was told he could "flip" his money quickly and receive 50% return in a short period.  LaMotta was not sure exactly when he made the investment but was sure it was prior to 2014.    At the time of the interview, Bick still owed LAMOTTA approximately $6,000 to $7,000. See Attachment J, MOI dated October 31, 2014.  Certain of the transactions were in cash, and thus the Government is unable to show all of the transactions from the banking records.  A fair inference is that LaMotta would not have invested with Bick had he known the truth of Bick's operations.  (*See* Attachment J).

- **Barbara Litchtman**.  Steven Litchman, as discussed above, testified regarding the $10,0000 investment made in his wife's name and the fraud relating to it is addressed above.  *See also* Attachment B (showing investment monies used to repay others).

- **Anastasia Osdranus**. Ian Bick went to Anastasia Osdranus's home with his father, Michael Bick. Ian Bick pitched his proposal of an investment in exchange for a 12.5% stake in his company: "The Youth, LLC DBA Tuxedo Junction". Michael Bick orally promised Anastasia and Charlie Osdranus that if Ian Bick defaulted on the agreement, Michael Bick, would pay the $3,000 balance on Charlie Osdranus's Home Depot credit card.  Ian Bick also promised to pay Charlie Osdranus $2,500 every month for four months for his labor at Tuxedo Junction.  Ian Bick presented a document entitled "Tuxedo Junction Partnership Agreement", which was notarized on May 15, 2014. Anastasia obtained a $6,000 bank check which was given to Ian Bick.  *See* Attachment K, MOI dated April 17, 2015. A fair inference is that the victim would not have invested if she knew the truth of Bick's operations, but Bick had generated a fraudulent image of success. (*See* Attachment K).

- **Thomas Spegnolo**. Bick met Spegnolo and he paid Bick $5,000 on his Bank of America credit card. Spegnolo paid an additional $15,000 on his Capitol One credit card. Spegnolo explained that Bick had a card reader attached to his cell phone when he made the two transactions. When Spegnolo saw the bank statements, he noticed the charges listed as being paid to "Something Fishy".  Spegnolo was issued two contracts from Bick dated October 29, 2013.   Each contract promised that he would receive a return on his investments within in forty (40) days. At the time, Spegnolo was confident that Bick would follow through with his agreed payments.  The contracts also listed Bick's jet skis as collateral to secure the investments.  Spegnolo understood that the funds were going to be spent on electronics with a quick turnaround on his investment. Spegnolo believed that Bick was doing well with his electronics business.  Spegnolo thought this was a secured investment and would not have invested his money otherwise.  (*See* Attachment L).

- **Jake and Martin Mallow**.  Jake Mallow and his father Martin Mallow were defrauded by Bick, including losing $5,000 to Bick in May of 2016, 6 months after the date of his conviction and while he was on supervision.  (*See* Attachment M*).*

  As background, Jake is the sixteen year old high school student who met Ian Bick through a friend.  In all they invested approximately $10,000 with Bick the last $5,000 investment coming in May of 2016.  The Mallow family did not know about Bick's criminal history until a point in time after they did not get their money back when they researched him on the internet.  All the money given to Ian was part of an investment in music concerts that Ian pitched to them.  The contracts and payments made using Mr. Mallow's credit card were done though Tuxedo Junction and "Something Fishing Catering."   (*See* Attachment M).

  As set forth in the memorandum of Interview, the Mallows and their friend we investing in

a show, the show they "invested in was originally supposed to occur in November of 2015," but it was repeatedly delayed.  A concert occurred in February 2016 but according to Bick the show lost money.  Bick pitched two other shows including a paint blast show that was supposed to occur in May 2016.  The May show supposedly occurred and Bick told the Mallows that they had made money on the paint blast show but didn't give them their supposed profit.  Instead Bick told them if they added an additional $5,000 they could invest in what Bick represented as an upcoming "Zomboy" show which Bick represented would occur on July 28 or 29, 2016.   The Mallows "rolled over" the profit from the paint blast and they invested an additional $5,000.  (See Attachment M).  At some point in June 2016, after they had invested the additional money along with their earlier investments, Bick, informed them that the Zomboy show was cancelled.  The Mallows did not receive their money back.

(The investigative agents have discovered evidence establishing that the Zomboy show was never going to take place in the first instance, and while someone on behalf of Tuxedo Junction had inquired about Zomboy performing, Zomboy immediately declined.  At no time had agreed to perform at Tuxedo Junction, but Bick falsely represented that there was a show scheduled, that they would perform and he took money based on these representations.)[7]

- **Eric Browndorf**.   Investment monies used to repay other investors and other non-concert or non-electronic expenses.  Attachment N.


## II.     <u>Statutory and Guidelines Exposure</u>

The Government agrees with the factual determination found by the probation officer based on the Pre-Sentence Investigation, but, based on an additional enhancement the Government asserts is appropriate in this case, the Government disagrees with the offense level computation reached by the Probation Office as set forth in the PSR.  PSR at ¶¶ 23-32.

The Government calculates the loss amount to be squarely between $250,000 and $550,000, approaching the top of this range and places the victims' lost totals just over $500,000

---

7    Some of the money the Mallow family invested was processed by credit card through Something's Fishy catering.  The court should note, Mr. Michael Bick is the Court ordered third party custodian of Ian Bick, and yet it is Mr. Michael Bick's business account that was used to complete the fraud.    Additionally, at one point, Mallow contacted Michael Bick about getting his money back, but Michael Bick told Mr. Mallow that if he went to the authorities that he would not get his money back.

resulting in a 12 level increase.  The Government agrees with the enhancements and adjustments

set out by the Probation Office, but asserts that the additional two-level enhancement of

sophisticated means should be added (as addressed below), thus bringing the resulting offense

level to a level 28 instead of a level 26.  The Government asserts that a total offense level of 28

resulting in a range of 78-97 months of imprisonment is a correct calculation based on the

offense conduct, and the specific offense characteristics, the Defendant's role in the offense,

including the facts set forth in the PSR, those established at trial, and those set forth herein.

**A. Base Offense Level and Specific Offense Characteristic for Loss Amount**

Pursuant to the United States Sentencing Guidelines ("USSG"), the Guideline for

violations of 18 U.S.C. § 1343 and 18 U.S.C. § 1957 are found at USSG Guideline §§ 2B1.1 and

2S1.1 respectively.  PSR at ¶ 24.  Because the defendant was convicted of an offense referenced

to these sections of the Guideline and the offense carries a maximum term of imprisonment of

twenty years, the base offense level is 7 under Guideline § 2B1.1(a)(1).  PSR at ¶ 24.

Pursuant to Guideline § 2B1.1(b)(1)(G), 12 levels are added because the total loss is more

than $250,000 but less than or equal to $550,000. PSR at ¶ 24.  Additionally, pursuant to USSG

§ 2S1.1(b)(2)(A), since the defendant was also convicted under 18 U.S.C. § 1957 for money

laundering, an increase by 1 level is warranted. PSR at ¶ 25.

1. Determination of Fraud Loss/Restitution

The Court has before it the record of the entire trial that details the defendant's various

fraudulent misrepresentations resulting in the losses suffered by the numerous victims who

testified.  The Government has also set forth herein, a more detailed itemization of fraud losses

as determined by the FBI forensic accountant Ms. Karen Palmer, who also testified at trial.

Attachment A includes a spreadsheet with a complete list of the investors who were defrauded by Bick and who lost money by virtue of the scheme, including other relevant conduct common scheme or plan. Additionally, Attachment B provides the Court back-up information supporting the break-down of deposits and withdrawals as well as other evidence to support the loss figure on a victim-by-victim basis. The attachment also includes a comments section where Ms. Palmer has indicated how the deposited monies were used or the source of any Ponzi payments made to the investors to perpetuate the scheme.

The first half of Attachment A lists victims who were called to testify and who testified to the fraud at trial. Based on the bank records, the testimony, as well the information provided to the agents, the forensic accountant calculated the monies invested, the monies returned, and the net loss to each of the victims.[8] The victims who testified are identified with a "T" next to their name for 'testifying' witnesses. Taking only the victim-witnesses who testified at trial, the fraud loss would be $405,075, far in excess of the threshold amount of $250,000, and thus the 12 level upward adjustment for loss falling between $250,000 and $550,000 would be applicable using only the trial witnesses.

