UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.  3:15-CR-001(JAM) |
| v. | : | |
| | : | |
| IAN BICK | : | September 22, 2020 |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE**

The Government respectfully submits this memorandum in opposition to Defendant Bick's Motion For Early Termination of Supervised Release.  (Def. Mem. (Doc. No. 224)).  As discussed in more detail below, early termination of Defendant's supervision, less than halfway through the three-year term, is simply not warranted.  Defendant Bick, who was convicted of defrauding twenty-seven victims out of hundreds of thousands of dollars, still owes over $400,000 in restitution, has missed multiple restitution payments, and still needs the structure and supervision that the U.S. Probation office can provide.  Additionally, as addressed below and in Attachment A, a number of Bick's post incarceration statements about "getting back into" the concert promotion business provide the Court strong evidence that supervision is still necessary.

Furthermore, the defendant has not and cannot identify any significant change in circumstance that would warrant early termination of supervision.  The gravamen of his argument in support of his sought after early termination is that he has attained and maintained employment.  Employment does not amount to a significant change in circumstance.  Employment is a condition of Supervised Release that the Court and the United States Probation Office mandate and expect.  If Bick had failed to maintain employment, he potentially would be considered in violation of his conditions.  Additionally, Bick's claimed success in securing

employment and his record of failed restitution payments are incongruous.  If he is working as frequently as he claims, he should be making more payments, not fewer.

Finally, as the Court is well aware, Bick last stood before the Court as an incorrigible unrepentant conman, who had not only been convicted of operating an elaborate investment scheme, but who defrauded an additional family while on post-conviction supervision.  Bick also traveled out of state, without approval, and went to Empire City casino to gamble with the ill-gotten funds.  This was accomplished while he was purportedly under the watchful eye of a third-party custodian.  Bick's prior disregard for this Court's orders and his demonstrated contempt for the Court's authority, make this a case where continued supervision is entirely necessary.  This fact is further underscored by the fact that Bick was ordered to spend the first 12 months of supervision on home confinement, thus he has been off home confinement for a mere 4 months.

For the reasons set forth herein, and for all the reasons the Court originally concluded that Bick would benefit from 3 years of supervised release, the Government opposes the defendant's motion.  The defendant's motion should be denied.

I.    **Background**

A.    The Criminal Conduct

The defendant, Ian Bick, engaged in a Ponzi scheme to defraud 27 individuals out of over $500,000. (Pre-Sentence Report "PSR" at ¶¶ 6, 15, 24). This scheme lasted from approximately October 2012 to January 2015.  In execution of his fraud scheme, Bick falsely represented to his victims that he was operating a successful on-line electronics business and that investments would be expressly used to purchase more electronics devices to sell for significant profit. (PSR at ¶¶ 6, 15, 24; Dkt No. 135).  Bick also told a number of investors that he was running a

successful concert promotion business. This too was false. Bick lost money on concerts with such artists as Big Sean, Rusko, Crizzly, Electric Flurry, Kid Ink (2 shows) and Tyga.[1] He failed at promoting concerts but continued to take in investor funds and used the ill-gotten funds to pretend to be a successful promoter and to buy jet skis, take trips to California, Florida, and New York City, and to buy personal items at such places as Gucci, sunglasses hut, and at tattoo parlors. Bick also used the investors funds, which were represented as going to his internet business, to fund his failed nightclub business and to pay for his personal extravagancies.

On October 26, 2016, the defendant was sentenced by the district court to 36 months of imprisonment, followed by three years of supervised release, and ordered to pay $480,000 in restitution. (*See* DA27; SPA1-SPA-2). The restitution obligation remains outstanding and Bick has missed multiple months even at a drastically reduced amount.