The additional victims who were not called at trial are listed on Attachment A but without the "T" next to their name. These additional witnesses should be included in the loss amount and should be included for restitution purposes just the same as the victims who testified at trial. The Second Circuit has repeatedly held that "the court in 'determining the amount of loss for purposes of calculating the offense level for a fraud, [must] include 'all such acts and

---

[8]   The financial analyst has reviewed the victims' trial testimony and, when applicable, prior MOIs. To the extent that the trial testimony regarding invested monies differs with relevant MOIs, the analyst has typically adopted the trial testimony as to loss. In any event, Attachment B in the comment section explains the basis for specific figures so that the Court is able to assess the weight of the evidence.

omissions that were part of the same course of conduct or common scheme or plan as the offense

of conviction.'" *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) (quoting *United States*

*v. McCormick*, 993 F.2d 1012, 1013 (2d Cir. 1992) (quoting U.S.S.G. ' 1B1.3(a)(2)).   The

Sentencing Commission Commentary explains that "a common scheme or plan" encompasses

offenses that are "substantially connected to each other by at least one common factor, such as

common victims, common accomplices, common purpose, or similar *modus operandi*."

U.S.S.G. § 1B1.3, cmt. (n.9(A)).   Thus, all the victims should be included.

  B.   <u>Two Level Increase for More than 10 Victims</u>

  As found by the Probation Officer, a two-level enhancement based on the number of

victims pursuant to U.S.S.G. 2B1.1(b)(2)(A) is appropriate.   PSR at ¶ 24.   This finding of the

number of victims is based on the number of victim-investors that were defrauded which was

determined to be greater than ten (10) victims.   *See* Attachment A.   The Government has

identified in Attachment A far more than ten individual victim-investors who lost money by

virtue of the scheme.   The Court should use the number of victims included in the chart

(Attachment A) who each sustained a part of the actual loss.   A "victim" is defined in the

Guidelines as "any person who sustained any part of the actual loss . . ."   U.S.S.G. § 2B1.1,

Application Note 1.   *See United States v. Abiodun*, 536 F.3d 162, 169 (2d Cir. 2008)

(concluding that when a court makes a finding as to actual loss, a victim enhancement must be

based on those who "sustained losses as determined by the loss calculation guidelines").   The

Second Circuit has stated that "'victims' of fraud counts are those persons who have lost money

or property as a direct result of the fraud." *United States v. Napoli*, 179 F.3d 1, 7 (2d Cir. 1999).

Here, there can be no doubt based on the bank records and the victim testimony that the victim-

investors suffered the actual loss as a direct result of the fraud.

The PSR also confirmed that the total net loss is just over $500,000 with far more than ten individuals identified as victims. PSR at ¶¶ 15, 24.

Moreover, with respect to this specific offense characteristic and the "joint accounts" or "family accounts," that were involved in the transactions, it is the Government's position that each member of a married couple or named family member should be considered as a separate victim for Guidelines purposes. For instance, in terms of counting victims, both Mr. and Mrs. Lichtman should be counted as victims since money came from their jointly held accounts. The same is true for Mr. and Mrs. Paume, as well as Mrs. Burke and her son Robert. This factual finding is supported by holdings in the Seventh Circuit case of *United States v. Harris*, 718 F.3d 698 (7th Cir. 2013) and the Eleventh Circuit case of *United States v. Densmore*, where the Circuit Courts held that with respect to jointly held accounts, when a husband and wife are co-owners of a bank account, they each may be counted separately as victims "because both sustain a 'part of the actual loss.'" *See United States v. Densmore*, 210 F. App'x 965, 971 (11th Cir. 2006) (quoting USSG § 2B1.1, comment. (n.1)). In *United States v. Harris*, 718 F.3d 698 (7th Cir. 2013) the Seventh Circuit reached the same conclusion and held that it "agree[d] with the district court's legal interpretation of the victim number adjustment in section 2B1.1(b)(2). Where, as [defendant] Harris conceded here, all of the accounts held by married couples were held jointly, there was no need for additional evidence to determine actual loss to each spouse. When a broker sells investment products to married clients who hold those accounts jointly, it is reasonable to conclude that both spouses suffer the loss or enjoy the gain, depending on the performance of the investment." *Id.* at 703.

Accordingly, the number of victims is significantly above ten (10) for this specific offense characteristic and accordingly, two additional level should be included.

C.  Two Level Increase for Sophisticated Means

The Government asserts that a two-level enhancement based on sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10)(c) is also appropriate.  United States Sentencing Guidelines § 2B1.1(b)(10)(c) provides for a two-level enhancement "[if] the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." "'[S]ophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 app. n. 9(B).  By way of example, the guidelines state that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities . . . also ordinarily indicates sophisticated means." *Id.*

In *United States v. Regensberg*, 2010 WL 2501042, 1 (2d Cir. 2010), the Court applied the enhancement when a defendant ran a Ponzi scheme and the execution of the scheme included "creation of fraudulent [ ] documents, detailed reporting of fake earnings, use of Ponzi scheme payments to lull his investors, and alteration of an account statement to make it appear as if he had not lost his investors' money."  *Id.*  The Second Circuit determined that this conduct over three years was the sort of "repetitive conduct...[that] demonstrates that more than routine planning was involved," and agreed that the enhancement for sophisticated means was appropriate. *Id.*

In this regard, Defendant Bick used multiple shell companies such as W&B Wholesale, W&B Investments, This is Where It's At Entertainment, and Planet Youth Entertainment to

operate the scheme.  He used multiple bank accounts to create the appearance that funds were

placed in a designated account based on the type of "investment" his victim-investors were

making.  Additionally, Bick used the skills and licenses of licensed attorneys (albeit

unknowingly by the attorneys) to execute the scheme by utilizing loan agreements or contracts

that were initially looked over and prepared an attorney and using them in connection with the

material false statements.  These contracts created the appearance of legitimacy.  Additionally,

Bick later in the scheme, attempted to use an attorney to privately organize payment plans while

he was under investigation.[9]  Defendant Bick used sophisticated means in both the execution and

concealment of the fraud.

Based on the trial testimony, the Court is well aware of the sophistication and intricacies

of Bick's criminal conduct but some such sophisticated means will be highlighted herein.  The

following facts more than demonstrate the sophisticated means that were used:

- Multiple bank accounts and shell companies were used to steal victims' money:

    o This is Where It's At Entertainment – Bick's original entertainment company
    o Planet Youth Entertainment – Bick's later entertainment company
    o W & B Wholesale – Bick and Wrobel's initial electronics company
    o W & B Investments – Bick and Wrobel's later investment company
    o Some Things Fishy Catering – Bick's father's company, which Bick would use to make Ponzi scheme payments to investors

- The fraudulently obtained proceeds were repeatedly moved from account to account and laundered through these accounts;

- Bick maintained an office space at the Matrix building which helped to create the appearance of legitimacy;

---

[9]       See *United States v. Charroux*, 3 F.3d 827 (5th Cir. 1993) (upholding sophisticated means enhancement where defendant sought advice of various tax professionals in order to lend appearance of legitimacy); see also *United States v. Ramirez*, 146 Fed.Appx. 518 (2d Cir. 2005) (sophisticated means enhancement was warranted where defendant used his specialized skills as an immigration attorney to perpetrate complex fraud).

- Bick provided free samples and showed potential investors the electronics he was supposedly wholesaling, when in fact these were counterfeit products he knew could not be sold;

- A lawyer was used to assist and approve a contract draft to create the appearance that the scheme was not fraudulent;

- Bick spent years lulling the victims by altering contracts, creating fake stories of how he was supposedly going to invest the money into electronics pallets, and how the funds would be arriving shortly;

- Bick lied about the success of sales of electronics pallets in order to encourage victims to invest again and instructed his coconspirator to tell the same lies to new potential investors;

- Bick repeatedly made false statements in text messages, emails, and in-person meetings about the success of his ventures;

- Bick repeatedly made lulling Ponzi-scheme payments as "returns" to his victim-investors to forestall discovery of the fraud;

- Multi-page sophisticated spreadsheets about electronic pallet sales were created by Wrobel to purport that the business was legitimate and profitable when no such pallets were being sold (Gov. Tr. Ex. 907, 913);

- Used a banking application on his cell phone to create falsified bank records in order to tell investors their returns were forthcoming. John Wrobel testified that Bick used this technology as a lulling tactic:

    > "So Ian had this app, his banking app -- besides the actual legitimate app for banking accounts, he had an app where it would falsify a bank statement or a bank record. You could create an account, it could say So-and-So Bank and you could input amount of money and then it would generate a statement or the account showing that this account had X amount of dollars in it. [. . .] So if an investor was questioning where the money was or if they could have the money back, Ian would say, we have your money, you know, here it is. And would show them the app or take a screen shot of it and send them a message. And that's was a tactic that he used so they think that he has money coming in or maybe a wire coming in, that there's money in the account and he's going to write them a check soon." Trial Tr. Vol. IV (Wrobel), pg. 922-23.