B.    Post Incarceration

The defendant completed his term of incarceration on May 14, 2019. The defendant was Ordered to spend the first year of Supervised Release on home confinement. In February 2019, while still serving his period of incarceration in a halfway house, Bick gave an interview to the Connecticut Post. In an article published by the Connecticut Post, Bick told the reporter that he "wants to get back in the nightclub business." (Attachment A). Also in that interview, even after

---

[1]      Bick tried to promote concerts, but, as the evidence showed, Bick failed miserably as a concert promoter, did not make any profit on any of those attempts, and, in fact, lost money on all the shows. Trial Tr. Vol. IX (Bick) at 2471. Trial Tr. Vol. III (David Osei) at 564-565 (Q. And when you were in college, did you make money generally or lose money on these ventures? A. Lost money on the ventures); *Id.* at 570 (Q. Do you remember approximately how much Mr. Bick's partners put into Big Sean? A. I'd say maybe ten to 15,000. Q. How did it do? A. It lost money). *Id.* at 573 ("the Rusko show at the Ryan Center -- … how did that show do financially? A. Lost money"); *Id.* at 574-75 (Q. How did, overall, the Crizzly show do?  A. I'd say it was a loss. . . . Q. And did Ian Bick's company, Planet Youth Entertainment, lose money? A. Yes.); *Id.* at 575 (testifying that Electric Flurry at UMASS lost money); *Id.* at 617-18 (testifying that Kid Ink in Waterbury lost money and Kid Ink in Providence lost money); *Id.* at 619 (testifying that the show at Lupo's lost money); *Id.* at 622 (testifying that the Tyga concert at the University of Rhode Island lost $40,000 - $50,000).

three years of incarceration, Bick again demonstrated a complete lack of insight into his own criminal wrongdoing and seemed to continue to deflect responsibility onto his victims. Bick was quoted as saying, "We were kids. You give a kid a million bucks he's not going to go buy jet skis and take a couple trips?" *Id.* The comment bespeaks of blaming the victim and his being somehow not culpable. Bick went on to convey his continued bravado and his continued lack of regret, in telling the Connecticut Post, "I was desperate because I wanted to make Tuxedo Junction work so bad," he said. "I was able to turn $500 to $20,000 at the baccarat table. I don't regret that." *Id.* Additionally, in a February 2019 story published by a local radio station, 95 Rock, in which Bick's desire to return to the nightclub business was addressed, it led the author to ask rhetorically, "Wasn't that the impetus that led him down that rocky cliff in the first place?" https://i95rock.com/former-owner-of-danburys-tuxedo-junction-ian-bick-released-from-prison/.

As part of his original sentence, Bick was ordered to pay $1,000 per month towards restitution. Bick has not done this. After first having his monthly restitution amount reduced by the United States Probation Officer from the original Court-ordered $1,000 per month to $200 per month, Bick then had his monthly payments reduced again to $100 per month for a period of time, so he could buy a car.

Even at the reduced monthly payment obligation, Bick has missed payments for a number of months – during a number of the relevant months Bick made no voluntary payments. Bick made no voluntary payments in April 2019, May 2019, and June 2019. He made no voluntary payments in February 2020, or April 2020, or May 2020 and paid a mere $75.00 in June 2020. (Attachment B).[2] A number of the larger payments credited against Bick's financial obligation were obtained by way of a garnishment put in place by the United States Attorney's Office

---

[2]     The Government respectfully moves herein, to file the defendant's payment history as a separate sealed document based on the right to financial privacy.

Financial Litigation Unit, by way of the Treasury Offset Program ("TOP"), and were paid by his co-conspirator (*i.e.*, $37,913 in payments) who has now satisfied his financial obligations to the Court.

On September 8, 2020, the multiple missed payments notwithstanding, defendant filed a motion seeking early termination of his term of supervised release. Bick has served approximately 16 months of his term of supervised release. Thus, assuming that Bick actually did spend the first year of supervised release on home confinement, as he was ordered to do by the Court, that would me that after a mere four months of supervision, while not on home confinement, counsel has moved to have supervision terminated.