- Sent screenshots of his bank accounts to lull investors into believing he had sufficient

40

funds to pay them back; in reality, many of the screenshots were outdated or were the product of Bick writing checks between his own accounts and screenshotting the balance before the check bounced. Ms. Denise Paume testified that he used this lulling tactic with her investments on at least four separate occasions:

> "Q. And Friday at 4:23 p.m. did you inquire again?
> A. "Hi Ian. What is the status of the check today. Thanks."
> Q. And did he respond?
> A. "Just waiting to hear from my dad. Haven't spoken to him all day. I will let you know when I do. Also deposited another 23,000 into my account last night, it's just on hold."
> Q. Is there a screen shot?
> A. He sent me a screen shot of deposits unavailable from -- and it's a hold of 15,000 and 8,000 totaling 23,000 and says on the bottom "deposits unavailable."
> Q. And what did you --
> A. Because -- sorry.
> Q. Go ahead.
> A. "Deposited funds not yet available because they are either still processing (pending) or held. Deposited funds are generally available the next business day unless a hold is placed."

Trial Tr. Vol. I (Denise Paume) at 99-100; *see also* Gov. Tr. Exh. 780 (screenshots located on pg. 8, 13, 16, 17 of the Exhibit).

- Changed names in Wrobel's phone and text back and forth with those numbers, then take screenshot of those conversations to show investors that money was on its way. In his direct examination, Wrobel testified:

> "Q. Was there something that you did with the texts to allay investors?
> A. Yes.
> Q. Tell the jury about that.
> A. Another tactic used, he would either do it with my phone or we would do it together or with another phone. And what he would do is he would go into the contacts and change the contact name to either an investor name or someone like his aunt. And then he would text back and forth. For example, he was texting me, he would change my contact in his phone to, for example, his aunt's name, so that he would text her, which was me, saying, you know, whatever he wants to say, and then he would use my phone to then respond with "I'm sending a wire transfer for $175,000 to you in two days."

Trial Tr. Vol. IV (Wrobel) at 924.

- Wrote bad checks from his various business accounts which he knew would bounce to lull victim-investors into believing they had received returns on their money and also instructed his coconspirator Wrobel to do the same from Wrobel's personal accounts; Wrobel testified:

> "A. So I believe at this time we didn't have our Wells Fargo bank account anymore, the W & B. And so I was the only one with checks. So Ian asked me to cover this check and to deposit the money. And I told him I don't have $14,000 in my account to cover this. He said, "Don't worry about it. I'll get you the money before it clears so it won't bounce."
> Q. Are you sure you didn't have the Wells Fargo account opened or -- how confident are you that the Wells Fargo account was open or not open at this time?
> A. Fifty-fifty.
> Q. So did you talk to Ian? What, if anything, did you talk to Ian about the fact that you didn't have the money to cover this check?
> A. I wanted to make sure that he was going to provide me with this $14,000 so it could cover the check. He said, "Don't worry about it, I'll take care of it."
> Q. Did he ever take care of it?
> A. No.
> [. . .]
> A. Like I said earlier, sometimes Ian would cut checks knowing that they were bad just so an investor had received the check or see the check initially hit their account, satisfy their needs. So in this case, this was one of those circumstances where Ian cut a check -- or I cut a check to give to Steve so, you know, he was confident that he was getting his money on time."

Trial Tr. Vol. IV (Wrobel) at 897-98.

- Bick lied to the United States Postal Inspectors and the Connecticut Department of Banking to conceal the fraud;

- Bick directed his coconspirator John Wrobel to lie under oath to both the Connecticut Department of Banking and Postal Inspectors to tell them that the clothing and other merchandise purchased were part of the W&B wholesale business when they were in fact clothes for Mr. Wrobel;

- In response to Grand Jury Subpoenas, Bick altered the checks (*See* Gov. Ex. 604 and 604A) by writing "Artist Deposits for concerts" in an effort to conceal the fraud and

42

support the story he told the postal inspectors, and did so before producing those documents to his attorney; and finally,

- Bick repeatedly perjured himself in his testimony at trial by saying he had no intent to defraud his victims and that many of them "never asked" about the use of their money and "only cared about the interest rate."

When these factors are looked at in their totality, Bick deserves a two-level enhancement for sophisticated means. The Second Circuit identifies factors in *United States v. Amico* which evidence sophisticated means that are clearly present in Bick's case. 416 F.3d 163 (2d Cir. 2005). These factors include "creation of false bank documents" (such as Bick's use of his banking application to falsify bank documents in order to mislead his victim-investors) and "other tactics designed to conceal the scheme" (much of what Bick did by his fraudulent misrepresentations, false emails, text messages, and Ponzi-scheme payments was to conceal the scheme). *Id.* at 169.

Bick's conduct is very similar to that of the defendant in *United States v. Loles*, where the Court held that the sophisticated means enhancement was warranted where a defendant convicted of mail and wire fraud "falsified hundreds of documents using his computer to create fake forms and account statements reflecting fictitious bond prices . . . controlled what proved to be shell companies . . . sent out false tax forms . . . and by taking all these steps managed to conceal the scheme from his victims for nearly eight years." 628 Fed. Appx. 7 (2d Cir. 2015) (AWT). Bick also created hundreds of false documents, such as fake spreadsheets to show profit, fraudulent loan agreements and joint venture agreements, screenshots of false bank records, and he controlled multiple shell companies to conceal his fraud.

The Second Circuit in *United States v. Fofanah* also indicated that the "repetitive and coordinated nature of [defendant's] conduct further reveal the sophistication of the means he

employed." 765 F.3d 141, 146 (2d Cir. 2014).  Here, Bick's conduct involved approximately 27 different victim-investors, and he dealt with each of them in a coordinated way: Bick would pitch his fraudulent wholesale business to the victim-investors, promise a high interest rate, have them sign a "Loan Agreement" or "Joint Venture Agreement," take their money, use the money in ways it was not intended for, return the victim-investors a Ponzi-scheme lulling payment (with money from other investors), convince them to invest more money, and then subsequently lose it all and cease communication with the victim-investors.  The repetitive and coordinated nature of Bick's conduct, coupled with his use of multiple bank accounts, shell companies, false spreadsheets, and banking applications indicate that the means Bick used were clearly sophisticated.

Thus, the Government asserts that the means used by Bick were "sophisticated" and his conduct falls squarely within the definition of sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10)(C).  Accordingly, the additional two levels should be applied.

D.  Two Level Enhancement for Obstruction of Justice

As found by the Probation Officer, the Defendant is also subject to a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1.  The U.S. Sentencing Guidelines direct that:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.  The Guidelines provide that the "conduct to which this adjustment applies is not subject to precise definition," U.S.S.G. § 3C1.1, Application Note 3, and provide a "non-

exhaustive" list of conduct to which the adjustment is intended to apply, U.S.S.G. § 3C1.1, Application Note 4, including, *inter alia*, "providing materially false information to a judge or magistrate," U.S.S.G. § 3C1.1, Application Note 4(F).