C.     <u>Victim Impact</u>

One of the victims who contacted the United States Attorney Office's Victim-Witness Coordinator stated the following:

> I also do not want to see the supervised release terminated early. There are people in jail for years for doing far far less than what he's done. As you mentioned in the letter, he still owes tens of thousands of dollars and maybe even hundreds of thousands of dollars in restitution. The motion also states that he has a girlfriend in South Carolina. I don't believe that he will continue to stay on track and pay towards the restitution without supervision, especially if he moves out of state. I also did not see that his family was the best influence on him when I attended the sentencing trial. They showed no concern for the people that he has hurt. Without court supervision this will not turn out well for any of the people whose lives he has already negatively impacted. I feel the "inconvenience" to him is quite a small price to pay for what he's done.

> I find it appalling that they're even requesting the early termination.

> Thank you for the chance to respond to this.

Attachment C (Victim Email to Victim-Witness Coordinator).[3]

---

[3]     The Government respectfully moves herein, to file the victim statement separately as a sealed document to protect the identity of the victim.

## II.    Legal Standard

Section 3583 of Title 18 of the U.S. Code authorizes the Court to grant early termination

of supervised release in certain circumstances.  That section provides:

> The court may, after considering the factors set forth in section 3553(a)(1),
> (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), and (a)(6)— terminate a term of
> supervised release and discharge the defendant released at any time after the
> expiration of one year of supervised release, pursuant to the provisions of the
> Federal Rules of Criminal Procedure relating to the modification of probation, if it
> is satisfied that such action is warranted by the conduct of the defendant released
> and the interest of justice.

18 U.S.C. § 3583(e)(1).  The factors referenced above include:

> (a)(1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;

> (2) the need for the sentence imposed—
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most effective
> manner;

> (4) the kinds of sentences and the sentencing range established for—
> (A) the applicable category of offense committed by the applicable
> category of defendant as set forth in the guidelines issued by the
> Sentencing Commission pursuant to section 994(a)(1) of title 28, United
> States Code, and that are in effect on the date the defendant is sentenced;
> or
> (B) in the case of a violation of probation or supervised release, the
> applicable guidelines or policy statements issued by the Sentencing
> Commission pursuant to section 994(a)(3) of title 28, United States Code;

> (5) any pertinent policy statement issued by the Sentencing Commission pursuant
> to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;

> (6) the need to avoid unwarranted sentence disparities among defendants with
> similar records who have been found guilty of similar conduct; and

> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The decision to grant early termination of probation or supervised release rests within the sound discretion of the court. *United States v. Rasco*, 2000 WL 45438 at *3 (S.D.N.Y., Jan. 19, 2000) (Haight, J.) (stating that defendant "maintained a record of good behavior in prison and has adjusted well to supervised release, model prison conduct and compliance with the terms of supervised release is what is expected of him and all others serving terms of imprisonment and supervised release and does not warrant early termination.") Early termination, however, is "not warranted as a matter of course." *United States v. Herrera*, 1998 WL 684471 at *2 (S.D.N.Y., Sept. 30, 1998). "It may be justified 'occasionally' in cases of new or unforeseen circumstances." *Id.* (citing *United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997)); *see Rasco*, 2000 WL 45438 at *1 ("Early discharge or another form of modification is appropriate to 'account for new or unforeseen circumstances' not contemplated at the initial imposition of supervised release."). "Such relief is warranted only '[o]ccasionally,' when 'changed circumstances — for instance, exceptionally good behavior by the defendant or a downward turn in the defendant's ability to pay a fine or restitution imposed as conditions of release — will render a previously imposed term or condition of release either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a).'" *United States v. Weintraub*, 371 F. Supp. 2d 164, 166 (D. Conn. 2005) (Arterton, J.) (quoting *Lussier*, 104 F.3d at 36).