In connection with an enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 the misrepresentations must be "material." U.S.S.G. § 3C1.1, Application Notes 4(F), 4(G) and 4(H). For the false statements to be "material," they must be information that, "if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, Application Note 6. *See United States v. Johns*, 27 F.3d 31, 34 (2d Cir.1994) ("Under the law of this Circuit ... we look to the defendant's representations in deciding the issue of materiality. If those representations could affect the sentence (if believed), then it is irrelevant that the Government has possession of other information that rebuts the defendant's representations."); *United States v. Rodriguez*, 943 F.2d 215, 218 (2d Cir.1991) ("The definition of a 'material' statement embraces all false statements that would tend to affect a defendant's sentence, whether or not discovery of the falsity of the statement is inevitable."). *See United States v. Sweeney*, 485 F. App'x 468, 470 (2d Cir. 2012) (holding that a two-point enhancement for lying is proper even if the "lie was immaterial to the 'issue under determination'" at a plea allocution, and even if the government knew the defendant was lying and therefore not misled by it); *United States v. Ortiz*, 251 F.3d 305, 306 (2d Cir. 2001) (holding that the U.S.S.G. § 3C1.1 "upward adjustment" for lying under oath was applicable and could not be offset by a finding that the lie was "aberrant behavior.") *United States v. Martin*, 737 F. Supp. 819, 825 (S.D.N.Y. 1990) aff'd, 923 F.2d 846 (2d Cir. 1990) ("Defendant's attempt to mislead the authorities in respect of Galarza's identity was an attempt to obstruct justice and as such warrants a two point enhancement.")

45

The Government proved at trial that Bick intended to defraud the victims at the time he stole their money.  Since the jury convicted Mr. Bick on six counts of wire fraud and one count of money laundering, they clearly rejected his testimony that the victims "never asked" where the money was going or that they "only cared about the interest rate."  PSR at ¶ 18.  The record supports a finding that Bick perjured himself multiple times throughout his testimony, and these misrepresentations as to what the victim-investors thought they were investing in are clearly material to the issue of whether he had the requisite intent to defraud at the time of contract formation.

For example, Bick testified to the Connecticut Department of Banking that he and Kevin Bill had no written agreements but rather a "handshake" agreement. *See* Trial Tr. Vol. X (Bick) at 2730-31.[10]  On cross-examination, the Government showed that Bick did indeed have a written agreement, as evidenced by Mr. Bill's testimony that he remembered Bick using a silver pen to sign the contract: "As I recall, Mr. Bick had brought in a pen that used silver ink, and it was difficult to read as an original. He tried to copy it over and make it more legible and apparently was unsuccessful." Trial Tr. Vol. VII (Kevin Bill) at 1914.  *See* Gov. Exh. 175, 177, 178, 179, 180.  (contracts establishing it was not merely a handshake deal).

Bick also testified at trial that he and Kevin Bill ***never*** discussed where the money would be going:

"Q. And he was investing in electronics and getting interest, wasn't he?

---

[10]    It is important to note that Bick's perjury during the Connecticut Department of Banking investigation, a state court proceeding, is also covered conduct under USSG § 3C1.1, Application Note 4(B): "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." Bick's testimony that his agreement with Kevin Bill was simply a handshake agreement, when there is clearly a contract between Bick and Kevin Bill (Gov. Exh. 178) is perjury and therefore covered conduct. "Q: There – are these like a handshake deal or are they agreements you signed? A: Handshake. Yeah." *See* Gov. Exh. 602, pg. 162-163 (Transcript of Bick's CT Dept. of Banking testimony); *compare with* Gov. Exh. 178 (Kevin Bill written agreement).

A. We never discussed. He had representations through his son and his sons'
friends.
Q. He was investing in electronics in written contracts, wasn't he?
A. No, not in written contracts, and there was no verbal agreements.
Q. So is it your testimony that there were no written agreements with Mr. Bill?
A. There were written agreements, it just did not say specifically for electronics."

Trial Tr. Vol. X (Bick) at 2731. Kevin Bill, however, testified that he and Bick specifically

discussed that the money would be going to electronics and that he would earn 35% interest:

"Q. Can you explain to the jury what Mr. Bick may have said to you about this
potential investment?
A. The investment in which I became involved was to -- he was buying large
quantities of iPads, iPods, things of that nature to sell.
Q. And so what was your understanding of how you might earn returns on your
investment?
A. I, you know, gave him the money, and he said that there would be a 35 percent
return on my money that I would provide him."

Trial Tr. Vol. VII (Kevin Bill) at 1910.

Bick also lied to the Connecticut Department of Banking and the U.S. Postal Inspectors

about his conduct and businesses in the course of their investigations, as evidenced by the

testimony of Mr. Klem Klementon and Inspector Thomas Ardito.  Significantly, Bick provided a

copy of a cashier's check to David Osei at his Department of Banking hearing.  Gov. Exh. 604.

Later that day, he was served with a Grand Jury Subpoena, and in an attempt to obstruct justice

and avoid discovery of his Ponzi payments, Bick altered the cashier's check by writing "Artist

deposits for concerts" in order to create the appearance that the money was intended to be used

for concerts before turning it over to the authorities.  Gov. Exh. 604A.  David Osei testified that

the check was simply a return on his and his father's investment, not an artist deposit.  ("Q: And

that $22,500, did that represent the return of principal and interest on your loan investment? A:

Yes." Trial Tr. Vol. III (David Osei) at 590).

Bick further instructed his coconspirator to lie to the Connecticut Department of Banking and the U.S. Postal Inspectors. As Wrobel testified:

> "Q. Did you ask him any advice about how to answer questions?
> A. When I actually had to go in when it was coming close to my appearance date, there's some transactions that I knew they were going to ask me about. So I talked to Ian about those and asked him what I should say.
> Q. And what did he tell you to say if they asked you about some transactions?
> A. He told me to lie about what their actual purpose was."

Trial Tr. Vol. IV (Wrobel) at 938-39.  By instructing Wrobel to lie about the purpose of the transactions, Bick unlawfully influenced a witness and was successful in doing so because Wrobel did in fact tell the Connecticut Department of Banking under oath that the purpose of certain transactions was for the wholesale company.  *Id.* at 943.  This fits directly into the example enumerated in USSG § 3C1.1, Application Note 4(A), stating the offense level increase is warranted for "unlawfully influencing a witness, directly or indirectly, or attempting to do so".

Based on the conduct set forth above, the adjustment pursuant to U.S.S.G § 3C1.1 is applicable. Therefore, the Court should find that Bick obstructed or impeded the administration of justice and two additional levels should be added to the total offense level.

E.  Two Level Enhancement for Role in the Offense

As found by the Probation Office and asserted by the Government, Defendant Bick's offense level should be increased by two levels because of his role as the leader and organizer of the scheme pursuant to U.S.S.G. § 3B1.1(c).  Because Bick was the leader and organizer and undoubtedly the supervisor of the criminal activity, the Government contends that he deserves an additional guidelines enhancement.  Clearly Bick had more authority in the scheme than Wrobel and was the one making the decisions.  Mr. Wrobel could not have called or scheduled a meeting with victim-investors without Bick.  At trial, the Government introduced evidence of Bick's

leadership role in the scheme, as demonstrated by Wrobel's testimony:

- Bick approached Wrobel about incorporating Wrobel's small business into his own larger entertainment company. ("Q. Did he talk about you possibly taking this business model and expanding it greatly? A. Yes . . . We were at the Matrix and I had the business of selling iPhones but was also selling other electronics. Ian knew about this. So we were talking about it and he wanted to know if I could take it on a larger scale, buy more products and higher quantities and resell them for profits.") Trial Tr. Vol. III (Wrobel) at 770-71.

- If there was a meeting, Bick organized it and occasionally brought Wrobel along to advise about the electronics business. ("A. I was more of the operations side. I had the past experience with selling iPhones and electronics online myself. So I would tell them the logistics of everything and where we could buy this from, how much these things are going to cost, what we were going to mark them up for.") *Id.* at 788.

- Bick would take Wrobel's phone, change names it in, and text with himself to make it appear to victim-investors as though money was coming in from other sources when it was not.
  > "A. Another tactic used, he would either do it with my phone or we would do it together or with another phone. And what he would do is he would go into the contacts and change the contact name to either an investor name or someone like his aunt. And then he would text back and forth. For example, he was texting me, he would change my name in his phone to, for example, his aunt's name, so that he would text her, which was me, saying, you know, whatever he wants to say, and then he would use my phone to then respond with 'I'm sending a wire transfer for $175,000 to you in two days.'" Trial Tr. Vol. IV (Wrobel) at 924.

- Bick set the terms of each contract, including the interest return rates, rather than Wrobel. (Q. And what percent did Ian offer people? A. Percent varied. Usually they were always high. Thirty-five, 45 percent.") Trial Tr. Vol. III (Wrobel) at 788.