It is not uncommon that even where a defendant is in compliance with his conditions of supervised release, that a request for early termination of supervised release is nonetheless denied, because compliance is what is expected by the Court. *See e.g.*, *United States v. Bastien*, 111 F. Supp. 3d 315, 322 (E.D.N.Y. 2015) (denying early termination where defendant's pre-and post-release conduct was apparently unblemished, and his efforts to seek medical treatment and educational and work opportunities were laudable. But holding that "[t]hese actions, however,

are expected of a person on supervised release, and are not so unusual as to merit early

termination."); *United States v. Fenza*, 2013 WL 3990914, at *1–2 (E.D.N.Y. 2013) (denying

early termination of supervised release where defendant, among other things, had completed two

of three years of supervised release without issue, returned to live with family in his childhood

neighborhood and house, regained operational management of his car service company and

developed it despite recession, and cared for his wife and grandchildren);  *United States v.

McKay*, 352 F.Supp.2d 359, 360–61 (E.D.N.Y. 2005) (denying early termination of supervised

release where defendant had flawless record during incarceration and fourteen months of three-

year period of supervised release, had health issues, was active member of community, took

responsibility for crimes, had never use drugs or abused alcohol, and had been meeting his

restitution obligation).

      In particular, payment of restitution obligations is also considered in determining if early

termination is or is not appropriate.  For example, in *United States v. Lagone*, 2017 WL 606016,

at *4 (E.D.N.Y. 2017) then District Judge, now Second Circuit Judge, Bianco denied defendant

Lagone's request for early termination of supervised release and found "given the serious nature

of defendant's underlying criminal conduct and his outstanding restitution payments, the Court

concludes that supervised release continues to be necessary to ensure that he does not return to

any criminal activity and ***that he fulfills his restitution obligations***." *Lagone*, 2017 WL 606016,

at *4 (emphasis added) (citing 18 U.S.C. §§ 3553(a)(2), (a)(7)). *See, e.g., Whittingham v. United

States*, 2017 WL 2257347, at *6 (S.D.N.Y. 2017) (denying early termination where petitioner

asserted that he had just been compliant with directives of the U.S. Probation Office and "still

ha[d] ***outstanding restitution obligations*** of approximately $248,000.") (emphasis added).

The defendant has the burden to demonstrate that the circumstances warrant early termination. *Rasco*, 2000 WL 45438 at *3 ("Neither the statute nor the relevant case law places an affirmative obligation upon the government to make a showing of compelling penal need before a defendant will be required to complete a validly imposed term of supervised release. If the defendant desires to have that period shortened, he must show that the circumstances warrant it, not that the government cannot prove otherwise.").

If the defendant presents no new or exceptional circumstances, early termination is not warranted. *Id*. ("While Rasco's good behavior in prison and on supervised release is laudable, I am not satisfied that his conduct has been so unusual as to merit the early termination of his supervised release."); Accord, *Herrera*, 1998 WL 684471 at *2 ("Although Herrera seems to have adjusted well to probation, there are ***no new or exceptional circumstances*** sufficient to warrant a termination of his probation term.") (emphasis added); *United States v. Martin*, 1992 WL 178585 at *1 (S.D.N.Y. 1992) ("The ***factors that led to imposition of the original sentence, however, remain unchanged***. . . . This court does not find, nor does defendant even offer, the existence of new circumstances that merit a modification of the original sentence.")(emphasis added).