- Bick directed Wrobel to create fake spreadsheets about electronic pallet sales to show to Scott Tepper. ("A. So Ian, you know, Ian said send to Scott – he told me to come up with a spreadsheet, numbers that would represent what Scott's investment went towards.  Q. So Ian asked you to come up with some numbers?  A. Yes.  Q. What did you say to him? A. I said sure.") *Id.* at 808.

- Bick directed Wrobel to lie to the Connecticut Department of Banking about certain clothing transaction and Wrobel testified consistent with what Bick told him to do. Trial Tr. Vol. IV (Wrobel) at 938-44.

- If victim-investors were looking for their money back, they contacted Bick rather than

49

Wrobel to demand the returns on their money.

Clearly Defendant Bick was the one calling the shots. There is no indication that he needed to check in with Mr. Wrobel nor is there any indication that Bick and Wrobel were co-equals in the scheme. The criminal scheme was directed and organized by Defendant Bick and his role constitutes an aggravating role under the Guidelines.

In all, he had a larger degree of participation in planning and organizing the offense and a leadership role. *See United States v. Bealieau*, 959 F.2d 375, 379-380 (2d Cir. 1992) ("Whether a defendant is considered a leader depends on the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy."). As the Second Circuit articulated in *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002), "[a] defendant may properly be considered a manager or supervisor if he 'exercise[d] some degree of control over others involved in the commission of the offense . . . or play[ed] a significant role in the decision to recruit or to supervise lower-level participants.'" *Blount*, 291 F.3d at 217 (2d Cir. 2002) (alterations in original) (quoting *Ellerby v. United States*, 187 F.3d 257, 259 (2d Cir. 1998) (per curiam)). *Accord United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003).

Moreover, it is enough to manage or supervise a single other participant. *United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir. 1995). Once this management or supervision is found, the adjustment is mandatory. *United States v. Jimenez*, 68 F.3d 49, 51-52 (2d Cir. 1995). Thus, upon a finding that Bick had authority over Wrobel, that alone would be sufficient for the enhancement to apply.

Furthermore, and as noted earlier, Bick received most of the fraud proceeds. He

controlled the bank accounts, he alone directed how those funds were expended, and he alone laundered the stolen proceeds. Even though Mr. Wrobel had access to the bank accounts, Defendant Bick had such control over Wrobel that he could direct Wrobel to use his own money and bank accounts to make Ponzi-scheme payments. This fact, ultimate control over the finances of the operation, weighs in favor of this enhancement. *See United States v. Garcia*, 413 F.3d 201, 224 (2d Cir. 2005) (enhancement applies where defendant supervised the operations finances).

Therefore, the Court should find that Bick was the organizer of the scheme and in a leadership, manager or supervisory position as required by U.S.S.G. § 3B1.1(C). As Application Note 4 to U.S.S.G. § 3B1.1 explains, the factors the Court should consider to determine if Bick was an organizer, leader, manager or supervisor include "the exercise of decision making" (the trial evidence demonstrated that Bick was making all the decisions as to how the fraud proceeds were expended); "the claimed right to a larger share of the fruits of the crime" (the trial evidence demonstrated that Bick took the largest share of the fraud proceeds and spent the majority of the stolen funds on the personal expenses, such as casinos, shopping trips, and vacations); "the degree of participation in planning or organizing the offense" (the trial evidence demonstrated that Bick was the most involved individual in the participation of the offense as he obtained all the funds in his business's bank accounts, directed how the funds were expended via repeated acts of money laundering, and spent years lulling the victims through false, fraudulent and altered text messages and emails); and "the degree of control and authority exercised over others" (the trial evidence demonstrated that Bick had complete control over Wrobel in the operation of W & B Wholesale and told him when and where to invest money). Based on the factors set forth

51

above, the adjustment pursuant to U.S.S.G § 3B1.1(C) is applicable. Therefore, two additional levels should be added to the total offense level.

    F.  <u>No Credit For Acceptance</u>

As recommended by the Probation Office, Defendant Bick should not be awarded credit for acceptance of responsibility pursuant to U.S.S.G. § 3E.1.1(a). Mr. Bick opted to go to trial and put the Government to its burden of proof. The Defendant continues to maintain his innocence and is only sorry he was caught.  Furthermore, Bick produced false and altered documents during a Grand Jury proceeding, and committed perjury during his trial testimony to the jury. It would be wholly inappropriate to award credit for acceptance of responsibility when it is clear he has shown no remorse or acceptance for the wrongs he committed. Accordingly, the defendant's total offense level should remain at 28.  PSR at ¶ 22, 31.

    G.  <u>Adjusted Range of 78-97 months</u>

The defendant has a Criminal History Category of I.  A Criminal History Category I and a total offense level of 28 results in a guideline range of 78-97 months. The Government asserts that this is the proper calculation for Defendant Bick's offense level, including the additional two-level enhancement for sophisticated means.

**III.**  **<u>Discussion</u>**

    A**.**  <u>Restitution Must Be Made Part of the Sentence</u>

In addition to the period of incarceration, the defendant should be ordered to make full restitution to the victims of the fraud and forfeit all right, title, and interest in any and all property, real or personal, which constitutes the value of the proceeds traceable or derived from the fraud scheme.

The Mandatory Victims Restitution Act ("MVRA") provides, in part, that in sentencing a defendant convicted of a felony committed through fraud or deceit, the court must order the defendant to pay restitution to any identifiable victim directly and proximately harmed by the offense of conviction.  *See* 18 U.S.C. § 3663A(a)(2).  The procedures to be followed in determining whether, and to what extent, to order restitution pursuant to the MVRA are those set out in 18 U.S.C. § 3664.  *See id.* at § 3663A(d).  Section 3664 provides that "[i]n each order of restitution, the court shall order restitution to each victim **in the full amount of each victim's losses** as determined by the court and without consideration of the economic circumstances of the defendant."  *Id.* at § 3664(f)(1)(A) (emphasis added).   In connection with any proposed order of restitution, the sentencing court may refer any issue . . . to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.  *Id.* at § 3664(d)(6).  "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."  *Id.* at § 3664(e).

Here, the defendant caused financial harm to approximately 27 victim-investors, all of whom are entitled to restitution pursuant to 18 U.S.C. §3663A(a)(3). To this end, the Government calculates the restitution amount to be $495,886. (*See* Attachment A).  Accordingly, pursuant to MVRA, the Court should order full restitution.  *See* 18 U.S.C. § 3664(f)(1)(A); *United States v. Harris*, 302 F.3d 72, 75 (2d Cir. 2002) ( "[T]he district court was required to order restitution and determine the amount thereof without consideration of the economic circumstances of the defendant." ).

Title 18 U.S.C. § 3664(f)(3)(B) provides that if the Court finds that "the economic

circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments," then the Court may order that the defendant make nominal periodic payments. *See* 18 U.S.C. § 3664(f)(3)(B).

Based on the facts of this case, including the size of the restitution order and the lack of clear accurate information provided to Probation as well as the failure of Bick to comply with the Decemeber 14, 2015 Minute Order of the Court regarding an accountant (*See* Doc. No. 111), the Government cannot accurately state (without having seen a true financial affidavit or profit and loss statement from the defendant's business) whether or not the defendant would have the funds necessary (or any funds for that matter) to make full restitution.

Accordingly, as restitution is mandatory and considering the victims are entitled to and in many instances in need of restitution payments, the Court order full restitution in as much as the defendant can pay immediately and should set a restitution schedule that is fair and just and workable so that the defendant can and will meet his ongoing obligation for the remainder of the obligation.

Accordingly, the Government asserts that the Court should fix a schedule for payment of restitution, and in so doing, must consider the following statutory factors:

(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

(B) projected earnings and other income of the defendant; and

(C) any financial obligations of the defendant; including obligations to dependents

18 U.S.C. § 3664(f)(2).12 *See United States v. Catoggio*, 326 F.3d 323, 326 (2d Cir. 2003) ("Section 3664 also requires the district court to determine a schedule for payment of restitution.

18 U.S.C. § 3664(f)(2).  In doing so, the Court must consider the defendant's financial resources and other assets, his projected earnings, and his financial obligations.")   If the Court intends to establish a schedule of periodic payments that do not begin immediately, the Court should do so expressly and clearly, as the failure to set forth such a schedule may create a presumption that the entire restitution amount is payable immediately.  *United States v. Nucci*, 364 F.3d, 419, 421 (citing 18 U.S.C. § 3572(d)(1)).  Nonetheless, in cases where a periodic payment schedule is established, the payment schedule must "be the shortest time in which full payment can reasonably be made."  *See* 18 U.S.C. § 3572(d)(2).