Full compliance with the terms of supervision is expected and does not justify early termination. *Weintraub*, 371 F. Supp. 2d at 167 (denying 77-year old defendant's motion for early termination of supervised release in the absence of exceptionally good behavior or exceptional illness); *Rasco*, 2000 WL 45438 at *2; *United States v. Medina*, 17 F. Supp. 2d 245, 247 (S.D.N.Y. 1998) (finding that defendant's compliance "with the terms of his supervision is commendable, but ultimately that is what is expected of him"). If simple compliance with the

9

terms of the Court's supervision were sufficient to justify early termination, "the exception would swallow the rule." *Id.*

## III.    Discussion

### A.    Defendant's Motion for Early Termination Should be Denied

According to the Supreme Court, "Congress intended supervised release to assist individuals in their transition to community life.  Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000) (citing § 3553(a)(2)(D); and citing United States Sentencing Commission, Guidelines Manual §§ 5D1.3(c), (d), (e) (Nov. 1998)).  The 2018 version of the United States Sentencing Guidelines explains that the purpose of Supervised Release is "the integration of the violator into community life while providing the supervision designed to limit further criminal conduct." U.S. Sentencing Guidelines Manual, at ch. 7, pt. A(4) (2018).

Here both such goals are still needed.  Bick needs the guidance and supervision for his integration into community life while providing the supervision designed to limit any further criminal conduct.  Moreover, he need the supervision to assure he makes timely restitution payments to his many victims.

1.    Supervision Will Limit Further Criminal Conduct and Assure Payment of Restitution

Bick clearly needs both the integrative aspects of supervised release as well as the supervision designed to limit further criminal conduct and assure payment of restitution.  As the Court no doubt recalls, after Bick had been convicted and while on post-trial release, with an immediate family member acting as a third-party custodian, Bick violated his conditions of release, defrauded another family of thousands of dollars by promising to promote a concert and make great returns, and also violated other conditions of release.   On October 3, 2016, the United States Probation Officer supervising Defendant Bick filed a Form 8 Petition for Action

asserting a number of violations. (Doc. No. 168). On October 4, 2016, the Court held a hearing

on the Defendant's violations of conditions. At the hearing, the Court found that Defendant Bick

had failed to satisfy his burden of proving, by clear and convincing evidence, that he was not

likely to pose a danger to the safety of any other person or the community if he were to remain

on release, citing 18 U.S.C. § 3143(a)(1), and ordered Defendant Bick detained. (Doc. Nos. 171

and 172).

On October 26, 2016, the Court sentenced Bick to 36-months imprisonment, followed by

three years of supervised release, with the first year of the supervised release to be served as

home confinement. (Doc. Nos. 177, 178). As the Court itself observed, Bick treated supervision

as an inconvenience. Doc. No. 196 at 84.

Bick has only served 16 months of his 36-month term of supervised release. Moreover,

assuming Bick complied with the Court's Order and spent the first 12 months of supervised

release on home confinement, it follows that he has been living on his own with fewer

restrictions just a very few months. As the Court no doubt concluded based on the trial, the PSR

and Bick's conduct, Bick is plainly the type of individual for which supervision is appropriate.

This is true, for among other reasons, to limit further criminal conduct (as occurred post trial)

and to assist Bick in integrating back into community life. The four months on supervised

release and not home confinement – a good portion of which while the state and nation were on

lock down – is not and adequate period of supervision to achieve any of the goals or purposes of

supervised release. Based on his disregard of his obligations to follow the Court's instructions

previously, and his failure to make timely restitution, it makes little to no sense to end

supervision earlier than originally ordered. In fact, it could well be argued that Bick is an

individual who could benefit from the oversight, guidance, and structure that the United States Probation Office can provide.

Moreover, from a legal perspective and from an interests of justice perspective, Bick does not offer any information that would justify early termination of his supervised release. He makes no assertion of extraordinary conduct or changed circumstances that would make his supervised release unduly burdensome or harsh. Bick is the type of candidate who will benefit from the guidance provided by and the skills acquired from a complete three-year-term of supervised release, within the meaning and purpose of the statute. The interest of justice and victims' rights would counsel in favor of continued supervision to ensure restitution payments.