Where a defendant has the capacity for future employment, the sentencing court should properly consider his potential future earnings in fashioning an appropriate payment schedule. *See United States v. Lino*, 327 F.3d 208, 210 (2d Cir. 2003) ("An order of restitution, if fashioned on a delayed schedule, will call for payment at times far in the future.").  The Second Circuit has found that the fact that a schedule necessarily involves some guesswork on the part of the Court regarding the defendant's future income is no impediment to the court making a reasonable prediction, based on information available at sentencing, regarding the amount of that income.  *Id.*; *United States v. Ismail*, 219 F.3d 76, 78 (2d Cir. 2000); *United States v. Atkinson*, 788 F.2d 900, 902 (2d Cir. 1986); *see also United States v. Kinlock*, 174 F.3d 297, 300 (2d Cir. 1999) ("a defendant's present financial situation does not eviscerate the district court's discretion to order restitution.").

Additionally, in fashioning a payment schedule that properly takes into account the defendant's personal expenses, the courts in this Circuit have frequently required defendants to pay a percentage of their income as restitution.  *See United States v. Fiore*, 381 F.3d 89, 98 n.9

(2d Cir. 2004) (sentencing court required the defendant to pay monthly installments following his release from incarceration; each monthly installment was based upon a formula which imposed a graduated percentage of his earned income based on the income amount); *United States v. Walker*, 353 F.3d 130, 132 (2d Cir. 2003) (sentencing court required the defendant to pay ten percent of his gross monthly earnings toward restitution during the 3 year period of supervised release); *United States v. Jaffe*, 314 F.Supp.2d 216, 226 (S.D.N.Y. 2004)(requiring the defendant to pay the greater of $150,000 or fifteen percent of his post-tax annual income on a monthly basis).

The Government asserts that the total amount of restitution to be ordered should be in the amount of $495,886.  *See* Attachment A.  Additionally, the Government proposes that setting a payment schedule requiring an amount or percentage of income per month, to be adjusted by probation based on the defendant's ability to pay, would be appropriate and would be reasonable and should use a figure that takes into account the concepts and the mandatory aspects of the restitution statute cited above.

Accordingly, the Court should order the defendant to make restitution, establish a payment schedule, designating when such payments should commence and how much the defendant should pay.  In doing so, the Court should insist on a clear and accurate financial statement and require further information be supplied by the defendant and/or defense counsel concerning the assets controlled by the defendant.  *See Hughey v. United States*, 495 U.S. 411, 413 (1990); *United States v. Germosen*, 139 F.3d 120, 131 (2d Cir. 1998); *United States v. Silkowski*, 32 F.3d 682, 689 (2d Cir. 1994).

Moreover, the restitution portion of the judgment can provide for periodic payments that

56

extend beyond any term of imprisonment and term of supervision, until the debt has been paid in

full.  Pursuant to 18 U.S.C. § 3613(b), a defendant's obligation to pay restitution does not expire

until, at the earliest, twenty (20) years after the entry of judgment.  *See* 18 U.S.C. § 3613(b), 18

U.S.C. § 3613(f) (making all provisions of 18 U.S.C. § 3613 applicable to restitution).  The

Court may set a date certain for payment of the balance of the restitution debt, but it is not

required to do so.  *See* 18 U.S.C. §§ 3572(d)(1) and 3664(f)(3)(A).  Moreover, as part of his

conditions of supervised release, the defendant can be required to make periodic payments.  The

end of the term of supervised released would in no way affect his continuing obligation to pay

the remaining restitution once supervision expires.  The imposition of restitution is a separate

part of his sentence from any period of incarceration and a term of supervised released.

      B.      <u>The Court Should Determine the Sentence Most Appropriate for Bick</u>

In *United States v. Crosby*, 397 F.3d 103, the Second Circuit explained that, in light of

*United States v. Booker*, 543 U.S. 220 (2005), district courts should engage in a three-step

sentencing procedure.  First, the district court must determine the applicable Guidelines range,

and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines

make relevant to the determination of a Guidelines sentence and all of the facts relevant to the

determination of a non-Guidelines sentence."  *Crosby*, 397 F.3d at 112.   That step is addressed

above.

Second, the district court should consider whether a departure from that Guidelines range

is appropriate.  *Id.* at 112.  There do not appear to be any grounds for a downward departure.

However, the Court may wish to consider an upward departure based on post-conviction conduct

while on supervision, specifically, traveling to New York to gamble rather than working to pay

money to the large restitution order and significantly the fraud perpetrated on the Mallow family

while on supervision.

Third, the court must consider the Guidelines range, "along with all of the factors listed

in section 3553(a)," and determine the sentence to impose. *Id.* at 112-13.

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient,

but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this

subsection," and then sets forth seven specific considerations:

(1)     the nature and circumstances of the offense and the history and characteristics of
        the defendant;
(2)     the need for the sentence imposed—
        (A)     to reflect the seriousness of the offense, to promote respect for the law,
                and to provide just punishment for the offense;
        (B)     to afford adequate deterrence to criminal conduct;
        (C)     to protect the public from further crimes of the defendant; and
        (D)     to provide the defendant with needed educational or vocational training,
                medical care, or other correctional treatment in the most effective manner;
(3)     the kinds of sentences available;
(4)     the kinds of sentence and the sentencing range established [in the Sentencing
        Guidelines];
(5)     any pertinent policy statement [issued by the Sentencing Commission];
(6)     the need to avoid unwarranted sentence disparities among defendants with similar
        records who have been found guilty of similar conduct; and
(7)     the need to provide restitution to any victims of the offense.

The Second Circuit has instructed district judges to consider the Guidelines "faithfully"

when sentencing. *Crosby*, 397 F.3d at 114. "*Booker* did not signal a return to wholly

discretionary sentencing." *United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006) (citing

*Crosby*, 397 F.3d at 113). The fact that the Sentencing Guidelines are no longer mandatory does

not reduce them to "a body of casual advice, to be consulted or overlooked at the whim of a

sentencing judge." *Crosby*, 397 F.3d at 113. Because the Guidelines are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596; *see also Rattoballi*, 452 F.3d at 133 (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting *United States v. Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (*en banc*); *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007).

The Second Circuit has "recognize[d] that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough*, 128 S. Ct. at 574 ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (quoting *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007)); *Rattoballi*, 452 F.3d at 133 ("In calibrating our review for reasonableness, we will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress.").

As the Court is well aware, Section 3553(a) provides that the sentencing court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing. The Court is no doubt familiar with this case having presided over the entirety of the jury trial to verdict. Thus the Court should, after considering all the information provided in this case, including the arguments of the parties advanced in the filings, the nature and characteristics

of the defendant, and all the 3553(a) factors, impose a sentence that (i) promotes respect for the law, (ii) serve as a "fair and just punishment" for Bick's fraud scheme in which more than 25 victims lost half a million dollars, including some like Ms. Osdranus who could not afford to lose the money, (iii) provides specific deterrence to Ian Bick who appears to be engaging in the same type of conduct and doesn't appear to take seriously the nature of the offense, (iv) addresses the seriousness of the crime, (v) avoids unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, (vi) provides restitution to the victims of the offense as discussed above, and (vii) that furthers all the goals of sentencing.

Accordingly, a sentence within the Guidelines range is appropriate when the Court takes into account the nature and characteristics of the Defendant, including both his repeated and blatant attempts to influence the Connecticut Department of Banking with his lies as well as those of Wrobel, his lies to the US Postal inspectors regarding his use of Henry Scozzafava's money, his repeated lies to the jury, his disregard for the role of the United States Probation Officers, and his disregard for the Orders of this Court.

1. <u>The Sentence Must Reflect the Seriousness of the Offense and Promote Respect for the Law</u>

There can be little doubt that this is a serious offense. Defrauding real hard working people, including the Paumes, the Burkes, Henry Scozzafava, Scott Tepper, Steve Lichtman, Gabe DeSiqueira (who about Bick's age) and Nataly Cardona-Vargas, as well as the numerous other victims, out of more than half a million dollars over a multiple year period is by any measure a very serious offense.