   2. Bick Has Failed to Make Court Ordered Restitution

Contrary to assertion by Bick's counsel, that he has made "all of his required [restitution] payments on schedule during the period of his supervision," (Def. Mem. at 3), he has not. Bick has missed a number of months during which he made no voluntary payments. Even after convincing the U.S. Probation Office to reduce his monthly restitution payments, from $1,000 per month to $200 per month and then to $100 per month, Bick made no voluntary payments in April 2019, May 2019, June 2019, February 2020, April 2020, or May 2020 and paid a mere $75.00 in June 2020. (*See* Attachment B). This poor payment history does not support an early termination of Supervised Release. This factor weighs heavily in favor of continued involvement of the Probation Office and continued supervision.

Bick claims, without submitting any time sheets or verification of employment, that he is working both a full time job at Whole Foods and working "30-40 hours a week at his second job." Def. Mem. at 3. Assuming it is accurate,[4] that Bick is and was working close to 80 hours a

---

[4]    This representation could not be confirmed through a conversation with the Supervising U.S. Probation Officer.

week while living at home with his parents, he should have had no difficulty making the original

court ordered $1,000 a month restitution, let alone the $200 per month that he failed to make.

Again, if Bick has been working close to 80 hours a week, then the restitution payments should

not have been reduced, and should immediately be restored to $1,000 a month.  Additionally, if

Bick has been working close to 80 hours a week, then he should be required to pay immediately

all restitution payments that are in arrears.

     Further, if he has in fact been working close to 80 hours a week, then the missed

restitution payments show a continued blatant disregard for his Court imposed obligations and

such flouting of the Court's Order could be seen as a violation of the conditions of his supervised

release.  That is, if he purposely failed to make payments that he otherwise could have made.  In

fact, Bick's failure to remain current with the Court Ordered restitution may require the Court to

schedule a compliance review hearing at a minimum or even a violation hearing.[5]  *See United

States v. Milne*, 771 Fed. Appx. 32, 34 (2d Cir.  2019) (affirming Judge Janet C. Hall's

imposition of a two-year sentence of incarceration on a violation of conditions of Supervised

Release for defendant's failing to make required payments to the SEC).

     It bears mention that the $37,913 in payments that were received in March of 2019 that

appear on Attachment B, were paid by a co-conspirator in Mr. Bick's case who is approximately

the same age as Bick and who has satisfied his own financial obligation to the Court and the

---

[5]     The law is clear with respect to a revocation of a term of supervised release.  The statute merely requires the court find, by a preponderance of the evidence, that the defendant violated a condition of his supervised release. 18 U.S.C. § 3583(e)(3). There is no requirement that a violation of a term of supervised release necessitates the finding that another crime was committed. *See Johnson v. United States*, 529 U.S. 694, 700 (2000) ("Although such violations often lead to reimprisonment, the violative conduct need not be criminal and need only be found by a judge under a preponderance of the evidence standard, not by a jury beyond a reasonable doubt) (citing 18 U.S.C. § 3583(e)(3)). *See also United States v. McNeil*, 415 F.3d 273, 277 (2d Cir. 2005) ("the imprisonment that ensues from revocation is partly based on new conduct, is wholly derived from a different source, and has different objectives altogether; it is therefore a different beast.")

victims.  Additionally, the $4,500 payment in April 2020 was obtained by way of a garnishment levied by the Financial Litigation Unit of the United States Attorney's Office (which Bick resisted) and the $953.52 in February of 2020 was received by way of a payment from the TOP.

Accordingly, since Bick has failed to pay voluntarily what he could have paid and has failed to stay timely with even the reduced restitution schedule, Bick's three year term of supervised release should be continued.  *See Lagone*, 2017 WL 606016, at *4; *Whittingham v. United States*, 2017 WL 2257347, at *6.