As detailed extensively above, Bick, together with his co-conspirator Wrobel, systematically lied to people – in many instances directly to their faces at in person

meetings and also *via* email and text message – and flat-out stole their money.  The amount of loss suffered does play and should play a crucial role in determining punishment for financial crimes.  However, here it is even more important and more pronounced because unlike perhaps a securities fraud case or mortgage fraud where the loss may have been driven in part by other factors or market forces, the seriousness of this case is demonstrated by the fact that Bick took and gained every dollar that he stole.  What he took from the victims, many of whom were friends and their parents, was his direct gain.

The way he took their money, including in their homes and sitting at their kitchen tables (Paumes) and stopping by their homes to pick up the checks (Atuahene) demonstrates the temerity that Bick demonstrated.  His constant lies regarding the money being on its way and the text messages saying he has it but the bank won't release the funds were remarkable.  Moreover, the way Bick spent the money with a 'care-free' 'devil may care' attitude underscores the brazenness of his greed and selfishness.  All of which the Court must consider.   These facts demonstrate not only the seriousness of the offense but the nature and characteristics of Bick the person.

This crime was neither a minor financial crime nor a one-time mistake of judgment.  To the contrary, Bick engaged in a carefully calculated fraud scheme over the course of more than a year, which required actively lying to investors.  This is by all accounts a serious offense, with a complex fraudulent scheme and at least 25 victim-investors.  The sentence in this case must reflect the seriousness of the offense committed by the defendant.

Any argument that the financial loss suffered in this case is not an appropriate measure of harm imposed belies credulity.  It is a longstanding legal, not to mention logical, principle that

loss is an appropriate and accurate method to measure the severity of economic crimes. An economic crime is saliently such a crime because of financial losses. There is an obvious connection between the amount of loss and the severity of a financial offense. A sentence with the appropriate amount of incarceration should be imposed in this type of case because Bick's fraud scheme and his money laundering in particular including buying Jet Ski's to use on Candlewood lake must be punished with a meaningful sentence.

Bick's entire enterprise was rampant with fraud, and adherence to the Sentencing Guidelines would ensure a just punishment. The Government respectfully submits that this factor warrants a sentence that does not deviate measurably from the Sentencing Guidelines.

The sentence must also be significant enough to promote public respect for the law and to demonstrate to the victims that those who commit financial crimes against individuals such as them and their families are not above the law. Moreover, the sentence in this case must promote respect for the law with respect to both Bick himself and to other potential white-collar criminals who would consider defrauding investors. A significant period of incarceration should be imposed in this case to demonstrate to Bick himself that his decision to repeatedly defraud investors of their investment funds has real consequences and that he will be punished with something more than a proverbial slap on the wrist and an order not to do it again. The sentence must especially promote that respect for the law here, in Bick's case, since he has been resistant to the Court's orders and disregarded Probation's supervision.

It assessing the seriousness of the offense and the need to promote respect for the law, it is the Government's position that the Court should sentence Bick to a term of

imprisonment consistent with the Guidelines, as such a sentence would be consistent with the seriousness, magnitude, and scope of Defendant Bick's conduct.

    2.  <u>The Court Must Address the History and Characteristics of the Defendant</u>

    According to the PSR, Bick grew up with both parents in his home and had a seemingly normal childhood.  PSR at 45.  In fact, based on the trial testimony it appears that Bick had a relatively normal and supportive hih school experience and even had employment at the Matrix while in school.  There does not appear to have been anything traumatic that would explain his extensive fraud.

    Bick does not appear to come from poverty or a broken home, but to the contrary he appears to have been given many of the advantages in life.  Yet he still made the decision, repeatedly to lie to his friends, their parents, and many others.  He seemed to have no difficulty sitting at dinner with Mr. Lichtman and lying directly to his face.  He had no difficulty going to Ms. Osdranus' home, with flowers no less, and stealing $6,000 from a woman who is on a fixed income.  *See* Attachment K.   Bick appears to have become a professional con-artist at a young age and seems to have not held a legitimate job in a number of years, at least since he stopped working at the matrix to "produce shows" and "sell electronics."

    Moreover, there is a real likelihood that the defendant will commit further crimes given that he has taken money from people while on supervised release and has apparently made no effort at restitution.   Bick took the stand and in addition to his lies he repeatedly told the jury that he planned to pay everyone back.  He seemed to like to state that he is working on the next project and will make it big and will somehow pay people back, but he doesn't seem to want to

work any job that requires him to punch a clock, earn a pay check, or draw a salary. Considering he still is engaged in the same professional endeavor and considering the fact that every project was proven to be a fraud, it is clear that the likelihood of recidivism is high.

Moreover, Bick appears to frequently blame others for causing the projects to fail. Even recently, he told the Mallow family (albeit falsely) that the Zomboy show was cancelled due to a radius restriction. He didn't tell them that Zomboy never agreed to perform in the first place. (Attachment M). Additionally, he told the Probation Officer that he had paid a refund (Attachment P (hand written notes)) but this was simply not true.

Bick's history and characteristics, which are detailed further in the post-conviction conduct set out below, do not provide this Court a real reason to depart significantly downward, if at all. Bick's utter lack of remorse or acceptance of responsibility for his crimes is striking. However, it is even more striking that he continues to engage in the same behaviors for which he was convicted. Bick clearly thinks he is above the law, and a lengthy prison sentence aimed at specific deterrence is clearly necessary to show Mr. Bick that he cannot continue to steal money from his friends and family and others.

In considering his history and characteristics, the Court will undoubtedly consider the defendant's age. Bick will undoubtedly ask that the Court take his age into consideration when determining his sentence. Under the Guidelines §5H1.1, age can be considered by the Court as a relevant factor to take into consideration, but it is not controlling as to whether a downward departure is warranted. In fact, much of the commentary discusses old age with respect to incarceration.

In this case, the Government asserts that Mr. Bick committed this fraud in spite of and

64

perhaps with the aid of his youthful age not because of it.  Additionally, many of the victims of

this crime were about the same age as Bick and thus in some sense vulnerable.  Bick also seemed

wise beyond his years in the ways of fraud as demonstrated by the fact that he befriended Henry

Scozzafava *after* Henry received a large settlement.  Thus, in many respects Bick was able to use

his age and that of his victims to get close to and defraud the victims.

    As the Court may recall, many of the victims who testified indicated how young and

bright and what a bright future they "thought" he had.  It clearly can be argued that the

youthfulness of Bick's appearance made him a wolf in sheep's clothing.  Thus, to a large extent,

age should be irrelevant for the purposes of sentencing.  Mr. Bick has showed that he is fully

capable of organizing a complex fraud and communicating as an adult, as he was able to swindle

$500,000 from people twice his age who had businesses and experience.  He used his age to

manipulate his friends and even friends' parents.  They didn't discount him because of his

youthful age, if anything their guard was down; they trusted him with their money and he stole it.

    This was not a scheme of youthful indiscretion – Mr. Bick knew exactly what he was

doing when he lied to 27 victim-investors about what he was using their money for and

subsequently lost or spent it all on his own personal whims.  The Government asserts that a

lesser prison sentence based on his youth would not be sufficient to promote the objectives of

specific deterrence, need for just punishment, and protection of the public.  As the Probation

Office aptly describes,

> "Mr. Bick's actions in the offense of conviction were *deliberate,
> callous and self-serving*. Throughout the presentence interview,
> Mr. Bick presented as an intelligent and quiet young man. His
> loved ones described him as loving, caring, loyal, and friendly,
> *qualities he possessed during the offense of conviction and likely
> utilized to gain the trust of his clients who ultimately became*

*victims*."

PSR at ¶¶ 87-88 (emphasis added).   Bick should not now get a benefit when he used his age to

in part commit the fraud.