> C.     His Public Statements Should Convince the Court that Supervision is Needed

The defendant's public statements, made after his period of incarceration, that he is determined to engage in the line of business that led to the criminal scheme should give the Court great concern.  As the Court no doubt recalls, Bick used stolen funds to create the appearance that he was a successful concert promoter and used victim money to support his outsized lifestyle.  Any return to this "business" without serious Probation Office Supervision will likely lead to a similar result.  Bick's assertions, coupled with his failure to pay timely restitution, demonstrates that there has not been a significant change in the defendant's character or circumstances such that early termination would be warranted.  *See Herrera*, 1998 WL 684471 at *2 ("there are no new or exceptional circumstances"); *Martin*, 1992 WL 178585 at *1 ("The factors that led to imposition of the original sentence, however, remain unchanged.").

> **B.     The character and history of the defendant and the nature and circumstance of the offense (18 U.S.C. § 3553(a)(1))**

The character and history of the defendant have not changed and the nature and circumstance of the offense were -- and remain -- serious.  The underlying conduct in this matter was serious: the defendant engaged in a multi-year fraud through which he defrauded his friends, their parents, and others out of hundreds of thousands of dollars.  He falsified documents, created

false IPhone invoices, created fake texts, lied to people, took their money and spent the money as if it were his own.  Bick testified at trial and the jury rejected his testimony.  Upon sentencing, the Court stated to the defendant "[y]ou treated your supervision conditions as inconveniences." (*See* ECF at 84). This attitude and outlook appear not to have significantly changed.  The defendant's description of his term of incarceration continues to convey a sense of irreverence. (See Attachment A).[6]

The record in this case demonstrates a history of disregard for the authority of the Court. This was made evident by his decision to violate bond, to defraud the Mallow family, and to leave the state of Connecticut and gamble at a New York casino prior to sentencing.  His personal history suggests that his federal conviction was a not a one-time aberrant event.  Bick's poor character has again been demonstrated by his most recent failure to make timely payments to his victims.

The main point cited by defendant in support of terminating his supervised release is that he has worked and that he wants to visit his girlfriend in South Carolina. (Doc. 224 at 5).  As one of the victims impacted by the offense conduct stated, "I don't believe that he will continue to stay on track and pay towards the restitution without supervision, especially if he moves out of state." (Attachment C (victim impact statement)).  The Government shares this concern.  He now finds himself having failed to pay hundreds of thousands of dollars in restitution, and yet articulates that he would like to go see his girlfriend, presumably using money that could otherwise be used to pay restitution.  It appears by all accounts, that the character and history of Bick supports continued supervision.

---

[6]    See Jordan Fenster, https://www.ctpost.com/local/article/Out-of-jail-Ian-Bick-wants-to-get-back-in-the-13590198.php.

**C.      The need for adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B)).**

The need for specific and general deterrence is served by continued supervision.  This is true in light of the fact that Bick's crime was a financial crime, and in light of the continued importance of reminding Bick as well as fraudsters in general that financial crimes are taken seriously.  Bick in particular and defendants in general should be reminded that the financial component of a federal sentence is an equally important part of the Court's Judgment.  In fact, for many of the victims, and to society in general, continued supervision to insure full restitution is necessary.  Additionally, continued supervision is also appropriate as a deterrence to future criminal conduct by Bick.

Briefly put, Bick is not current on his financial obligations and thus he needs to be supervised so that he does not fail to pay.  Terminating a period of supervised release when the defendant has made such a minimal effort towards restitution would send the wrong signal to this defendant and to financial criminals generally.  Moreover, the investing public trusts that when a criminal sentence has a financial component it will be respected.

Furthermore, the defendant fails to argue any particular hardship or injustice that would result from his completing his 3-year term of supervised release.  The defendant argues that given COVID-19, probation resources should be spent elsewhere. This argument has no merit. The U.S. Probation Office can supervise Bick and other defendants.  The Probation Office is comprised of talented Probation Officers who can supervise numerous defendants even in this challenging environment.  In fact, it may be easier and more efficacious to supervise Bick since his compliance can, to a large extent, be confirmed by reviewing bank records and employment records.   Additionally, Bick may, in some respects, benefit more than other defendants by the good guidance and steady hand of the Probation Officers.  The United States Probation Office's

resources should be allocated for specifically this purpose, to help offenders like Bick transition to a law-abiding life. Ending supervision while he is not in compliance, would undermine the purpose of supervised release and would not be a deterrent to future criminal conduct nor would it create the right incentives to other defendants on supervised relase.