### 3.  Court Should Consider Deterrence, Just Punishment, and Protection of the Public

One of the factors the Court must consider in imposing sentence is the need for the

sentence to "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  A

prison sentence for such conduct can serve as a powerful deterrent against the commission of

financial fraud and, in particular, investment fraud or Ponzi-schemes.   Thus, the Government

requests that the Court consider general and specific deterrence in fashioning an appropriate

sentence for the defendant.   The author of a survey of academic research regarding the

efficacy of criminal sanctions for white collar crimes found the following:

> White-collar crime is believed to be particularly amenable to deterrence due to its rational and profit-oriented motivation.  In a conceptual analysis of the topic, Braithwaite and Geis observed that white-collar offenders are not committed to a lifestyle of illegality, are risk aversive, and have more to lose as a result of a criminal conviction than street offenders.  Elsewhere Geis noted that "[j]ail terms have a self-evident deterrent impact upon corporate officials, who belong to a social group that is exquisitely sensitive to status deprivation and censure." It is generally perceived that executives exhibit distress at the thought of being sentenced to incarceration: "It results in hypertension, it causes heart attacks, it is very serious."
>
> Most judges and prosecutors view general deterrence as the one of the goals, if not the major purpose, in sentencing white-collar offenders. Punishment should serve to discourage others from committing similar offenses and jail or prison sentences, judges and scholars alike tend to believe, are particularly effective as a general deterrent.

Elizabeth Szockyj, "Imprisoning White-Collar Criminals?" from "Symposium: A Fork in the

Road: Build More Prisons or Develop New Strategies to Deal with Offenders," 23 S. Ill. U. L.J. 485, 492 (1999) (footnotes omitted).

More recently, the Second Circuit reiterated in *United States v. Cutler*, 520 F.3d 136, 162-63 (2d Cir. 2008) that, in a case involving bank fraud and a related tax offense, the sentencing court did not give sufficient justification for departing below the Guidelines range. Cutler, 520 F.3d at 162-63. Further, the Second Circuit found that the relative length of the sentence **does** seem to be important in providing deterrence. *See id.* at 163 (emphasis added).[11]

Defendant Bick also merits specific deterrence. There is simply no reason to believe that a below-Guideline sentence will curb Bick's tendency to lie, cheat, and steal. In fact, the defendant's perjury on the stand, followed by his claiming victory in social medial in the face of a multiple felony conviction demonstrates that he is as strident as ever that he was somehow wronged by this prosecution. Perhaps the proper remedy is a significant period of incarceration to provide him the specific deterrence to cause him to not allow his ego to get the better of him and come to grips with the reality that he is, at his core, a con-artist. Bick needs to be separated from the investing public for a sufficiently long period of time so that he may develop a sense of right and wrong and develop actual set of skills to seek employment rather than just the ability to lie and deceive.

In addition to deterrence there is also a need for punishment. The goal of affording just punishment would not be served by a significantly below Guideline sentence. Here, the

---

[11] While the Second Circuit abrogated *Cutler's* holding with respect to substantive review, see *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008), it did not undermine the rationale regarding the need for deterrence in white collar cases. *See id.* at n.7 ("This does not mean that we are questioning the result reached.").

defendant has been convicted of multiple counts of wire fraud, as well as a count of money laundering, so it is necessary for the Court to punish him justly as the Court would any other defendant who was also convicted of these offenses.   Moreover, in that regard, the need to avoid unwarranted sentence disparities among defendants similarly situated is controlled to a large extent by using the Guidelines as a starting point.

    4.   <u>Post-Conviction Conduct</u>

This may be one of the rare white collar cases where a significant term of imprisonment is necessary for specific deterrence as demonstrated by Bick's post-conviction conduct.

On the stand Bick lied about his conduct and he has yet to accept responsibility for the crimes he committed.   The Government was successful at trial as a jury verdict found Bick guilty of six counts of wire fraud and one count of money laundering.   Despite a jury verdict finding the defendant guilty of many of the charged counts, Bick still maintains his innocence. He has been resistant toward Court orders regarding his bond conditions, and he has made supervision difficult for Probation by not showing up to scheduled appointments and not providing adequate financial disclosures to Probation. PSR at ¶ 85.

Furthermore, and perhaps the most egregious of Bick's conduct, Bick continues to steal money from victim-investors.   Since the jury verdict, Defendant Bick continues to solicit "investments" from other contacts in the music industry, and uses those "investments" to leave Connecticut and gamble at Empire City Casino.

Not only did Bick initiate this investment scheme with dishonest intentions, he continues to perpetrate the same financial crimes for which he was convicted

The post-conviction violations include:

**First**: traveling out of the State of Connecticut.  Bick's travel was limited to the State of Connecticut, however he traveled to New York, without permission on multiple occasions.  As set forth in Attachment O and Q, the Government has gathered evidence establishing that Bick went to the Empire City Casino on at least the following days:

- April 11, 2016
- April 21, 2016
- April 22, 2016
- May 3, 2016
- May 12, 2016
- May 26, 2016

Additionally, when asked about his travel by his supervising probation Officer on August 5, 2016, Bick lied to the Probation Officer and stated he had not left the state.

**Second**: Bick has continued to take in newly-invested funds based on false representations.  As set forth above, since his conviction in November 2015, Bick solicited investments from among other individuals, Jake Mallow and his father Martin Mallow.  To date, the Mallows have invested approximately $10,000 with Bick for concerts.  As described in Attachment M, Bick told them first that the concert lost money.  Next he told them they had made money and could roll it over.  When they did roll over the investment and added $5,000 to it in early May, 2016 Bick told them the concerts did not happen.  See Attachment M.

To date, none of the funds that Bick took from the Mallows have been returned, with or without the high interest rate promised.  As with the same course of conduct established at trial, Bick sent a promissory note to the Mallows as recently as June 18, 2016, setting out a payment schedule in which he would pay the Mallows back and they were encouraged not go to the authorities.  (Attachment M)

69

Mallows have not received any funds as of August 31, 2016. Bick did not disclose to the Mallows his convictions, or of the enormous restitution that he owes. The Mallows knew nothing of Bick's recent convictions for wire fraud and money laundering when they invested with him in December 2015, March 2016, and May 2016.

Furthermore, Bick has used his father's catering business credit card merchant account, Some Things Fishy Catering to collect funds for Ian Bick. According to the Memorandum of Interview Michael Bick, Ian's father, told Mr. Mallow not to contact the authorities because he "would never get his money back that way." Attachment M.

Additionally, when asked about this contract and the money owed by his supervising probation Officer, Bick lied to the Probation Officer and stated he had returned the money. Attachment P (hand written notes). That statement was not true and no refund has been credited.

**Third**: Bick did not arrange for an accountant to meet with the Probation Officer as indicated in the Court's December 14, 2016 Minute Entry and Order. (Doc. No. 111.) Accordingly, the Supervising Probation Officer cannot ascertain Bick's true financial condition. Moreover, as Bick did not disclose the thousands of dollars he was gambling with in New York (Attachment Q, O) and thus it is doubtful that probation was provided accurate information about his financial affairs.

**Fourth**: Bick continues to overdraw his account and has numerous bounced checks. His casino expenditures are also evident: Bick received a $4,500 deposit from a Mr. Benz from California, presumably related to an event a Tuxedo Junction, however, immediately upon receipt on April 21, 2016 Bick subsequently withdrew $4,431.95 at Empire City Casino.

70

Attachment Q.  If this were in fact Business income it should not have been used for personal expenditures such as gambling.  It seems evident that Bick sees no need to report accurate financials to the Probation Office or the Court.

**Fifth**: Bick continues to show contempt for authority and fails to comply with rules and regulations.  While not as egregious as stealing nearly $10,000 while on supervision, Bick recently demonstrated a significant level of contempt for the fire safety laws at his club, Tuxedo Junction.  According to a report that Federal Agents received from the Danbury Fire Marshall, the fire suppression system at his club was disabled for months, which created substantial risk of injury to the patrons some of who are minors.  According to the report (Attachment R) Bick was aware it was off for months.  Additionally, Bick did not pay the fees associated with the inspection as businesses are required to do.

Luckily, no serious safety event occurred and while this incident is not directly related to the financial crimes for which Bick faces sentencing now, this demonstrates Bick's poor character, his incorrigible behavior since conviction, and his disrespect for the law.

**IV.**    <u>**Conclusion**</u>

Accordingly, for the reasons set forth in the PSR and those set forth in this Sentencing Memorandum, the Government asserts that under the circumstances of this case, given the seriousness of the conduct, the perjury and obstruction of justice, the failure to comply with conditions of supervised release, the defendant should receive a significant sentence at or near the Guidelines' range and be ordered to make full restitution.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

*Michael S. McGarry /S/*

MICHAEL S. McGARRY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT25713
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2016 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF.


____/s/_____

MICHAEL S. McGARRY
ASSISTANT U.S. ATTORNEY