Additionally, the defendant's statement that he plans to get a "book deal" about his criminal conduct, evidences the defendant's lack of remorse and failure to appreciate his situation. He's a convicted felon, not a celebrity. It also underscores his need for supervision and rehabilitative support from trained probation officers not enablers. Such supervision will hopefully ensure that he will be deterred from engaging in the type of conduct that landed him in federal prison in the first place.

Finally, Bick's desire to travel more frequently to South Carolina, currently a national hotspot of COVID-19, is a fact that tends to undermine his argument.

### D. The need to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C)).

Though his employment at Whole Foods appears steady, getting a job is exactly what is expected of him and every other person serving a term of supervised release. A steady job is not evidence of extraordinary conduct or evidence of new or exceptional circumstances that might warrant an early termination.

In the article published shortly after his release, the defendant told the Connecticut Post he was planning on going back into the concert promoting business. He also said, "[w]e were kids. You give a kid a million bucks he's not going to go buy jet skis and take a couple trips?" Additionally, a February 2019 published by a local radio station reported the same desire to return to the nightclub business. These statements of intent weigh heavily in support of

continued supervision to advance the goal of protecting the public from further crimes of the defendant, pursuant to 18 U.S.C. § 3553(a)(2)(C)).

**E.      The kinds of sentence available, the Guidelines calculation, and sentencing policy statements  (18 U.S.C. §§ 3553(a)(4) and (a)(5)).**

In the absence of a showing of extraordinary circumstances, the defendant's motion for early termination should be denied.  *See United States v. Gentile*, 2007 WL 2009779 at *1 (D. Conn. July 5, 2007) (denying early termination even though defendant "paid his fine, maintained successful employment, and continued stable and supportive relationships with his girlfriend and family. . . . [T]he conduct [defendant] cites amounts to compliance with the conditions of supervision, not 'extraordinary conduct' worthy of early termination"); *Medina*, 17 F. Supp. 2d at 247 (holding that compliance with conditions of release "alone cannot be sufficient reason to terminate the supervised release since, if it were, the exception would swallow the rule").

This defendant already received a significant break from the Court in terms of the period of incarceration.  Even considering that Bick violated his conditions of release the Court sentenced the defendant well below the recommended Guidelines range. The 36-month sentence of imprisonment was significantly below the calculated advisory Guidelines range of 63-78 months imprisonment. (PSR at ¶ 70.) Having already been given the trust of the Court in that regard, it would behoove Bick to take advantage of the Probation Office's support and return to making on time payments in the amount agreed upon.

**F.      The need to provide restitution to any victims (18 U.S.C. § 3553(a)(7)).**

This factor has been discussed at length above, and while the defendant contends that he works a second job to make progress with paying off the restitution, the Government, having

reviewed the actual payment history, remains unconvinced.  The defendant's unimpressive record of missing restitution payments, which were already reduced from $1,000 to $200 per month, makes the sentencing factor of 'needing to provide restitution to any victims pursuant to 18 U.S.C. § 3553(a)(7)' even more important.

Bick was permitted to reduce the required payments to $100 for the months of November and December 2019 but has missed many other months.  The defendant's failure to make timely restitution, in full, every month, demonstrates the ongoing need for supervision.   This statutory factor weighs heavily in favor of continued supervision.

## III.    Conclusion

For the foregoing reasons, the defendant's motion to terminate his supervised release should be denied.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY


/s/
MICHAEL S. McGARRY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct 25713
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.:    (203) 821-3700
michael.mcgarry@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 22, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ _____
Michael S. McGarry
Assistant United States Attorney